**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DISTRICT OF COLUMBIA, | |
| Plaintiff, | |
| v. | Case No. 1:21-cv-03267-APM |
| PROUD BOYS INTERNATIONAL L.L.C. *et al*., | |
| Defendant. | |

**PLAINTIFF DISTRICT OF COLUMBIA'S OMNIBUS OPPOSITION TO
<u>DEFENDANTS' MOTIONS TO DISMISS</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...............................................................................1

FACTUAL BACKGROUND...................................................................................5

    A.    Leading Up to and Immediately Following the 2020 Presidential Election, the Proud Boys and Oath Keepers Prepare to Incite Violence in the District ........................................................................5

        1.    The Defendants Carefully Coordinate Their Efforts to Plan the Attack.............................................................................7

        2.    Recruitment.......................................................................7

        3.    Disguising Identities ........................................................8

        4.    Collection of Weapons and Tactical Supplies ................8

        5.    Travel Arrangements .......................................................9

    B.    As January 6 Approaches, the Defendants Fervently Promote the Attack and Issue Calls to Action ..............................................10

    C.    On the Eve of the Attack, the Defendants Assemble Forces in the District ......................................................................................11

    D.    The Defendants Execute the January 6 Attack, Using Coordinated Violence to Disrupt the Election Certification Process ............................12

    E.    The Defendants Attack MPD and Other Law Enforcement Officers, Causing Severe Physical and Psychological Harm ..................15

    F.    Insurrectionists, Including Defendants, are Criminally Indicted and Some Plead Guilty ..................................................................17

ARGUMENT.........................................................................................................18

I.     Legal Standards ........................................................................................18

II.    The District Has Standing to Pursue Its Claims. ....................................19

    A.    The District Has Article III Standing to Assert Its Claims......................19

        1.    The District Suffered Actual, Concrete and Particularized Injuries. ............................................................20

        2.    The District's Harms Are Fairly Traceable to the Conspiracy. ...................................................................28

    B.    The District Has Statutory Standing to Assert Its Claims Under 42 U.S.C. §§ 1985(1) And 1986. ...............................................32

III.   The District Has Adequately Pleaded Each of Its Claims. .....................38

    A.    The District Has Stated Claims Under Section 1985(1)...........................38

        1.    The District Plausibly Alleged Defendants' Involvement in the Conspiracy. ..............................................................39

2.      There is No State Action Requirement for Section 1985(1) Claims. ........................................................................45

3.      Generally Applicable Pleading Standards Apply to Section 1985(1) Claims. ...........................................................47

4.      The District's Injuries were Caused by the Conspiracy. ..............48

B.   The District Has Stated Claims Under Section 1986................................49

C.   The District Has Stated Civil Conspiracy Claims for Assault, Battery, and Intentional Infliction of Emotional Distress.........................52

IV.   The January 6 Attack Was Not Protected Speech Under the First Amendment.................................................................................................56

V.   The Amended Complaint Does Not Violate Federal Rule of Civil Procedure 8. ..............................................................................................60

CONCLUSION...................................................................................................62

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acosta v. Islamic Republic of Iran*,
574 F. Supp. 2d 15 (D.D.C. 2008)................................................................56

*Adinolfe v. United Techs. Corp.*,
768 F.3d 1161 (11th Cir. 2014) ...................................................................21

*United States v. Aetna Cas. & Sur. Co.*,
338 U.S. 366 (1949).....................................................................................25

*Arias v. DynCorp*,
752 F.3d 1011 (D.C. Cir. 2014)..............................................................22, 31

*Armstrong v. F.A.A.*,
296 F. App'x 88 (D.C. Cir. 2008)...............................................................45

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................18, 61

*Atchley v. AstraZeneca UK Ltd.*,
22 F.4th 204 (D.C. Cir. 2022)....................................................................56

*Attias v. Carefirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017)..........................................................18, 19, 28

*Bank of Am. Corp. v. City of Miami, Fla.*,
137 S. Ct. 1296 (2017).................................................................................33

*Banneker Ventures, LLC v. Graham*,
798 F.3d 1119 (D.C. Cir. 2015) ..................................................................19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................47

*District of Columbia v. Beretta, U.S.A., Corp.*,
872 A.2d 633 (D.C. 2005) .................................................................25, 26, 28

*Bowie v. Maddox*,
642 F.3d 1122 (D.C. Cir. 2011)....................................................................49

*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993).....................................................................................46

*Bushrod v. District of Columbia,*
    521 F. Supp. 3d 1 (D.D.C. 2021)..........................................................................52, 53

*Carpenters Indus. Council v. Zinke,*
    854 F.3d 1 (D.C. Cir. 2017)...........................................................................................20

*Ciralsky v. C.I.A.,*
    355 F.3d 661 (D.C. Cir. 2004)................................................................................60, 61

*Coleman v. Drug Enf't Admin.,*
    134 F. Supp. 3d 294 (D.D.C. 2015)..............................................................................28

*Competitive Enterprise Institute v. Mann,*
    150 A.3d 1213 (D.C. 2016)........................................................................................53, 54

*Cottrell v. Alcon Labs.,*
    874 F.3d 154 (3d Cir. 2017)..........................................................................................20

*Danvers Motor Co. v. Ford Motor Co.,*
    432 F.3d 286 (3d Cir. 2005).........................................................................................20

*Evans-Reid v. District of Columbia,*
    930 A.2d 930 (D.C. 2007).......................................................................................52, 53

*Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.,*
    749 A.2d 724 (D.C. 2000)............................................................................................53

*Fair Emp. Council of Greater Washington, Inc. v. BMC Mktg. Corp.,*
    28 F.3d 1268 (D.C. Cir. 1994).....................................................................................28

*Farah v. Esquire Magazine,*
    736 F.3d 528 (D.C. Cir. 2013)......................................................................................47

*Ferrer v. CareFirst, Inc.,*
    265 F. Supp. 3d 50 (D.D.C. 2017)................................................................................18

*Flaherty v. Bryson,*
    850 F. Supp. 2d 38 (D.D.C. 2012)................................................................................31

*Food & Water Watch, Inc. v. Vilsack,*
    808 F.3d 905 (D.C. Cir. 2015)................................................................................21, 28

*Freedom Watch, Inc. v. Google Inc.,*
    816 F. App'x 497 (D.C. Cir. 2020)...............................................................................29

*Halberstam v. Welch,*
    705 F.2d 472 (D.C. Cir. 1983)..............................................................................*passim*

iv

*Harris v. U.S. Dep't of Veterans Affs.*,
   776 F.3d 907 (D.C. Cir. 2015) .................................................................54

*Hildebrand v. Vilsack*,
   102 F. Supp. 3d 318 (D.D.C. 2015) ........................................................20

*Kotsch v. District of Columbia*,
   924 A.2d 1040 (D.C. 2007) .....................................................................54

*United States v. Kuehne*,
   No. 1:21-cr-00160-TJK (D.D.C 2021), ECF No. 132 ...............................40

*Kurd v. Republic of Turkey*,
   374 F. Supp. 3d 37 (D.D.C. 2019) ..........................................................43

*Kush v. Rutledge*,
   460 U.S. 719 (1983) .................................................................................46

*La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya*,
   477 F. Supp. 2d 131 (D.D.C. 2007) ........................................................24

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty*
   *Abuse–Wisconsin, Inc.*,
   991 F.2d 1249 (7th Cir.1993) .................................................................45

*Lagayan v. Oldeh*,
   199 F. Supp. 3d 21 (D.D.C. 2016) ..........................................................44

*Levine v. Nat'l R.R. Passenger Corp.*,
   80 F. Supp. 3d 29 (D.D.C. 2015) ............................................................21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) .....................................................................28, 32, 33

*Liggins v. O'Sullivan*,
   No. 3:19-CV-50303, 2022 WL 787947 (N.D. Ill. Mar. 15, 2022) .............46

*Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*,
   657 F. Supp. 2d 104 (D.D.C. 2009), *aff'd*, 383 F. App'x 1 (D.C. Cir.
   2010) ........................................................................................................48

*Love v. Bolinger*,
   927 F. Supp. 1131 (S.D. Ind. 1996) ........................................................36

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...........................................................................19, 28

*Magruder v. Cap. One, Nat'l Ass'n,*
    540 F. Supp. 3d 1 (D.D.C. 2021) ...................................................................18

*Marsh v. Barry,*
    705 F. Supp. 12 (D.D.C. 1988) .....................................................................48

*Maynard v. Melton,*
    2021 WL 6845008 (D.D.C. Apr. 7, 2021) ....................................................61

*Middlebrooks v. St. Coletta of Greater Washington, Inc.,*
    2009 WL 3163061 (D.D.C. Sept. 30, 2009) ................................................60

*Miller v. Bill Harbert Int'l Const., Inc.,*
    608 F.3d 871 (D.C. Cir. 2010) .....................................................................48

*Mitchell v. Cnty. of Nassau,*
    No. 05-4957-SJF-WDE, 2007 WL 1580068 (E.D.N.Y. May 24, 2007) ...................50

*Montgomery v. Risen,*
    197 F. Supp. 3d 219 (D.D.C. 2016), *aff'd*, 875 F.3d 709 (D.C. Cir.
    2017) ............................................................................................................47

*United States v. Nordean,*
    No. 21-cr-175 (D.D.C. 2021) .......................................................................17

*Novotny v. Great Am. Fed. Sav. & Loan Ass'n,*
    584 F.2d 1235 (3d Cir. 1978), *vacated on other grounds*, 442 U.S. 366
    (1979) ...........................................................................................................34

*Odish v. Apple, Inc.,*
    No. 15-CV-11955, 2015 WL 6507427 (E.D. Mich. Oct. 28, 2015) ..........................37

*Peavey v. United States,*
    128 F. Supp. 3d 85 (D.D.C. 2015) ...........................................................19, 31

*Peck v. United States,*
    470 F. Supp. 1003 (S.D.N.Y. 1979) .............................................................50

*Pierce v. Yale Univ.,*
    2019 WL 162029 (D.D.C. Jan. 10, 2019), *aff'd on other grounds*, 788
    F. App'x 1 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 362 (2020) ...............29

*United States v. Price,*
    383 U.S. 787 (1966) .....................................................................................35

*United States v. Rhodes, III,*
    No. 22-cr-00015 (D.D.C. 2022) ..............................................................17, 18

*United States v. Richardson*,
418 U.S. 166 (1974)........................................................................20

*Rossy v. Puerto Rico Police Dep't*,
Case Civ. No. 08-2167, 2009 WL 1140174 (D.P.R. Apr. 24, 2009)............37

*Scott v. District of Columbia*,
101 F.3d 748 (D.C. Cir. 1996)..............................................................52

*Simmons v. Abruzzo*,
49 F.3d 83 (2d Cir.1995) ...........................................................60, 61

*Sines v. Kessler*,
324 F. Supp. 3d 765 (W.D. Va. 2018)..................................21, 29, 35, 44

*Smith v. Kaufman*,
No. 21-cv-2170 (D.D.C.) (Complaint filed August 13, 2021) ...................25

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016)........................................................................20

*Stern v. U.S. Gypsum*,
547 F.2d 1329 (7th Cir. 977) ........................................................35, 46

*Tabron v. Trump*,
No. 22-cv-11 (D.D.C.) (Complaint filed January 4, 2022)........................25

*Tah v. Glob. Witness Publ'g, Inc.*,
991 F.3d 231 (D.C. Cir. 2021)..............................................................47

*Thompson v. Trump*,
Nos. 21-cv-400, 21-cv-586, 21-cv-858, 2022 WL 503384 (D.D.C. Feb.
18, 2022)....................................................................................*passim*

*Transamerica Ins. Co. v. South*,
125 F.3d 392 (7th Cir. 1997) ................................................................24

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021)........................................................................19

*Trew v. Am. Inst. of Intradermal Cosms., Inc.*,
2005 WL 1079316 (W.D. Tenn. May 3, 2005) ........................................60

*United Bhd. of Carpenters & Joiners of Am., Local 610, AFL–CIO v.
Scott*,
463 U.S. 825 (1983)..................................................................35, 46

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*,
 529 U.S. 765 (2000).................................................................................23

*Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan*,
 518 F. Supp. 993 (S.D. Tex. 1981).....................................................50, 51

*Whitehorn v. F.C.C.*,
 235 F. Supp. 2d 1092 (D. Nev. 2002).......................................................37

**Statutes**

42 U.S.C. § 1985.........................................................................................*passim*

42 U.S.C. § 1986.........................................................................................*passim*

18 U.S.C § 2384...........................................................................................58

Assault Weapon Manufacturing Strict Liability Act of 1990.............................25

D.C. Code § 4–602 ......................................................................................25

D.C. Code § 5–603 ..................................................................................24, 25

D.C. Code § 5–133.17 ..................................................................................36

D.C. Code §§ 5–602 ....................................................................................24

**Rules and Other Authorities**

Congressional Globe, 42d Cong., 1st Sess. at 568 (1871)................................35

Fed. R. Civ. P. 8 .......................................................................................*passim*

Fed. R. Civ. P. 9........................................................................................47

Fed. R. Civ. P. 12.......................................................................................18

Fed. R. Civ. P. 17..................................................................................25, 28

U.S. Constitution .......................................................................................*passim*

Plaintiff District of Columbia ("Plaintiff" or "the District") submits this consolidated opposition to five separate motions to dismiss the District's Amended Complaint (ECF No. 94, the "Amended Complaint") filed by 8 of the 37 named Individual Defendants—Klein, Kuehne, C. Meggs, K. Meggs, Minuta, Pepe, Steele, and Ulrich—and joined by Defendants Harrelson, Biggs, Tarrio, and Worrell.[1]  For the reasons set forth below, each of the Defendants' motions should be denied.

## PRELIMINARY STATEMENT

On January 6, 2021, a violent mob of insurgents, led by and including the Defendants and their coconspirators, stormed the United States Capitol building with the express purpose of preventing members of Congress and the Vice President from discharging their official constitutional duties and declaring Joseph Biden the winner of the 2020 Presidential Election.  The leaders, members, and affiliates of the Defendant organizations—the Proud Boys and the Oath Keepers—worked together to plot, recruit participants for, finance, and ultimately carry out an attack on the Capitol (the "Attack").

As a result of Defendants' actions—and as they had planned—thousands of individuals, including the Defendants, convened on the grounds of the U.S. Capitol, stormed police barricades, and forced their way inside the Capitol to disrupt the members of Congress and the Vice President who were carrying out their constitutional and statutory duties of receiving and counting the Electoral College votes.  Among those injured in the Attack were scores of officers of the District's

---

[1]   As of the date of this filing, Defendant Worrell's motion for joinder (ECF No. 140) has not been granted.  Nonetheless, for purposes of efficiency and convenience of the Court, the District addresses the applicability of the moving Defendants' arguments to Worrell as if the joinder had been granted.  Two Defendants filed answers to the Amended Complaint (ECF No. 101 (Defendant Moerschel), 117 (Defendant Caldwell)).  Service has not yet been completed on three Defendants (Defendants Ochs, Schaffer, and Vallejo).  The District effected service of the Amended Complaint on Defendant Bru on July 18, 2022, who has until August 12, 2022 to respond.  The remaining Defendants have failed to timely respond to the Amended Complaint.

Metropolitan Police Department ("MPD"), approximately 1,000 of whom were deployed to the Capitol and the surrounding area in the wake of the insurrection.  The Defendants brutalized these officers, causing extensive physical and mental injuries—at terrible cost borne by the officers, and in turn, the District of Columbia.

The District brought this action to hold the Defendants accountable for the Attack they unlawfully planned, coordinated, and participated in, and to deter the Defendants and others from returning to the District to engage in additional acts of violence.  In their motions to dismiss, the Defendants attempt to evade accountability for the laws they violated by contending that the District does not have constitutional standing to pursue its claims, that it does not have statutory standing to assert claims under 42 U.S.C. §§ 1985(1) and 1986, and that it did not adequately allege violations of 42 U.S.C. §§ 1985(1) and 1986 and various common law tort claims.  The Defendants' arguments are all without merit.

As an initial matter, the contention that the District does not have constitutional standing— because the District's alleged injuries purportedly were neither concrete and particularized, nor traceable to the Defendants' actions—disregards the well-pleaded facts in the Amended Complaint.  The District specifically alleged the concrete, particularized injuries it suffered, including, but not limited to, the costs the District has already paid, and continues to pay, for medical care and other treatment provided to injured MPD officers.  These injuries are traceable to the Defendants, who are alleged to have planned and participated in the conspiracy that caused the District's injuries.

The Defendants also argue that the District does not have "statutory standing" under Sections 1985 and 1986 because the District and its MPD officers are not "federal officers" or "federal officer holders."  But Section 1985 expressly authorizes any individual and entity injured

2

by those engaged in a Section 1985(1) conspiracy to assert a Section 1985 claim, not just federal officers.  Case law further supports that non-federal officers can bring claims under Section 1985. The Defendants' argument that the District does not have statutory standing to assert a claim under Section 1986 fails for the same reason.

Additionally, the Defendants assert that the District's 119-page, meticulously detailed Amended Complaint does not plausibly allege facts sufficient to adequately plead each of its claims.  Specifically, the Defendants claim that:  (1) the Amended Complaint fails to allege their involvement in a Section 1985 conspiracy, (2) the Amended Complaint failed to allege that the District's injuries were caused by the Section 1985 conspiracy, (3) the District's Section 1986 claim fails because the Defendants were not powerful enough to prevent commission of the Section 1985 conspiracy with "reasonable diligence," and (4) the Amended Complaint failed to allege facts sufficient to show that the Individual Defendants, by name, engaged in assault, battery, and/or intentional infliction of emotional distress.  Each of these arguments also fails.

*First*, in related cases, this Court already found that the facts of the January 6 Attack were adequate to plead the existence of a Section 1985 conspiracy that included "the Proud Boys, the Oath Keepers, [Proud Boys Chairman] Tarrio, and others who entered the Capitol on January 6th with the intent to disrupt the Certification of the Electoral College vote through force, intimidation, or threats." *Thompson v. Trump*, Nos. 21-cv-400, 21-cv-586, 21-cv-858, 2022 WL 503384, at *33 (D.D.C. Feb. 18, 2022).  Accordingly, the Amended Complaint—which alleges the same key facts as the complaints addressed in the Court's *Thompson* decision—sufficiently alleges the Defendants' involvement in a Section 1985 conspiracy.  Moreover, each of the Defendants has been charged with crimes arising from their involvement in the January 6 Attack, with several of the Defendants having been charged with, or having pleaded guilty to, seditious conspiracy.  These

3

criminal allegations, which are incorporated by reference in the Amended Complaint, further support the Defendants' involvement in the conspiracy.

*Second*, there is similarly no question that the Amended Complaint plausibly alleges that the District's injuries were caused by the Section 1985 conspiracy—and by the Defendants' involvement in that conspiracy. The Amended Complaint not only describes each Defendant's individual acts of violence, but also alleges that Defendants played a leading role in unleashing a larger mob. Because Defendants' conduct was designed to bring about, and substantially contributed to, the larger mob's violence, Defendants' conduct is a proximate cause of that violence. Indeed, in *Thompson*, this Court found it "apparent" that injuries resulting from the January 6 Attack were caused by each coconspirator in the Section 1985 conspiracy. *Id*. at *10.

*Third*, the Defendants' argument that they did not have the power to prevent the commission of the Section 1985 conspiracy through "reasonable diligence"—and therefore are not adequately alleged to have violated Section 1986—has no basis in law. The Defendants have not cited, and the District cannot identify, any authority supporting the notion that an individual must have a position of power in a conspiracy in order to violate Section 1986. Moreover, the Amended Complaint plausibly alleges that the Defendants did not take *any* steps, let alone "reasonably diligent" steps, to prevent the conspiracy. Indeed, the Amended Complaint makes clear that the Defendants took actions to hide their conspiracy from authorities and ensure that it was carried out to maximum impact.

*Finally*, the Defendants' argument that the District did not plausibly allege claims for assault, battery, and intentional infliction of emotional distress (IIED) fundamentally misunderstands the nature of conspiracy. Because the District plausibly alleged that Defendants entered into a conspiracy for the purpose of disrupting the certification of the Electoral College

votes ("Certification") in violation of Section 1985(1), Defendants are vicariously liable for all reasonably foreseeable tortious acts taken by coconspirators in furtherance of that goal.

Contrary to Defendants' assertions, their conduct does not qualify as protected speech under the First Amendment.  Nor is the Amended Complaint so "confusing" that it must be dismissed for failure to state a short and plain statement of the District's claims.  The miscellaneous assortment of other arguments and defenses asserted by the Defendants—too numerous to recount in detail in this preliminary statement, many of which this Court has already rejected in related cases—similarly have no basis in law or fact.  The Defendants' motions to dismiss should be rejected in their entirety.[2]

## FACTUAL BACKGROUND

This Statement of Facts is drawn from the Amended Complaint's well-pleaded allegations and certain documents incorporated therein by reference.  The District respectfully refers the Court to the Amended Complaint for a fuller recitation of the relevant factual background.

**A.    Leading Up to and Immediately Following the 2020 Presidential Election, the Proud Boys and Oath Keepers Prepare to Incite Violence in the District**

Proud Boys International L.L.C. (the "Proud Boys") is a U.S.-based group that promotes and engages in political violence.  Am. Compl. ¶ 11.  At the time of the Attack, its Chairman was Henry "Enrique" Tarrio.  *Id.* ¶ 44.  Nineteen of the 37 named Individual Defendants are members or affiliates of the Proud Boys.  *Id.* ¶¶ 13-15, 17-18, 20-22, 25, 27-28, 33-34, 37-39, 42, 44, 48.

The Oath Keepers, a nonprofit corporation founded and led by Elmer Stewart Rhodes III, is an anti-government militia movement group united by baseless conspiracy theories.  *Id*. ¶¶ 12, 40.  Eighteen of the 37 named Individual Defendants are members or affiliates of the Oath Keepers.

---

[2]    As noted *supra* n. 1, Defendant Caldwell filed a *pro se* answer in this case on June 16, 2022 (ECF No. 117).  Insofar as the Court may construe his arguments as the equivalent of a motion to dismiss, they fail for all of the same reasons set forth herein.

*Id*. ¶¶ 16, 19, 23-24, 26, 29, 30-32, 35-36, 40-41, 43, 45-47, 49.   The Proud Boys and the Oath Keepers—and their members and affiliates—have historically engaged in a range of violent activities, including, in the case of the Oath Keepers, coordinated armed standoffs with federal authorities.  *Id*. ¶¶ 61-66, 80-87.

As the 2020 Presidential Election approached, Defendants openly advertised their willingness to use violence to secure a second term for then-President Donald Trump.  *Id.* ¶ 95. For instance, when, during a presidential debate in September 2020, President Trump stated, "Proud Boys, stand back and stand by," *id.* ¶ 96, Proud Boys leader and moving Defendant Joseph Biggs posted publicly on Parler, "Trump basically said to go fuck them up!  [T]his makes me so happy," *id.* ¶ 98.   Proud Boys' Chairman Tarrio also posted, "[s]tanding by sir."   *Id.* ¶ 98. Likewise, Oath Keepers members planned their course of action if President Biden were to be elected.   *Id.* ¶ 100.   As one member explained, that plan included "[c]hoos[ing] a side and fight[ing], looking down the sights of a rifle at our fellow Americans."  *Id.*

In the days following the election—as President Trump falsely promoted the baseless theory that he had won the election—the Defendants trumpeted their plans to bring terror and violence to the District and recruited others to join their efforts.  *Id.* ¶¶ 102-10.  On November 9, 2020, Oath Keepers leader Rhodes hosted an online "[n]ational" members' call, during which he outlined a plan to stop the lawful transfer of presidential power, including by force.  *Id.* ¶ 111. Rhodes urged listeners, including Defendants K. Meggs, Harrelson, Watkins, and Hackett, to go to the District, explained that others should stay outside the city "fully armed and prepared to go in armed, if they have to," *id.*, and threatened a "bloody, bloody civil war," *id.*; *see also* ¶¶ 111-15, 117, 121-22 (other Oath Keepers Defendants planned for violence).  During the same period

of time, Tarrio and other Proud Boys Defendants similarly promoted violence as a response to Biden's electoral victory. *Id.* ¶¶ 116, 118-19, 123-26.

### 1.     The Defendants Carefully Coordinate Their Efforts to Plan the Attack

On December 19, 2020, President Trump announced on Twitter a "[b]ig protest" in the District "on January 6th," saying "Be there, will be wild!"   January 6 was the date on which members of Congress and the Vice President were required, under the U.S. Constitution and federal law, to count the certified electoral votes and formally declare the winner of the presidential election. *Id.* ¶¶ 138-39.  Immediately after President Trump's December 19 announcement, Proud Boys Defendants and Oath Keepers Defendants began coordinating the Attack.  *Id.* ¶¶ 141-42. Oath Keepers member and moving Defendant Kelly Meggs announced "an alliance between Oath Keepers, . . . and Proud Boys," adding that the two organizations "have decided to work together and shut this shit down."  *Id.* ¶ 141 & Fig. 2.  Over the next several days, Kelly Meggs elaborated on this alliance in Facebook posts, writing, among other things, that "at least 50-100" Oath Keepers would be in the District on January 6; that they would join with the Proud Boys, whom Meggs described as a "force multiplier"; and that the two groups would position themselves for maximum impact. *Id.* ¶ 144 & Fig. 3; *see also* ¶¶ 146-47 & Fig. 4 (detailing the plan that the Oath Keepers and Proud Boys "orchestrated").

There were several facets to the Defendants' coordinated planning efforts, including recruiting new members, strategizing to disguise their identities, collecting weapons and tactical supplies, and arranging travel to the District.

### 2.     Recruitment

As January 6 neared, Defendants intensified their efforts to recruit coconspirators.  *Id.* ¶ 149.  Some Defendants posted calls to action on social media.  *See, e.g.*, *id.* ¶¶ 152, 155-56.

Defendants also hosted online meetings, *id.* ¶ 154, and expressed their perceived need to recruit "real men," *id.* ¶ 157.   Tarrio and other Proud Boys members created a new "national rally planning" chapter—the "Ministry of Self Defense," or "MOSD"—that would include only "hand-selected" members from across the country.  *Id.* ¶¶ 158-59.

### 3.    Disguising Identities

Many Defendants designed strategies for disguising their identities in order to gain a tactical advantage against law enforcement during the Attack.  *Id.* ¶ 160.  For example, Proud Boys Defendants announced plans to attend the January 6 rally "incognito" and not "in colors"—the traditional black and yellow worn by Proud Boys members—so that they would blend in with the crowd.  *Id.* ¶¶ 161-66.

Both Defendants Proud Boys and Defendants Oath Keepers also coordinated strategic methods for secret communication before and during the Attack, including encrypted and invitation-only messaging that facilitated ongoing communication.  *Id.* ¶¶ 167-69.

### 4.    Collection of Weapons and Tactical Supplies

Oath Keepers members amassed weapons, ammunition, and tactical gear in advance of the Attack.  *See* ¶¶ 170-82.  As just one example, Oath Keepers member and moving Defendant Ulrich described plans to prepare a backpack filled with ammunition that he could use in case "shit truly [hits the] fan," and to "run[] around" carrying a "budget AR[-15]."  *Id.* ¶ 173.  Oath Keepers members also created a "Quick Reaction Force," or "QRF," whose members would bring weapons, ammunition, and tactical equipment to a staging area in Virginia for potential use in the District. *Id.* ¶¶ 174-76.  In the days leading up to January 6, certain Oath Keepers Defendants, including Defendants Rhodes, K. Meggs, Harrelson, Watkins, James, Hackett, Moerschel, Ulrich, and Vallejo, along with other coconspirators, transported firearms, ammunition, and other equipment

to the Washington D.C. metropolitan area. *Id.* ¶ 178. Defendant Rhodes alone spent $15,500 on these firearms and related equipment. *Id.* ¶ 179.

Proud Boys members also obtained tactical vests and military-style communications equipment that could be used during the Attack. *Id.* ¶ 183. Defendant Nordean—the self-described "Sergeant-at-Arms" of the Seattle chapter of the Proud Boys—used social media to solicit donations of "protective gear" and "communications equipment" for the Attack. *Id.*

### 5.    Travel Arrangements

As part of their planning, promotion, and coordination efforts leading up to the January 6 Attack, Defendants arranged to travel with coconspirators or reserve nearby hotel accommodations to allow for additional in-person coordination before convening near the Capitol on January 6. *Id.* ¶ 185. In particular, Oath Keepers Defendants including Caldwell, Watkins, S. Parker, B. Parker, K. Meggs, and C. Meggs coordinated to convene at the Comfort Inn Ballston in Arlington, Virginia. *Id.* ¶ 186. There, as part of their coordination efforts, Oath Keepers Defendants reserved three rooms for various Quick Reaction Force teams—which would travel from as far as Arizona, North Carolina, and Florida and use those rooms to store and guard firearms. *Id.* ¶¶ 186, 188.

Other Oath Keepers Defendants also communicated with one another as they coordinated travel, lodging, and weapons collection and storage. *Id.* ¶¶ 187, 189-99. As just one example, on January 5, Defendant Steele—firearms in tow—traveled with others from North Carolina to the Washington D.C. metropolitan area and checked into the Holiday Inn in Springfield, Virginia; when Steele went into the District the following day for the Attack, she left those firearms in her group's vehicle in the hotel parking lot. *Id.* ¶ 200. In another instance, Defendants C. Meggs, K. Meggs, and Harrelson attended a firearms class together. *Id.* ¶ 198.

Proud Boys Defendants also coordinated travel to the District. *Id.* ¶ 201. Using an encrypted messaging application, Defendant Greene participated in a planning channel among

Proud Boys chapters in New York whose members planned to travel to the District. *Id.* Greene also coordinated plans with Defendant Pezzola and other Proud Boys members. *Id.* Defendants also fundraised, *see, e.g.*, *id.* ¶ 202, and paid for one another's travel costs, *id.* ¶ 203.

### B.   As January 6 Approaches, the Defendants Fervently Promote the Attack and Issue Calls to Action

Both publicly and in encrypted messages, the Defendants made their plans clear:  on January 6, they would assemble in the District to stop the lawful transfer of presidential power. *Id.* ¶¶ 204-37.  Oath Keepers leader Rhodes stated explicitly in an interview that if President-elect Biden assumed the presidency, then a "massively bloody revolution" would be necessary. *Id.* ¶ 207.  Rhodes published an open letter on the Oath Keepers' website referencing the Certification of the Electoral College vote that would take place on January 6 and stating that "tens of thousands of patriot Americans" would be in the District, that many would stow "mission-critical gear" just outside the District, and that he and others might have to "take to arms in defense of our God given liberty." *Id.* ¶ 208.  As January 6 drew nearer, Rhodes continued to advocate using force to stop the lawful transfer of presidential power. *See, e.g.*, ¶¶ 210-12.  Other Oath Keepers leaders and Defendants joined Rhodes in calling for "action" in the District on January 6 and announcing their intent to use violence to stop the Certification of the Electoral College vote. *E.g.*, *id.* ¶¶ 206, 213, 216-17.  On January 4, K. Meggs expressed contempt for District police officers, writing on Facebook, "Fucking DC cops protect those antifa fuckers though pisses me off." *Id.* ¶ 215.

Over the same period of time, Proud Boys Chairman Defendant Tarrio and other Proud Boys Defendants similarly intensified their promotion of the January 6 Attack. *Id.* ¶ 218.  In messaging groups consisting of MOSD leaders, members, and prospective members, Tarrio announced a "top down structure" and advised prospective members to follow leadership's directions, *id.* ¶¶ 219-20, 222-23, 225; and MOSD members discussed "storm[ing] . . . the capital

[*sic*]," "push[ing] thru police lines," and "stack[ing] . . . bodies in front of Capitol Hill," *id*. ¶ 233. The Proud Boys' operation was explicitly aimed at keeping Trump in power. *Id*. ¶ 221. Tarrio promoted the Attack to as many as 7,000 followers on Telegram, asking: "[w]hat if we invade it?" The first reply answered: "January 6th is D day in America." *Id*. ¶ 234. Another MOSD leader stated in a voice note that the "main operating theater" should be in front of the Capitol, "where the vote is taking place." *Id*. ¶ 236.

Between December 30 and December 31, 2020, a John Doe Defendant sent Tarrio a nine-page document titled "1776 Returns," which detailed a five-part plan for the occupation on January 6 of six to seven government buildings—including House and Senate office buildings around the Capitol—in an effort to keep Trump in power. *Id*. ¶¶ 226-29. Part of this document, labeled the "Patriot Plan," was apparently intended for public distribution and recommended storming the target buildings on a timeline that coincides with when the Attack on the Capitol took place. *Id*. ¶ 229.

On January 4, as Tarrio arrived in the District, he was arrested for burning a church banner after a pro-Trump rally in December 2020. *Id*. ¶ 238. While arresting Tarrio, MPD officers discovered he possessed two illegal high-capacity firearm magazines bearing the gold Proud Boys insignia. *Id*. Within an hour, other MOSD leaders created new encrypted messaging groups in an effort to evade detection by law enforcement, and then carried on with their planning. *Id*. ¶¶ 239-42.

C.      **On the Eve of the Attack, the Defendants Assemble Forces in the District**

By January 5, Proud Boys and Oath Keepers Defendants implemented their plan to descend on the District. Am. Compl. ¶ 243. Undeterred by law enforcement efforts to prevent violence and with open disdain for police officers, *id*. ¶¶ 262-68, Defendants stored their firearms, confirmed one another's locations, mapped routes to the Capitol, programmed handheld radios,

set up yet another encrypted messaging group, and finalized the plan for the following day, *id*. ¶¶ 244-61.  Proud Boys Defendants planned to assemble at the Washington Monument at 10:00 a.m. on January 6, disguised in non-Proud Boys' colors.  *Id*. ¶¶ 254-55.  They also reestablished contact with Proud Boys Chairman Tarrio, after his release from jail.  *Id*. ¶¶ 256-60.

After Tarrio's release—while Tarrio was under a court order to leave the District and less than 24 hours before the January 6 Attack—Tarrio and Oath Keepers leader Rhodes met in a parking garage near the Phoenix Park Hotel in downtown Washington D.C.  *Id*. ¶¶ 274-75 & Fig. 5.  Four John Does also attended this gathering, which lasted approximately 30 minutes.  *Id*. ¶ 275.  A film crew was also present and detected audio of one participant referencing the Capitol.  *Id*.  At the gathering, Tarrio told another individual that he had cleared all messages from his phone before his arrest and that no one would be able to access the contents of his phone because "two steps" were required to gain access.  *Id*.  Tarrio then left the District for Baltimore, Maryland, and used other John Doe coconspirators' phones to make calls and access his encrypted messaging accounts. *Id*. ¶ 276.

In the early morning on January 6, the Defendants traveled together and convened in the District.  *Id*. ¶ 278.  The Defendants took their positions: Proud Boys' leadership prepared to convene at the Washington Monument at 10:00 a.m., while Oath Keepers Defendants armed themselves and monitored communications.  *Id*. ¶¶ 277-82 & Fig. 6.

### D.   The Defendants Execute the January 6 Attack, Using Coordinated Violence to Disrupt the Election Certification Process

Around 10:00 a.m. on January 6, approximately 100 Proud Boys members from across the country, including many Individual Defendants, convened at the Washington Monument.  *Id*. ¶ 285.  As President Trump spoke at his rally, they marched to the Capitol, led by Proud Boys leaders including Defendants Nordean and Biggs, and encouraged by President Trump's calls to

action.  *Id*.  ¶¶ 286-92, 294-96.   Oath Keepers Defendants equipped themselves with communication devices, reinforced vests, helmets, and goggles.  *Id*. ¶ 301.

By approximately 11:30 a.m, a large mob had congregated outside the Capitol, including Proud Boys and Oath Keepers leaders, certain Defendants, and other members and affiliates.  *Id*. ¶ 304.  The Attack escalated around 1:00 p.m., as the Joint Session of Congress and Vice President Pence convened to carry out their constitutional and statutory duties of receiving and counting the Electoral College votes.  *Id*. ¶¶ 313-14.  MPD and Capitol Police officers in riot gear arrived at the steps of the Capitol.  *Id*. ¶ 314.  Undeterred, the mob—including certain Defendants—pushed forward, assaulted officers, and rushed toward the Capitol building.  *Id*. ¶ 315.  Proud Boys and Oath Keepers Defendants led the charge, both on-site and by directing and urging on their coconspirators in encrypted chats.  *Id*. ¶¶ 316-30, 340, 349-54.

Several Proud Boys Defendants and others, led by moving Defendant Biggs and other Proud Boys leaders, succeeded in overwhelming the police officers, breached barricades, and stormed into the plaza on the west side of the Capitol building.  *Id*. ¶¶ 308-12.  Oath Keepers Defendants were among the first to breach the barricades on the Capitol's east side and rushed toward the steps leading up to the east-side Rotunda doors.  *Id*. ¶ 331 (explaining that Harrelson rushed to be in front of the mob storming the Capitol's east side).  Proud Boys member Defendant Pezzola used a stolen Capitol Police riot shield to break a window of the Capitol and climbed inside.  *Id*. ¶¶ 333-37 & Fig. 14.

As the afternoon went on, more Defendants and coconspirators breached the Capitol building.  Shortly after 2:25 p.m., a group of Oath Keepers and John Doe Defendants—including moving Defendants Harrelson, Steele, K. Meggs, and C. Meggs—joined to form a "military stack" ("Stack One") formation and maneuvered up the Capitol steps in a coordinated fashion, with each

person's hand on the shoulder of the person in front of them.  *Id.* ¶¶ 345, 347-48 & Fig. 15.  Stack One forced its way through the Rotunda door at the center of the east side of the building.  *Id.* ¶ 356-58.  In order to breach the building, the Stack assaulted police officers by throwing objects at and deploying chemical irritants against them.  *Id.* ¶ 356.  Additional Oath Keepers Defendants, including moving Defendant Ulrich and moving Defendant Minuta, who was armed with bear spray and tactical gear, formed a second Stack ("Stack Two") that forcibly entered the Capitol following the same path that Stack One had taken a few minutes earlier.  *Id.* ¶¶ 369-70.  Livestreamed video footage showed a scene of violence and terror; as the videographer narrated, "flash bombs [were] going off.  Rubber pellets were flying everywhere.  Tear gas was everywhere."  *Id.* ¶ 371.

Once inside the Capitol building, the Defendants pushed past law enforcement toward the Congressional chambers in pursuit of the federal officials carrying out the election Certification process.  *Id.* ¶¶ 372, 375-76, 398.  For example, Oath Keepers member Defendant James—with Oath Keepers member Defendant Minuta's encouragement—approached MPD Officer J.M., yelled at him, grabbed his vest, and pulled him toward the mob.  *Id.* ¶ 376.

Defendants' shared objective was clear:  to prevent members of Congress and Vice President Pence from executing their official duties to certify the Electoral College results.  *See id.* ¶¶ 378-79; ¶ 385 (certain Defendants carried plastic zip handcuffs for capturing and detaining members of Congress).  Indeed, multiple Defendants admitted as much in their guilty pleas.  *See*, *e.g.*, *id.* ¶¶ 359, 380.  Oath Keepers Defendant Young admitted in his plea agreement that the goal was to impede Congress's Certification of the Electoral College vote, *id.* ¶ 359, and Proud Boys Defendant Greene admitted the same, *id.* ¶ 380.  Others flaunted on social media that they had breached the House and Senate chambers.  *See*, *e.g.*, *id.* ¶ 384.

The Attack posed a serious threat to members of Congress, the Vice President, and congressional staff—so much so that the Joint Session was halted, and Congressional chambers were evacuated.  *See id*. ¶¶ 381-83.  The Joint Session could not reconvene until hours later, at approximately 8:00 p.m., and at 3:40 a.m. on January 7, the Vice President finally affirmed the election results and formally declared now-President Biden the President-elect.  *Id*. ¶ 389.

Throughout the Attack, the Defendants kept in communication with one another.  *Id*. ¶ 403.  Oath Keepers leader Rhodes coordinated logistical details in real time and instructed Oath Keepers Defendants to report to a particular area on Capitol grounds opposite from where the Proud Boys were positioned.  *Id*. ¶¶ 340, 343-46; *see also id*. ¶ 362 (Crowl later confirmed that Defendants simultaneously attacked the Capitol building through separate doors).  Over two-way radios, phone calls, encrypted messaging applications, and social media, the Defendants continued to coordinate their movements.  *Id*. ¶¶ 403-08, 413-15.  Defendants also exchanged information about the locations of members of Congress, who were hiding from the mob.  *Id*. ¶ 409-10.  One coconspirator communicated to Oath Keepers Defendant Caldwell:  "All members are in the tunnels under capital [*sic*] seal them in.  Turn on gas."  *Id*. ¶ 411.  Defendant Tarrio posted publicly on social media, encouraging his coconspirators by stating that he was "enjoying the show" and directing them: "don't fucking leave."  *Id*. ¶¶ 349, 351; *see also, e.g*., ¶¶ 363, 366-67.

### E.    The Defendants Attack MPD and Other Law Enforcement Officers, Causing Severe Physical and Psychological Harm

The Attack necessitated an unprecedented deployment of MPD resources.  *Id*. ¶ 457.  The District deployed approximately 850 MPD officers to the Capitol, and approximately 250 additional MPD officers to the area to support the response and aftermath.  *Id*.  MPD officers had to engage in battle for hours, many forced into hand-to-hand combat to protect the Capitol from the Defendants and their cohort.  *Id*. ¶ 448.

Defendants, their coconspirators and other members of the mob, viciously attacked the police officers who tried to defend the Capitol, members of Congress, and the Vice President from the insurrectionists. *Id.* ¶ 393; *see also id.* ¶ 376 (describing Defendant James' attack on MPD officer J.M.). One MPD officer was beaten by the mob with sticks and crutches, including by one person wielding an American flag. *Id.* ¶ 396 & Fig. 32. That MPD officer later recalled in testimony before the House Select Committee that his attackers lunged at him and tried to grab his gun while chanting "kill him with his own gun." *Id.* ¶ 396. One of the Defendants ripped an officer's riot shield as the officer was physically engaged with others. *Id.* ¶ 397. Other Defendants joined a mob pushing against a line of riot police officers guarding the hallway connecting the Rotunda to the Senate. *Id.* ¶ 400. One of the Defendants commanded the mob to "push, push, push," and to "get in there, get in there," while insisting, "they [the police officers] can't hold us." *Id.* Members of the crowd also sprayed law enforcement officers with bear mace, which causes temporary loss of sight, nasal congestion, and, in some, difficulty breathing. *Id.* ¶ 394. Others dragged, kicked, trampled, and punched officers; pushed them down stairs; and ran over them in a stampede. *Id.* ¶ 395.

At least 65 MPD officers reported sustaining injuries as a direct result of the January 6 Attack. *Id.* ¶ 450. One officer, hit by a metal pole and beaten in the face with his own baton, suffered a concussion and permanent head injuries, and died by suicide after struggling with severe depression and brain trauma. *Id.* ¶ 451. Another officer was electrocuted and beaten unconscious. *Id.* ¶ 452. Officers also suffered bruises, swelling, lacerations, eye and lung irritation, cracked ribs, shattered spinal discs, wounds from being hit with a metal fence stake, and head injuries from blows from various objects. *Id.* ¶ 453. Officers' psychological injuries were also extensive. *Id.* ¶ 454. Dr. Beverly Anderson, a therapist and clinical director of the Metropolitan Police Employee

Assistance Program, has worked to help nearly 1,000 officers cope with the trauma caused by the Defendants and their cohort.  *Id*.  Dr. Anderson discovered through this work that some officers suffered head traumas as a result of the Attack that were previously undiagnosed.  *Id*.

The officers' injuries were severe and sustained over time.  *Id*. ¶ 455.  Months after the Attack, some officers remained on leave as a result of the trauma they suffered at the Defendants' hands.  *Id*.  The District incurred significant costs related to the provision of emergency and other medical care, including ongoing mental health care, that MPD officers required as a result of Defendants' actions.  *Id*. ¶ 458.  Indeed, according to the District's preliminary estimates, the MPD incurred millions of dollars in costs during the week of January 6 alone.  *Id*. ¶ 459.

## F.      Insurrectionists, Including Defendants, are Criminally Indicted and Some Plead Guilty

Each of the named Individual Defendants has been criminally charged for their actions related to the January 6 Attack, and several have pleaded guilty.  *See* Am. Compl. ¶¶ 13-49.  Sixteen of these defendants, including moving Defendants K. Meggs, Harrelson, Minuta, Ulrich, Tarrio and Biggs, were charged with, *inter alia*, seditious conspiracy—a conspiracy to overthrow, put down, or destroy by force the Government of the United States or to prevent, hinder or delay the execution of any law of the United States.[3]  *See id*. ¶¶ 14, 33, 38-39, 44, 90; Third Superseding Indictment, *United States v. Nordean*, No. 21-cr-175 (D.D.C. 2021), ECF No. 380.[4]  Moreover, in connection with their plea deals across the various criminal cases arising from the Attack, certain

---

[3]      The other Defendants charged with seditious conspiracy are Rhodes, Watkins, James, Hackett, Moerschel, Caldwell, Vallejo, Nordean, Pezzola, and Rehl.  *United States v. Rhodes, III*, No. 22-cr-00015 (D.D.C. 2022), ECF No. 167.  Defendants James and Ulrich have already pleaded guilty to seditious conspiracy.  *Id.*, ECF Nos. 60, 117.

[4]      These Defendants were charged in *United States v. Nordean* before the Amended Complaint was filed on April 1, 2022, as alleged therein.  *See* Am. Compl. ¶¶ 14, 33, 38-39, 44.  The seditious conspiracy charges were added in a superseding indictment after the Amended Complaint was filed.  *See Nordean*, No. 21-cr-175, ECF No. 380 (June 6, 2022).

17

Defendants have admitted to, among other things:  seditious conspiracy (Am. Compl. ¶¶ 26, 92 (James); *United States v. Rhodes*, No. 22-cr-00015 (D.D.C. 2022), ECF No. 117 (Ulrich)); conspiring to unlawfully enter the Capitol to interfere with the Certification of the Electoral College vote (Am. Compl. ¶¶ 22, 72, 311, 380 (Greene); ¶¶ 49, 168, 359 (Young admitted to forcibly entering the Capitol and conspiring to thwart the election Certification)); armed trespass of the Capitol (*id.* ¶¶ 41, 88 (Schaffer)); and obstruction of an official proceeding of Congress (*id.* ¶¶ 88, 92 (Schaffer, James)).

## ARGUMENT

### I.     Legal Standards

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(1) "plaintiffs bears the burden of establishing that the Court has subject-matter jurisdiction over their claims." *Ferrer v. CareFirst, Inc.*, 265 F. Supp. 3d 50, 53 (D.D.C. 2017) (citing *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)).  However, a court "must accept the well-pleaded allegations of the complaint as true and draw all inferences in favor of the plaintiff." *Id.*  Standing is a jurisdictional matter and thus a motion to dismiss for want of standing is brought pursuant to Rule 12(b)(1). *Id.* at 52. Establishing standing at the pleadings stage is a "low bar" that requires only that a plaintiff "'state a *plausible* claim' that each of the standing elements is present." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017) (citation omitted).  "[G]eneral factual allegations of injury resulting from the defendant[s'] conduct" are considered sufficient to clear this bar. *Magruder v. Cap. One, Nat'l Ass'n*, 540 F. Supp. 3d 1, 8-9 (D.D.C. 2021).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint need only "contain sufficient factual matter, [if] accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In evaluating a motion to dismiss, the Court must "treat the complaint's

factual allegations as true and must grant [plaintiff] the benefit of all inferences that can be derived

from the facts alleged." *Peavey v. United States*, 128 F. Supp. 3d 85, 89 (D.D.C. 2015) (quoting

*Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009)). The Federal Rules of Civil

Procedure "do not require 'detailed factual allegations' for a claim to survive a motion to dismiss,"

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (quoting *Iqbal*, 556

U.S. at 678), but rather "a short and plain statement of the claim showing that the pleader is entitled

to relief[.]" Fed. R. Civ. P. 8(a)(2).

## II.     The District Has Standing to Pursue Its Claims.

Defendants argue that the District does not have standing to pursue its claims—and

therefore is not a proper plaintiff—both because it does not meet the constitutional standing

requirements under Article III of the U.S. Constitution and because it does not have "statutory

standing" under Sections 1985 and 1986 (*i.e.*, Sections 1985 and 1986 do not encompass the

District's claims). These arguments are without merit.

### A.     The District Has Article III Standing to Assert Its Claims.

Article III of the Constitution limits the authority of the federal courts to deciding "cases"

and "controversies." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). For a dispute

to constitute a case or controversy under Article III, the plaintiff must have standing—that is, the

plaintiff must have alleged a sufficient interest in the dispute. *Attias*, 865 F.3d at 625. A plaintiff

can demonstrate such an interest by showing that (1) it has suffered a concrete injury (referred to

as an "injury in fact"); (2) the injury is fairly traceable to the actions of the defendant(s); and (3) it

is likely, as opposed to merely speculative, that the injury will be redressed by judicial relief. *Id.*;

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

Certain Defendants argue that the District has not met the minimal burden to establish

standing because its alleged injuries are neither concrete and particularized nor traceable to the

Defendants' actions.[5]  *See* Kuehne Mot. to Dismiss ("MTD") 5-9; Ulrich MTD 8-12; Steele MTD 8-9, 13-15; Meggs MTD 3-9; Klein MTD 11-13.  These arguments are without merit.  The District adequately pleaded each of these elements in its Amended Complaint and therefore has Article III standing.

### 1.  The District Suffered Actual, Concrete and Particularized Injuries.

The standard articulation of the injury-in-fact requirement is that a plaintiff must show that it suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).  An injury is "concrete" when it is "'real' and not 'abstract.'" *Id*. at 1548.  An injury is particularized if there is a "particular individual or class" that has been affected by the challenged conduct differently from other "members of the public." *United States v. Richardson*, 418 U.S. 166, 179 (1974).  "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo*, 136 S. Ct. at 1548, n.7.

Economic harm is clearly sufficient to establish Article III injury in fact.  "[Even a] dollar of economic harm is still an injury-in-fact for standing purposes." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017); *Danvers Motor Co. v. Ford Motor Co*., 432 F.3d 286, 291 (3d Cir. 2005) (Alito, J.) ("While it is difficult to reduce injury-in-fact to a simple formula, economic injury is one of its paradigmatic forms."); *see also Cottrell v. Alcon Labs*., 874 F.3d 154, 163 (3d Cir. 2017) (quoting *Danvers*, 432 F.3d at 293) ("[W]here a plaintiff alleges financial harm, standing 'is often assumed without discussion.'").

---

[5]  Defendants do not seriously dispute that the District's injuries can be redressed by the relief that the District seeks. For the avoidance of doubt, such argument would also be meritless.  It is clear that, in addition to the other relief sought, an award of compensatory damages would redress the District's injuries, which include costs related to deployment of MPD officers to the Capitol and medical care and paid medical leave for MPD officers injured during the Defendants' January 6 Attack. *See, e.g., Hildebrand v. Vilsack*, 102 F. Supp. 3d 318, 322 (D.D.C. 2015) (injuries can be redressed by judgment in plaintiff's favor and "award of compensatory damages").

Case 1:21-cv-03267-APM   Document 145   Filed 07/29/22   Page 30 of 73

As the D.C. Circuit has noted, physical injury is also the type of "concrete and particularized injury" that supports Article III standing. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 915 (D.C. Cir. 2015); *see also Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1172 (11th Cir. 2014) (physical harm is a "well-established injur[y]-in-fact under federal standing jurisprudence."). Emotional harm, too, can constitute a cognizable injury for Article III standing purposes. *See Levine v. Nat'l R.R. Passenger Corp.*, 80 F. Supp. 3d 29, 40 (D.D.C. 2015) (plaintiffs can "establish an Article III injury in fact based on emotional harm if that alleged harm stems from the infringement of some legally protected or judicially cognizable interest that is either recognized at common law or specifically recognized as such by the Congress") (internal quotation marks omitted); *see also Sines v. Kessler*, 324 F. Supp. 3d 765, 774 (W.D. Va. 2018) (denying a motion to dismiss a Section 1985 claim where plaintiffs "suffered various emotional injuries").

Here, the District has clearly made a showing sufficient to establish that the economic, physical, and emotional injuries suffered by the District and its MPD officers were concrete, particularized, and actual—not hypothetical or speculative. As the District alleged in the Amended Complaint:

- The District diverted an unprecedented number of officers to protect members of the public throughout the District, permitting no officers to take leave and imposing 12-hour shifts. Am. Compl. ¶¶ 441-43. More than 1,000 MPD officers were deployed to the Capitol and its immediate surroundings over the course of the day to respond to the insurrection—far more than the District would ordinarily deploy during a non-violent rally or protest. *Id*. ¶ 457. This unprecedented, expansive deployment imposed significant fiscal costs on the District. *Id*.

- When the Capitol Police called for aid to protect the Capitol and those inside it, the District had to deploy several MPD platoons, and MPD officers were forced to fight for their lives, with at least 65 officers sustaining injuries. *Id*. ¶¶ 446-50. One officer was beaten so severely that he suffered a concussion and permanent brain injuries and ultimately lost his life to suicide. *Id*. ¶ 451. Another was electrocuted and beaten unconscious. *Id*. ¶ 452. Scores of other officers suffered physical injuries,

ranging from shattered bones and spinal discs to lacerations, bruises, and edemas, and many officers also suffered extensive psychological injuries. *Id*. ¶¶ 453-54. As discussed below, *see infra*, 24-28, the District has a statutory right to recover costs associated with injuries sustained by its MPD officers during the course of their employment.

- The District incurred significant costs in paying for medical care and treatment for officers injured during the January 6 Attack. The District expects to continue to incur such costs as medical care and treatment for many officers is ongoing. *Id*. ¶ 458.

- MPD officers were also forced to take leave, some for months, to recover from their injuries. This has continued to impose a cost on the District, which has been deprived of these officers' valuable services. *Id*. ¶ 455.

Nevertheless, Defendants advance two broad arguments for discounting the District's injuries.

*First*, certain Defendants assert that the District's alleged harms, which they characterize as "the costs of deploying D.C. police officers, the costs to treat injured officers, and the costs for paid leave for injured officers," do not constitute an injury-in-fact for the purposes of Article III standing because they amount to mere "lost revenue," which Defendants claim is not cognizable. Kuehne MTD 7-8; Ulrich MTD 11-12.[6] That is incorrect. The District does not seek to recover "lost revenue." Rather, it alleges—and seeks to recover—direct, concrete expenditures that the District has already paid, and continues to pay, as a result of the Defendants' conspiracy.

Moreover, Defendants have not cited—and the District has not identified—any authority that supports this argument. Defendants' heavy reliance on *Arias v. DynCorp*, 752 F.3d 1011 (D.C. Cir. 2014) is misplaced. In that case, certain provinces of the Republic of Ecuador brought

---

[6]   Defendants miscast their argument that the District's alleged harms do not constitute an injury in fact as a component of their ultimate point that "[t]he District lacks Article III standing under Section 1985(1) because its alleged injuries are not *traceable* to the Defendants." Kuehne MTD 7 (emphasis added). The inquiry into the existence of an injury-in-fact is legally distinct from the inquiry of whether that injury is a likely result from Defendants' challenged conduct. As discussed in detail below, *see infra*, Section II.A.2, the District has alleged an injury that likely resulted from Defendants' conduct, and thus has Article III standing.

tort claims for alleged "injuries to health, property, and financial interests" against companies that had sprayed pesticides over cocaine and heroin farms in Ecuador. *Id.* at 1013. While the D.C. Circuit explained that "[l]ost *tax* revenue is generally not cognizable as an injury-in-fact for purposes of standing," *id.* at 1015 (emphasis added), it expressly confirmed that the provinces' "direct expenditures on facilities like health centers could theoretically constitute an injury in fact for standing purposes," *id.* at 1016. The D.C. Circuit then held, however, that the provinces failed to adequately allege that these expenditures were "traceable" to defendant's conduct because their complaint did not allege that the defendant was "any kind of cause" of the expenditures. *Id.* at 1015. As noted, *DynCorp* bears no comparison to this case, in which the District is not seeking to recover "lost tax revenue."

*Second*, Defendants erroneously contend that the District's injuries are not sufficient to establish an "injury in fact" because they are exclusively "third-party harms" suffered by MPD officers, and because the District is a corporate entity that cannot suffer the common law torts alleged. Steele MTD 7-16.

As an initial matter, the Amended Complaint alleges that the District suffered *direct* harm from the January 6 Attack, including the costs of deploying an unprecedented number of MPD officers to the Capitol on January 6, 2021, the costs of providing care for MPD officers, and the costs of paid medical leave for MPD officers. These are not "third-party harms." In any event, to the extent the District seeks to recover damages resulting from injuries suffered by MPD officers, it also satisfies Article III.

"[S]ubrogees, who [the law has] described as 'equitable assign[ees],'" have long been held to "ha[ve] standing to assert the injury in fact suffered by the assignor." *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 774 (2000) ("We conclude, therefore, that the United

23

States' injury in fact suffices to confer standing on [relator in False Claims context]."); *accord Transamerica Ins. Co. v. South*, 125 F.3d 392, 397 (7th Cir. 1997); *La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya*, 477 F. Supp. 2d 131, 135 (D.D.C. 2007).

In this case, the District has a statutory right to pursue Section 1985, Section 1986, and common law tort claims as a subrogee for its employees' and medical beneficiaries' tort claims, including the injuries inflicted on the MPD officers here. *See* DC Code §§ 5–602; 4–602. Under D.C. Code § 5–602, when (i) the District "is authorized or required by law" to provide or pay for medical treatment of its police officers, or to provide them with "leave of absence with pay" (ii) under circumstances where the officer's injury created "a tort liability upon a 3rd person to pay damages therefor," then (iii) the District has "a right to recover from said 3rd person the reasonable value" of the care and wages provided. Section 5–603, in turn, specifies that to enforce this right, the District may either "[i]ntervene or join in any action or proceeding brought by the injured [officer]," or "[i]f such action or proceeding is not commenced within 6 months after the 1st day in which care and treatment is furnished by the District of Columbia in connection with the injury . . . , institute and prosecute legal proceedings . . . against the 3rd person who is liable for the injury."

Here, the District alleges that it "incurred costs related to the emergency and other medical care provided to MPD officers who were injured as a result of the Defendants' actions," ¶ 458, and that it suffered "costs for paid leave for MPD officers who could not work as a result of their injuries," ¶ 467. The District incurred those costs under circumstances for which the Defendants are liable in tort, as set forth *infra* at Section III.C. And no injured MPD officer initiated a lawsuit within six months after the District first furnished care and treatment—which it did on an

24

"emergency" basis immediately following the January 6 Attack.[7]  Am. Compl. ¶ 458.  The District is thus authorized under § 5–603 to "prosecute legal proceedings" against the tortfeasors.  D.C. Code § 5–603.

D.C. Code § 4–602 likewise provides that once the District begins providing such healthcare assistance, "it shall become subrogated to any right or claim that the beneficiary has against a third party for the care and treatment it has undertaken to provide or pay for."  § 4–602(b). Section 4–602 also affords the District "an independent, direct cause of action" against a third party to recover the cost of "health-care assistance" provided to a "beneficiary who has suffered an injury . . . under circumstances creating liability in a third party."  § 4–602(a); see § 4–604(a)(3) ("In enforcing its right to reimbursement, the District may . . . [i]nstitute and prosecute a proceeding either alone . . . or in conjunction with the beneficiary.").

Defendant Steele concedes that the District "has rights of 'legal subrogation' under § 5–602," but misreads District of Columbia v. Beretta, U.S.A., Corp., 872 A.2d 633 (D.C. 2005) (en banc), to mean that the District may not maintain this action unless all of its subrogors are joined as plaintiffs.[8]  See Steele MTD 16.

In Beretta, the District and several individuals sued manufacturers and distributors of firearms in Superior Court to recover certain medical costs incurred because of gun violence.  See Beretta, 872 A.2d at 637, 653.  On appeal, the D.C. Court of Appeals held that D.C.'s Assault

---

[7]   Two actions were brought by MPD officers or their estates for injuries related to the January 6 Attack; both were initiated more than six months after the District first furnished emergency care and treatment.  See Tabron v. Trump, No. 22-cv-11 (D.D.C.) (Complaint filed January 4, 2022); Smith v. Kaufman, No. 21-cv-2170 (D.D.C.) (Complaint filed August 13, 2021).

[8]   Steele does not explain why such a requirement would apply, nor how it would square with Rule 17(a), which requires that the action "be prosecuted in the name of the real party in interest."  See United States v. Aetna Cas. & Sur. Co., 338 U.S. 366, 380–81 (1949) ("[O]f course an insurer-subrogee, who has substantive equitable rights, qualifies as [the real party in interest under Rule 17(a)].  If the subrogee has paid an entire loss suffered by the insured, it is the only real party in interest and must sue in its own name.").

Weapon Manufacturing Strict Liability Act of 1990 provided a right of action only to individuals, but not to the District itself. *Id*. at 652-53. The court therefore dismissed the District's "direct" claims, but permitted the District to pursue claims based on the subrogation statutes identified above. *Id*. Of the nine individual plaintiffs involved in the case, the court determined that the District had only pleaded payment of health care costs and Medicaid expenses (and was therefore only legally subrogated) with respect to two. *Id*. at 652. *Beretta* thus confirms the utility of the subrogation statutes at issue, and simply requires that the District plead payment of health care costs, costs of treatment, leave of absence costs or similar such costs in order to pursue claims as a subrogee. Here, the District has done so. *See e.g.*, Am. Compl. ¶¶ 458, 467.

Defendant Steele focuses on a single sentence from the introduction of *Beretta*, where the court previewed a later substantive discussion of the issue, summarizing that the District could pursue its claims "to the extent—but only the extent—that it seeks subrogated damages as to named individual plaintiffs for whom it has incurred medical expenses." 872 A.2d at 637. In context, the court was simply distinguishing between the two "named individual plaintiffs" for whom the District had a subrogation right, and the seven other "named individual plaintiffs" for whom it did not. There were no "unnamed" plaintiffs in the suit, and the court never suggested— let alone decided—that the District would be required to plead the names of individual subrogors.

To the extent that Defendant Steele suggests that the absence of officer names in the Amended Complaint fails to provide adequate notice, that argument fails as well. Here, the District seeks to recover the cost of treating the limited universe of MPD officers who were injured because of the January 6 Attack, and of affording paid leave to officers whose injuries from the January 6 Attack prevented them from working. The scope of the District's subrogated claims are therefore limited to the discrete set of officers involved in responding to the January 6 Attack—*i.e.*, the

26

approximately 850 officers at the Capitol, and approximately 250 additional officers in the area to support the response and aftermath (¶ 457)—and to injuries incurred as a result of one specific incident: the January 6 Attack. The Amended Complaint further specifies that by the time of filing, at least 65 officers had reported sustaining physical injuries as a result of the January 6 Attack, and provides details regarding several of their injuries. ¶¶ 450–55.

Even if there were a requirement to identify particular subrogors with specificity, which there is not for the reasons stated above, the District has still stated a claim because it identified injured MPD officers by initials and description.[9] The Amended Complaint identifies "MPD Officer J.M.," who was yelled at, grabbed, and pulled toward the mob. Am. Compl. ¶ 376. It further specifies that at least 65 MPD officers were injured as a direct result of the January 6 Attack, *id.* ¶ 450, including (i) one officer who was beaten in the face and hit with a metal pole, sustained a concussion and permanent head and neck injuries, and later died by suicide, *id.* ¶ 451; (ii) another officer who was electrocuted multiple times and beaten unconscious while screaming for help, *id.* ¶ 452; and (iii) officers who sustained "bruised arms and legs, swollen ankles and wrists, and lacerations," as well as "irritated eyes and lungs from sprayed chemicals, cracked ribs, shattered spinal discs, wounds from being hit with a metal fence stake, and injuries from head blows from various objects, including metal poles ripped from inauguration-related scaffolding and an American flagpole," *id.* ¶ 453. Thus, even if the District had to plead facts identifying specific subrogors, it has done so.[10]

---

[9]   The Amended Complaint also includes photographic evidence of particular MPD officers being injured. For example, Figure 32 of the Amended Complaint shows an MPD officer who was beaten with sticks and crutches, including by one person wielding an American flag; that MPD officer later testified before the House Select Committee. *Id.* ¶ 396 & Fig. 32. Figure 8 of the Amended Complaint depicts MPD officers clashing with a crowd outside the Capitol. *Id.* ¶ 307 & Fig. 8.

[10]   Moreover, even if the Court were to determine that the District must identify its subrogors with greater particularity, the District should have the opportunity to amend its complaint to do so as discovery progresses.

The District has adequately pleaded an injury in fact with respect to its Section 1985, 1986, and common law claims for injuries inflicted on MPD officers. [11]

### 2.     The District's Harms Are Fairly Traceable to the Conspiracy.

To demonstrate traceability, a plaintiff must show a "causal connection" between its injury and the challenged conduct of the defendants. *Lujan*, 504 U.S. at 560. At the pleadings stage, a plaintiff need only state a "plausible claim" that its injury is "fairly traceable to the actions of the defendant[s]." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015)). Article III does not require that a defendant be the "most immediate cause, or even a proximate cause," of the plaintiff's injury. *Attias*, 865 F.3d at 629; *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) (explaining that a plaintiff does not need to show proximate causation to establish traceability).

Courts assessing standing to assert conspiracy claims at the motion to dismiss stage must assume that the plaintiff adequately alleged a conspiracy. *Thompson*, 2022 WL 503384, at *10.

---

*See Beretta*, 872 A.2d at 654 n.12. ("[T]he District is free to move to amend the complaint in conformity with the rules to include other beneficiaries with claims under the SLA whose identity has come to light during these proceedings."); *see also* Fed. R. Civ. P. 17(a)(3) ("The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.").

[11]   To the extent that some Defendants argue that the District lacks standing to pursue injunctive and declaratory relief, *see* Steele MTD 21-22; Meggs MTD 7, those arguments fail as well. To pursue prospective relief, a plaintiff must allege only "that [it] is likely to suffer a future injury." *Coleman v. Drug Enf't Admin.*, 134 F. Supp. 3d 294, 306 (D.D.C. 2015); *see Fair Emp. Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1272 (D.C. Cir. 1994). Here, the District has alleged that the conspiracy was not simply a momentary occurrence, but was ongoing even after the Attack, as Defendants continued to plot to prevent President Biden, Vice President Harris and other federal officials from exercising the duties of their offices. *See* Am. Compl. ¶¶ 416-40. Indeed, the night *after* the attack, Defendant K. Meggs wrote to his coconspirators, "[w]e aren't quitting!! We are reloading!!" *Id.* at ¶ 425. Moreover, the very nature of Defendants' conspiracy—an attempt to violently undo the settled results of an election that was completed months earlier—reflects a refusal to acknowledge or concede, and an ongoing willingness to violently contest, long-settled results. It is fair to infer from this conduct that, absent action by this Court (and/or effective criminal prosecution), Defendants will continue to pursue their conspiracy.

Accordingly, in such circumstances, a plaintiff must only have pleaded an injury that is fairly traceable *to the alleged conspiracy*, not to each and every individual coconspirator's conduct. *See Pierce v. Yale Univ.*, 2019 WL 162029, at *3 (D.D.C. Jan. 10, 2019) (to establish standing at the pleadings stage, a plaintiff must plausibly allege that its injury is fairly traceable to the conspiracy), *aff'd on other grounds*, 788 F. App'x 1 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 362 (2020).[12]  In other words, it is enough to make "the general claim that [the Defendants] were engaged in a conspiracy" that resulted in injuries to the plaintiff.  *Freedom Watch, Inc. v. Google Inc.*, 816 F. App'x 497, 499 (D.C. Cir. 2020).

This Court's recent decision in *Thompson* is particularly instructive.  In *Thompson*, police officers and legislators injured in the Attack alleged that President Trump and others conspired to forcibly prevent members of Congress from certifying the results of the Electoral College, and that those efforts culminated in the Attack.  *Thompson*, 2022 WL 503384, at *2.  Assuming, as it must at the motion to dismiss stage, that Trump so conspired, this Court held it was "apparent" that the plaintiffs' injuries were "fairly traceable" to the conspiracy and therefore to Trump, despite the fact that Trump himself was not alleged to have stormed the Capitol or inflicted direct physical injury on anyone.  *Id*. at *10.

Here, it is clear that the District's injuries are fairly traceable to the Defendants' conspiracy, and therefore to the Individual Defendants as coconspirators.  The Amended Complaint pleads that, as part of their conspiracy, the Defendants planned the Attack, armed themselves, recruited others to join them, and ultimately carried out a coordinated act of terrorism at the Capitol.  *Id*.

---

[12]   Defendants' arguments as to traceability might be better understood as arguments about substantive conspiracy liability—not standing.  Fundamental to the law of conspiracy is the proposition that "[e]ach Plaintiff need not be able to point to an injury incurred from each Defendant."  *Sines v. Kessler*, 324 F. Supp. 3d 765, 773 (W.D. Va. 2018).  Rather, when all Defendants were part of the conspiracy, "Plaintiffs may hold each Defendant liable for the reasonably foreseeable acts of their coconspirators."  *Id*.; *see infra*, Part III.A.

¶¶ 107-29 (following President Trump's electoral loss, Defendants trumpeted plans to use violence to prevent the lawful transfer of presidential power), ¶¶ 140-59 (Proud Boys and Oath Keepers worked together to plan the Attack and encouraged others to participate), ¶¶ 160-69 (Defendants coordinated disguises and created secret channels for communication), ¶¶ 170-83 (Defendants collected weapons, ammunition, and tactical gear), ¶¶ 184-203 (Defendants coordinated travel plans), ¶¶ 204-61 (as January 6 approached, Defendants called for violence, encouraged thousands of others to join the Attack, descended on the District, and issued instructions), ¶ 388 (thousands of people stormed the Capitol).  When the mob congregated outside the Capitol, the Defendants provided tactical direction to their coconspirators and violently clashed with Capitol Police and MPD officers, ultimately overwhelming them.  *Id*. ¶¶ 305-11, 314-15, 318-19, 323.  The enormous mob and the violence it inflicted necessitated the unprecedented deployment of MPD officers to the Capitol.  *Id*. ¶¶ 441-49, 457.

The Amended Complaint further pleads that, as part of their conspiracy, the Defendants incited, encouraged, and enabled the mob.  For example, the Defendants "provided tactical direction" outside the Capitol, *id*. ¶ 305; "positioned themselves at or near the front of the crowd" that stormed Capitol grounds, *id*. ¶¶ 311, 331; "led the charge at the front of the mob," *id*. ¶ 314; "instigated" violence against police officers, *id*. ¶ 323; broke Capitol windows and forced open doors, *id*. ¶¶ 333-35; coordinated logistical details in an effort to weaken the building's defense, *id*. ¶¶ 340, 362; and urged the mob not to "leave" the Capitol and to "[k]eep fucking going," *id*. ¶¶ 351, 370.  The Defendants and their coconspirators directly took credit for these actions.  For example, Proud Boys Chairman Henry "Enrique" Tarrio boasted, "[w]e did this."  *Id*. ¶ 353; *see also id.* ¶ 364 (Caldwell posted on social media, "[w]e are surging forward.  Doors breached[.]").

The Amended Complaint further pleads that the Defendants and their coconspirators directly assaulted MPD and Capitol Police officers, including by pushing, kicking, stampeding, beating, throwing objects, and deploying chemical irritants.  *Id.* ¶¶ 307, 315, 323-24, 356, 358, 369, 373-76, 393-97, 400-02.  The MPD officers' resulting physical and psychological injuries—inflicted directly by the Defendants and their coconspirators—caused the District to incur direct costs for medical care and the loss of these officers' valuable services.  *Id.* ¶¶ 446-59.

Accordingly, there can be no question that the District's injuries are fairly traceable to the Defendants and their conspiracy.

Defendants' arguments to the contrary are unavailing.

First, certain Defendants assert—in conclusory fashion—that because "thousands" of other people they presume were not coconspirators participated in the Attack, the District "would have incurred most or all of these costs regardless of Defendants' conduct."  *E.g.*, Kuehne MTD 8.[13] This assertion conflates Article III traceability with the higher but-for causation standard.  *See Flaherty v. Bryson*, 850 F. Supp. 2d 38, 50 (D.D.C. 2012) ("Plaintiffs need demonstrate neither proximate causation nor but-for causation to establish traceability.").  To satisfy Article III, the District need only allege that its injuries are "fairly traceable" to the Defendants' alleged actions as coconspirators.  That standard is clearly met here.

Similarly, certain Defendants invoke *Arias v. DynCorp*, 752 F.3d 1011 (D.C. Cir. 2014), for the proposition that the presence of "other potential causes" of a plaintiff's injury forecloses Article III standing.  *E.g.*, Kuehne MTD 8-9.  That is incorrect, and *DynCorp* is inapposite.  The

---

[13]   To the extent that Defendants attempt to raise a factual issue as to whether their conspiracy—as opposed to some purportedly independent actions of the mob—caused any of the District's injuries, that factual issue cannot properly be resolved on motions to dismiss.  In evaluating the motions to dismiss, the Court must treat the factual allegations in the Amended Complaint as true, drawing all reasonable inferences in the District's favor.  *See Peavey*, 128 F. Supp. 3d at 89.

*DynCorp* plaintiffs alleged that they were injured because they needed to build health centers to address high infant mortality and several prevalent diseases, *see supra*, 23, but they failed to allege "that these medical issues [were] a result of the [defendants'] spraying [of pesticides]." *Id*. at 1015. The court reasoned that although "[a] defendant in a tort suit can, of course, be liable without being the sole cause of a plaintiff's injury," the plaintiffs did not demonstrate that the defendant "was *any* kind of cause of their alleged financial injuries." *Id*. (emphasis added). Plaintiffs here have sufficiently plead that the Defendants' conspiracy inflicted the stated harm. And contrary to *DynCorp*, the actions of any non-Defendant individuals could only have supplemented the injury caused by Defendants' conspiracy.

### B.    The District Has Statutory Standing to Assert Its Claims Under 42 U.S.C. §§ 1985(1) And 1986.

Certain Defendants also argue that the District does not have standing to bring claims under Sections 1985 and 1986 "because only federal officers and federal office holders have standing to assert a claim" under those Sections. Kuehne MTD 6; *see* Steele MTD 11 ("The only plaintiffs with statutory standing under § 1985 are federal officers.").[14] The Defendants' argument conflates Article III standing with "statutory" standing, or the question of whether the statute provides the District with a cause of action. Moreover, both Sections 1985(1) and 1986 clearly include the District within the class of those authorized to sue.

To determine whether a plaintiff "has a cause of action under" a given statute, courts ask whether the plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue under" that statute. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). To ascertain "[w]hether a plaintiff comes within the zone of interests," a court must

---

[14]    "Because statutory standing is not jurisdictional," Defendants who have not raised this argument have forfeited it. *Thompson*, 2022 WL 503384, at *24 n.18.

"determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l*, 572 U.S. at 127. The District satisfies this standard because its "claims of injury . . . are, at the least, '*arguably* within the zone of interests' that the [statute] protects." *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1303 (2017) (quoting *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970)) (emphasis in original); *see also Lexmark*, 572 U.S. at 130 (explaining that the Supreme Court often "include[s] the word 'arguably' in th[is] test to indicate that the benefit of any doubt goes to the plaintiff[.]'") (citation omitted).

Traditional tools of statutory interpretation—the statute's text, purpose, and legislative history—demonstrate that Section 1985 broadly authorizes any person or entity injured by those engaged in a Section 1985(1) conspiracy, not just "federal officers or office holders," to assert a claim.

The plain language of Section 1985(3) provides that a "party so injured" may pursue damages if it is "injured or deprived" by virtue of "any act" committed by a conspirator "in furtherance of the object of [a] conspiracy" that violates Section 1985(1). 42 U.S.C. § 1985(3). Nothing about the statute requires "party so injured" to mean "federal office holders."

The District easily qualifies as a "party so injured." Defendants conspired in violation of Section 1985(1) "to prevent, by force, intimidation, or threat," President-elect Biden and Vice President-elect Harris "from accepting or holding an[] office, trust, or place of confidence under the United States," and likewise to prevent Vice President Pence and the Members of Congress from "discharging [their] duties" in connection with receiving the certified votes of electors in the 2020 election. *See id*.

The District suffered injuries as a result of that conspiracy.  The District incurred and continues to incur costs in its diversion of unprecedented numbers of police officers to the Capitol, rendering of medical treatment, and compensation of officers for paid leave to address their emotional and physical injuries incurred from Defendants' attack.  Given these injuries, there can be no doubt that the District was a "party" who was "injured or deprived" by virtue of "an[] act" committed by a conspirator "in furtherance of the object of [a] conspiracy" that violates Section 1985(1).  42 U.S.C. § 1985.  Accordingly, based on the statute's plain text, the District is within the zone of interests and may assert a claim under Section 1985.

Indeed, this Court so held in *Thompson*.  In that case, as here, certain of the plaintiffs alleged a Section 1986 claim based on the theory that the Defendants had engaged in a Section 1985 conspiracy to prevent President-elect Biden and Vice President-elect Harris from accepting or holding office.  *Thompson*, 2022 WL 503384, at *28.  The claims were not dismissed because "even if the [plaintiffs] are not 'covered federal officials,' President-elect Biden and Vice President-elect Harris are, and a conspiracy directed at preventing them from accepting or holding office" states a Section 1985 claim.  *Id*.  The Court went on to state that, under this theory, the plaintiffs "would be able to seek damages as 'person[s]' injured by that alleged conspiracy."  *Id.* (alteration in original) (quoting 42 U.S.C. § 1985(3)).[15]

The statute's remedial and protective purpose accord with this reading of the text.  Section 1985 is a Reconstruction-Era statute designed to preserve civil rights and ensure the orderly

---

[15]    The *Thompson* decision is consistent with the Third Circuit's decision in *Novotny v. Great*, an analogous case under Section 1985(3).  In *Novotny*, a male employee alleged that officials at his company had conspired to deprive female employees of equal employment opportunities, that he had attempted to intervene, and that he had been discharged as a result.  He filed suit under Section 1985(3), and the Third Circuit held that he stated a claim— even though the alleged conspiracy was designed to deprive *women* of equal rights—"because an action under § 1985(3) need not be predicated on a conspiracy involving invidious animus directed against the plaintiff personally."  *Novotny v. Great Am. Fed. Sav. & Loan Ass'n*, 584 F.2d 1235, 1245 (3d Cir. 1978), *vacated on other grounds*, 442 U.S. 366 (1979).

functioning of the federal government.  *See Stern v. U.S. Gypsum*, 547 F.2d 1329, 1335 (7th Cir.

977) (noting that Section 1985 is not "narrow and limited" to addressing the atrocities in southern

states in 1871; rather, "[t]he outrageous conditions there at that time were, no doubt, what induced

Congress to act, but it chose to do so with a statute cast in general language of broad applicability

and unlimited duration").  The Supreme Court has recognized that Reconstruction-Era civil rights

statutes such as Section 1985 "sweep as broad as [their] language."  *United States v. Price*, 383

U.S. 787, 801 (1966).  In evaluating a companion statute, Section 1983, the Supreme Court held

that Congress intended to protect not only victims of race-based animus, but also their

"supporters."  *See United Bhd. of Carpenters & Joiners of Am., Local 610, AFL–CIO v. Scott*, 463

U.S. 825, 836 (1983); *see also Kessler*, 324 F. Supp. 3d at 780.

Legislative history further demonstrates that Congress meant what it said in the statutory

text: anyone harmed by a 1985(1) conspiracy may sue, not only those whose rights the conspirators

directly sought to deprive.  As Senator Edwards succinctly stated, "This section gives a civil action

to anybody who shall be injured by the conspiracy."  Congressional Globe, 42d Cong., 1st Sess.,

at 568 (1871).  Members of Congress contemplated that the statute would afford a cause of action

to white people who were injured by those conspiring with white supremacists during

Reconstruction.  *See id*. at 192-93, 517 (describing harms inflicted by the KKK on individuals who

were apparently white, including hanging a man who sought to educate Black Americans, shooting

at and banishing a man who taught Black children to read, and the near-fatal whipping of a minister

who preached to the Black community).  By the same token, the statute affords a cause of action

to the District for the injuries it suffered in responding to the Attack on the Capitol on January 6.

*See supra,* Section A (describing injuries suffered by the District).

Accordingly, the District need not plead that *it* is a federal official whose duties Defendants sought to disrupt; rather, it is sufficient to plead that the conspirators sought to prevent certain federal officials from carrying out their duties and that the District was among those *harmed* by this unlawful conspiracy.  The Amended Complaint plainly fulfills that requirement.[16]

The cases Defendants rely on are not to the contrary.[17]  Defendants seek to use these cases to elide two distinct questions:  first, whether the alleged Section 1985(1) conspiracy was intended to prevent the discharge of official duties by federal officials; and second, whether the plaintiff must himself be a federal officer to recover for injuries under this Section.  None of the Defendants' cited cases dispute that the first question requires the Court to consider whether *those targeted* by the conspiracy are federal officials.  And, for the most part, the Defendants' cited cases stand for only that uncontroversial proposition.  *See, e.g.*, *Love v. Bolinger*, 927 F. Supp. 1131, 1139-40 & n.14 (S.D. Ind. 1996) (dismissing section 1985(1) claim because officials whose duties were allegedly interfered with were state, not federal, officials).

Of course, in some cases cited by Defendants, the plaintiff alleged that *he* was the one who was allegedly targeted by a Section 1985(1) conspiracy, meaning that the aforementioned two questions collapse into a single one:  is the plaintiff a federal official?  If so, then he has alleged a

---

[16]  Even if the statute were to be given a narrower reading than its plain text, there can be no doubt that the District is among those Congress sought to protect.  The District's employees were not mere interlopers or bystanders on January 6; they were summoned by the federal government to protect a sitting session of Congress.  The federal government and the District had previously entered into a cooperative agreement whereby the MPD could aid the Capitol Police, and vice-versa, when needed.  *See generally* Cooperative Agreements Between Federal Agencies and Metropolitan Police Department, D.C. Code § 5-133.17, 111 Stat. 782, Pub. L. 105-33, § 11712(a)-(d) (Aug. 5, 1997), *as amended*, 115 Stat. 2099, Pub. L. 107-113, § 2 (Jan. 8, 2002).  On January 6, pursuant to that agreement, the federal government called for aid, and the District promptly responded, to ensure that federal officials could peaceably discharge their duties.  Am. Compl. ¶¶ 445-48.  And ensuring that federal officials can peaceably discharge their duties is at the heart of Section 1985(1).

[17]  The only District of Columbia authority any of these defendants cite for their "statutory standing" arguments, *Neely v. Blumenthal*, is not a Section 1985 case at all.  458 F. Supp. 945, 950 (D.D.C. 1978).  *Neely* is about remedies for employment discrimination claims brought by federal employees.  It did not, as Steele claims, "limit[] [Section 1985(1) plaintiffs to federal officials."  ECF No. 109-1, at 12 n.3.

conspiracy that targets a federal official *and* that the conspiracy injured him. In these cases, when the resolution of a claim did not require distinguishing between these two questions, courts have sometimes used loose language conflating them. For example, in *Whitehorn v. F.C.C.*, 235 F. Supp. 2d 1092, 1100–01 (D. Nev. 2002), the court started its Section 1985 analysis by noting that it was unable to discern under which subsection the plaintiff sought to assert a claim. With minimal analysis, it dismissed the Section 1985(1) claim, "if any" had been brought, reasoning that the plaintiff would not have "standing" to assert any such claim because he was not a member of the "protected class." *Id.*; *see also Rossy v. Puerto Rico Police Dep't*, Case Civ. No. 08-2167, 2009 WL 1140174, at *4 (D.P.R. Apr. 24, 2009) (dismissing frivolous Section 1985(1) claim brought by Puerto Rico Police Department officer in an employment discrimination case against his employer because "plaintiff is not employed by the federal government, and has not alleged that he is authorized to perform any official federal duties"). But these cases do not hold that, when a plaintiff alleges that it was harmed by a Section 1985(1) conspiracy that sought to prevent the discharge of *someone else's* official duties, the court should collapse these two inquiries and reject a claim by anyone other than a federal official.[18]

Ultimately, Defendants' argument boils down to a false equivalency between those targeted by the conspiracy and those injured by it. But when those questions are considered separately—as they must be—the District's claims here are plainly sufficient.

---

[18] Against the weight of authority, Defendants identify only a single non-precedential district court opinion from Michigan that arguably adopts a contrary position. *See Odish v. Apple, Inc.*, No. 15-CV-11955, 2015 WL 6507427, at *11 (E.D. Mich. Oct. 28, 2015) ("[A] plaintiff must be an individual who holds 'any office, trust, or place of confidence under the United States' to bring a claim under § 1985(1) regarding impediments to her ability to carry out her duties."). That court offered very little reasoning for this conclusion. Its barebones opinion did not engage with this issue; it quickly rejected it. This is unsurprising given that the claim was part of the ninth lawsuit filed by a serial litigant on the same general topic, containing myriad claims, and given that the Section 1985 argument was frivolous on several grounds.

For the same reasons, the District has a cause of action under Section 1986, which provides that

> [e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in [§ 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed, shall be liable to the party injured.

42 U.S.C. § 1986.  Defendants argue that the District has no cause of action under Section 1986 because it has no cause of action under Section 1985.  Kuehne MTD 9; Klein MTD 9; Steele MTD 3-4.   Because this argument is entirely premised on the same incorrect understanding of Section 1985, it also fails.

## III.    The District Has Adequately Pleaded Each of Its Claims.

### A.    The District Has Stated Claims Under Section 1985(1).

Defendants raise several additional challenges to the adequacy of the District's Section 1985(1) claims:  Each moving Defendant argues that the District failed to adequately allege their involvement in the conspiracy. *See* Kuehne MTD 3-5; Steele MTD 17; Meggs MTD 11-12;  Klein MTD 15-16; Ulrich MTD 10-12; *see* Harrelson Notice to Join Meggs MTD (ECF No. 114) ("Harrelson Notice").  Defendants C. Meggs and K. Meggs (and by joinder, Harrelson) also argue that the District failed to allege facts satisfying a purported "state action" requirement.  Meggs MTD 12-13; Harrelson Notice.  Defendants Klein, Minuta, and Pepe argue that Section 1985(1) claims should be held to a "heightened pleading" standard.  Klein MTD 15-16.  And Defendants Minuta, Pepe, and Klein further argue that the District did not adequately plead causation between the conspiracy and the District's injuries.  *See* Klein MTD 14.  All of those arguments lack merit, and many have already been rejected by this Court in related cases.

1.     **The District Plausibly Alleged Defendants' Involvement in the Conspiracy.**

Moving Defendants incorrectly argue that the District failed to adequately allege their involvement in the conspiracy that resulted in the January 6 Attack. *See* Kuehne MTD 3-5; Steele MTD 17; Meggs MTD 11-12; Klein MTD 15-16; Ulrich MTD 10-12; Harrelson Notice.

A civil conspiracy is "an agreement between two or more people to participate in an unlawful act or a lawful act in an unlawful manner." *Thompson*, 2022 WL 503384, at *30 (citation omitted). To violate Section 1985(1), the agreement must target "a person who occupies 'any office, trust, or place of confidence under the United States' or is 'any officer of the United States.'" *Id.* at *25 (quoting 42 U.S.C. § 1985(1)). Such an agreement can be "express or tacit"; all that is required is that participants "came to a mutual understanding to try to accomplish a common and unlawful plan." *Id.* at *30 (citation omitted); *see Halberstam v. Welch*, 705 F.2d 472, 476 (D.C. Cir. 1983). Although all conspirators must "share in the general conspiratorial objective," they "need not know all the details of the plan or even possess the same motives," and they "need not know the identities of other coconspirators." *Thompson*, 2022 WL 503384, at *30. For a civil conspiracy claim to be actionable, there must be "an overt act in furtherance of the conspiracy that results in injury." *Id.*

This Court's decision in *Thompson* is, once again, instructive. In that case, this Court found, based on essentially the same facts alleged in the Amended Complaint, that the plaintiffs had sufficiently pled a Section 1985 conspiracy that included, among others, "the Proud Boys, the Oath Keepers, Tarrio, and others who entered the Capitol on January 6th with the intent to disrupt the Certification of the Electoral College vote through force, intimidation, or threats." *Id.* at *33.

Regarding the Oath Keepers, this Court stated that the various statements published online by Oath Keepers leadership (including moving Defendant K. Meggs) were "direct evidence of a

civil conspiracy." *Id.* at *38; *see* Am. Compl. ¶ 141 & Fig. 2. It further stated that the complaints "easily" established a Section 1985 claim against the Oath Keepers by detailing the Oath Keepers' and Proud Boys' "preparations for January 6th," and describing that "members from each group forcibly entered the Capitol building intent on disrupting the Certification." *Thompson*, 2022 WL 503384, at *38. Regarding moving Defendant Tarrio, the Court also found that the Complaint easily alleged a Section 1985 conspiracy for numerous reasons, including that: "as the leader of the Proud Boys, he would have participated in forming the announced 'alliance' and 'orchestrated plan' with the Oath Keepers"; he made statements online about the Proud Boys going to the District on January 6 in "records numbers" and about the Proud Boys showing up "incognito"; and because it is "reasonable to infer that he would have been involved in the Proud Boys' collection of tactical vests, military-style communication equipment, and bear mace." *Id.*

The District's claims are based on the same well-pleaded facts alleged in *Thompson*. The Amended Complaint details how the Defendants "work[ed] together to coordinate their efforts at the planned January 6th Attack," and forced their way into the Capitol "actively seeking. . . to disrupt the election certification process with threats and violence." Am. Compl. ¶¶ 141, 372. With respect to each moving Defendant, the District has alleged both an affiliation with other conspirators and specific acts taken alongside coconspirators in furtherance of conspiracy's goal. For example, among other allegations, the Amended Complaint alleges that:

- Defendant Kuehne was a member or affiliate of the Proud Boys, and breached the barricades together with other members and affiliates of the Proud Boys. Am. Compl. ¶¶ 28, 308.[19]

---

[19] The Amended Complaint also incorporates by reference the Superseding Indictment in which Kuehne is charged. *See* Am. Compl. ¶ 28. That indictment contains additional details about Kuehne's involvement in the conspiracy, including that Kuehne and other coconspirators "stayed together in a short-term rental property," met with other conspirators at the National Mall, agreed to travel together with other Proud Boys for the remainder of the day, affixed orange tape to their clothing and tactical gear as identifying insignia, and "traveled together throughout the Capitol building." Superseding Indictment, *United States v. Kuehne*, No. 1:21-cr-00160-TJK, (D.D.C 2021),

- Defendants C. Meggs and K. Meggs were members of the Oath Keepers, coordinated their travel to the District with other Oath Keepers, gathered firearms and ammunition and equipped themselves with communication devices, reinforced vests, helmets, and goggles, and formed a "military stack" with other Oath Keepers that maneuvered toward and forcibly entered the Capitol.  *Id.* ¶¶ 29-30, 186, 197, 244, 301, 345, 347.

- Defendant K. Meggs also sent a message to other Oath Keeper members explaining that they had "been issued a call to action for DC" and announcing an "alliance" between the Proud Boys and Oath Keepers, writing among other things that the two organizations "have decided to work together and shut this shit down" and that "at least 50-100" Oath Keepers would be in the District on January 6; that they would join with the Proud Boys, whom Meggs described as a "force multiplier"; and that the two groups would position themselves for maximum impact.  *Id.* ¶¶ 113, 141 & Fig. 2, 144 & Fig. 3; *see also* ¶¶ 146-47 & Fig. 4 (detailing the plan that the Oath Keepers and Proud Boys "orchestrated").   K. Meggs also advised another participant in the Attack to bring "mace," "gas masks," "batons," and "armor," and communicated with other Oath Keepers about menacing United States Senators. *Id*. ¶¶ 171, 211, 425.

- Defendant Steele was a member of the Oath Keepers, traveled to the District together with other members of the Oath Keepers, and formed a "military stack" with other Oath Keepers—including moving Defendants C. and K. Meggs and Harrelson—that maneuvered toward and forcibly entered the Capitol.  *Id.* ¶¶ 43, 193 n.10, 345, 347-48, 356.

- Defendant Klein was a member of the Proud Boys, and obtained and used a police barricade to help others climb the Capitol walls and gain access to an external stairwell.  *Id.* ¶¶ 27, 319.

- Defendant Minuta was a member of the Oath Keepers, participated with his coconspirators in invitation-only Signal discussions planning for the Attack on the Capitol, stayed near the District with his coconspirators, announced "that's what I came here for!" after hearing that the Capitol was breached, wore tactical gear and rushed to join the "[p]atriots" who were "storming the Capitol building," and accompanied his coconspirators in forcibly entering the Capitol and assaulting officers guarding the path from the Rotunda to the Capitol lobby. *Id.* ¶¶ 31, 128, 167, 248, 338-39, 369, 376.

- Defendant Pepe was a member of the Proud Boys, stayed with a coconspirator on the night before the Attack on the Capitol, and joined with several coconspirators

---

¶¶ 25-33, 42-43, ECF No. 132.  According to the Superseding Indictment, Keuhne purchased the orange tape to be used in identifying other members of the conspiracy.  *Id.*

to overwhelm the police and breach the outermost barricade protecting the Capitol on January 6.  *Id.* ¶¶ 37, 261, 308.

- Defendant Tarrio was a member and leader of the Proud Boys, called for a "revolt" and promoted an invasion of the Capitol on social media, created and moderated a chat group in which Proud Boys exchanged messages about the forthcoming Attack on the Capitol, and communicated directly with rioters at the Capitol, encouraging and instructing them to remain at the Capitol.  *Id.* ¶¶ 44, 231-34, 351, 353, 414.

- Defendant Biggs was a member of the Proud Boys, instructed other members of the Proud Boys to show up on January 6 disguised to blend in with other demonstrators, called for Members of Congress to be "dragged out of office and hung," coordinated the Proud Boys' movements and activities on the day of the Attack, and tore down fences, facilitating attacks on officers.  *Id.* ¶¶ 14, 161, 235, 254, 285, 310.

- Defendant Harrelson was a member of the Oath Keepers, participated in chats and meetings where plans for going to the District on January 6 was discussed, held a training session on "unconventional warfare," transported firearms and ammunition to the Washington D.C. metropolitan area, breached Capitol barricades and maneuvered to the front of a crowd that pushed against a police line on the Capitol steps, joined a "military stack" with coconspirators including moving Defendants Steele, C. Meggs, and K. Meggs and forcibly entered the Capitol, pushed past law enforcement officers, and searched the Capitol for Speaker of the House Nancy Pelosi.  *Id.* ¶¶ 24, 113, 121, 153, 167, 178, 210, 244, 331, 347-48, 356, 375.

- Defendant Ulrich was a member of the Oath Keepers, participated in an invitation-only encrypted chat group regarding January 6 wherein he stated that he would be "the guy running around with the budget [Armalite rifle], made plans for bringing guns to the Washington D.C. metropolitan area and did transport firearms and ammunitions there, traveled to the District with a coconspirator, and joined a "military stack" with coconspirators and entered the Capitol.  *Id.* ¶¶ 45, 167, 173-74, 178, 199, 248, 369.

- Defendant Worrell was a member of the Proud Boys who participated in the January 6 Attack.  *Id.* ¶ 48.  Worrell appeared at the Capitol on January 6 equipped with a tactical vest and communications equipment.  *Id.* ¶ 319.  He sprayed a noxious substance (seemingly pepper spray gel) toward officers guarding an entryway to the Capitol on the west side.  *Id.*

Moreover, each of the Defendants has been charged with crimes arising from their involvement in the January 6 Attack, with several of the Defendants (including moving Defendants K. Meggs, Minuta, Ulrich, Harrelson, Tarrio and Biggs) having been charged with, or having pleaded guilty

42

to, seditious conspiracy.[20]   *Id.* ¶ 90.   These criminal allegations, which are incorporated by reference in the Amended Complaint, further support the Defendants' involvement in the conspiracy.[21]

As this Court has already concluded, it is "reasonable to infer" from similarly pled facts that Defendants shared the "general conspiratorial objective" of "disrupting the Certification" and acted to further that objective.  *Thompson*, 2022 WL 503384, at *30, *38.

Seeking to avoid that conclusion, Defendants assert various arguments, none of which is persuasive.

Defendants Steele and Kuehne invoke *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37 (D.D.C. 2019), to assert that they were merely acting "in parallel" and not as part of a Section 1985 conspiracy.  *See* Kuehne MTD 3-5; Steele MTD 17-18.  But that case bears little resemblance to the facts here.  In *Kurd*, the Court found that "civilian defendants who attacked protesters were not part of a Section 1985(3) conspiracy because there were "no allegations that the civilian [d]efendants knew each other prior to the protest or that they communicated with each other during the protest," and therefore there was no basis to infer an "agreement" among the defendants rather than "parallel conduct that could just as well be independent action."  *Id.* at 62 (quoting *Twombly*, 550 U.S. at 557).  Here, the Amended Complaint expressly alleges each Defendant's affiliation with the Proud Boys or Oath Keepers, two violent groups whose members engaged in extensive coordination and planning both before and during the January 6 Attack.  *See, e.g.*, Am. Compl. ¶¶

---

[20]   As described above in Background Section F, the other Defendants charged with seditious conspiracy are Rhodes, Watkins, James, Hackett, Moerschel, Caldwell, Vallejo, Nordean, Pezzola, and Rehl.  Defendant James has already plead guilty to seditious conspiracy.

[21]   Every Defendant named in this case has been indicted by the Department of Justice for their involvement in the Attack on the Capitol.  Those indictments recount and implicate each Defendant in precisely the conspiracy that the District alleges here..

161, 308, 311, 314, 319, 323, 355.  These facts indicate joint, rather than parallel, action.  *See Lagayan v. Oldeh*, 199 F. Supp. 3d 21, 31 (D.D.C. 2016) ("[A]ll Defendants . . . are related to one another, making it reasonable to infer that their alleged actions were not mere parallel conduct"); *see also Halberstam*, 705 F.2d at 481 ("The easiest situation in which to draw the inference of agreement is where the parties are on the scene together at the same time performing acts in support of one another. . . . Mutually supportive activity by parties in contact with one another over a long period suggests a common plan.").

Defendant Steele's invocation of *Sines v. Kessler*, 324 F. Supp. 3d 765 (W.D. Va. 2018), is similarly unavailing.  *See* Steele MTD 19.  In *Kessler*, the court dismissed conspiracy claims against a particular defendant, Michael Peinovich, on the grounds that there were "no allegations that he participated in any violent acts" or appeared alongside any defendants during the incident at issue.  324 F. Supp. 3d at 794-95.  The allegations against Defendants here are very different.  The Amended Complaint alleges that Defendants, including moving Defendant Steele, participated directly in the violent and unlawful acts of January 6 (*e.g.*, by storming the Capitol), and that they did so alongside other Defendants with whom they were affiliated.  Defendants' conduct here is thus far closer to the conduct of the *other* defendants in *Kessler*, whom the court declined to dismiss based on their direct role in the violence alongside their coconspirators.  *See id.* at 784.

Defendant Steele also argues that the Amended Complaint fails to allege that she entered an agreement to achieve the particular goals of the conspiracy, namely: disruption of the Certification, prevention of President Biden and Vice President Harris's assumption and exercise of office, and harm to Vice President Pence's person and property.  Steele MTD 17.  And Defendants C. Meggs and K. Meggs likewise argue that "not one fact is alleged that would be

inconsistent with these Defendants alleged to have sought to protect and provide security as volunteers for others." Meggs MTD 11-12.[22]

Those arguments fail as well. The Amended Complaint alleges several statements by K. Meggs indicating an intent to menace Members of Congress and impede the Certification. *See e.g.*, Am. Compl. ¶¶ 111-13, 141, 211. And the Amended Complaint alleges numerous other Defendants' similar statements and indications of intent to disrupt the Certification, obstruct the transfer of power, and harm Vice President Pence. *See, e.g.*, *id*. ¶¶ 136, 140-41, 150, 161, 322, 327. Defendants' enthusiastic response to those statements—including joining with coconspirators who issued and endorsed those calls (in a "military stack," no less), and physically storming the Capitol—is reflective of a similar intent. Such conduct is wholly inconsistent with providing security for a lawful protest. Defendants' actions thus evince the "intent to disrupt the Certification of the Electoral College vote through force, intimidation, or threats." *Thompson*, 2022 WL 503384, at *33.

### 2.    There is No State Action Requirement for Section 1985(1) Claims.

Certain Defendants assert that the District's Section 1985(1) claims must fail because such claims are "limited to constitutional violations by state actors." Meggs. Mot. 12-13. That is incorrect. The plain text of Section 1985(1) prohibits *all* conspiracies targeting federal officials, whether by private individuals or under color of state law. *See* 42 U.S.C. § 1985(1) ("If two or more persons in any State or Territory conspire . . .."). As the Seventh Circuit has explained, Section 1985 was directed at the Ku Klux Klan and aimed to provide a federal remedy to private

---

[22] To the extent that Defendants argue that under the First Amendment, their "political rhetoric" may not be considered as evidence of intent, Meggs MTD 12, that is incorrect. *See Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse–Wisconsin, Inc*., 991 F.2d 1249, 1260 (7th Cir.1993); *see also Armstrong v. F.A.A*., 296 F. App'x 88, 89 (D.C. Cir. 2008).

misconduct in the face of *inaction* by state governments. *See Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1334 (7th Cir. 1977). If Section 1985 required state action, it would have failed to accomplish its original and primary purpose. Unsurprisingly, the District is not aware of any legal authority that suggests, let alone holds, that claims under Section 1985(1) require state action. *See, e.g.*, *Liggins v. O'Sullivan*, No. 3:19-CV-50303, 2022 WL 787947, at *6 (N.D. Ill. Mar. 15, 2022) (noting that "§ 1985(1), like § 1985(3), is a restraint upon federal officers *and private organizations*, as well as state action." (emphasis added)).

In suggesting a state action requirement, Defendants rely on cases that concern claims brought under Section 1985(3), rather than Section 1985(1). *See* Meggs Mot. 12-13 (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 278 (1993), and *United Brotherhood of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 833 (1983)). This would erroneously import Section 1985(3)'s requirement of state involvement into Section 1985(1),[23] but courts have repeatedly rejected similar attempts. *Stern*, 547 F.2d at 1340 (rejecting the importation of Section 1985(3)'s class-based animus requirement into Section 1985(1)); *see also Kush v. Rutledge*, 460 U.S. 719, 726 (1983) (rejecting the same importation into Section 1985(2)). By the statute's plain terms, Section 1985(1) conspiracies do not depend on deprivations of "equal protection," but on interference with *federal* officials. *Thompson*, 2022 WL 503384, at *25. Defendants' attempt to manufacture a "state action" requirement is thus without basis in text or precedent.

---

[23] The Supreme Court has explained that Section 1985(3) "can and does protect [constitutional] rights from interference by purely private conspiracies." *Carpenters*, 463 U.S. at 833. However, because most constitutional rights require state action, such claims usually require that "the state was somehow involved in or affected by the conspiracy." *Id*. That state "involvement" requirement does not apply to claims implicating the Thirteenth Amendment (which does not require state action), and may be satisfied where a private conspiracy hinders state action. *See Bray*, 506 U.S. at 278-79.

3.      **Generally Applicable Pleading Standards Apply to Section 1985(1) Claims.**

Moving Defendants Klein, Minuta, and Pepe (and by joinder, Defendants Tarrio, Biggs, and Worrell) argue that the general pleading standard under Rule 8 is inapplicable in this case because plaintiffs must plead conspiracy claims "with particularity." Klein MTD 16. This Court explicitly rejected that argument in *Thompson*, stating that "Rule 9(b)'s heightened pleading standard applies only to the two instances identified in the Rule: 'the circumstances constituting fraud or mistake.'" 2022 WL 503384, at *29 (quoting *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993)). This case also does not involve claims for fraud or mistake. Thus, the Rule 8 general pleading standard is applicable, and the District need only plead "a short and plain statement of the claim showing that the pleader is entitled to relief." *Twombly*, 550 U.S. at 555.

The same moving Defendants also argue that the District's Section 1985 claims requires the District to plead "actual malice" because the claims are "based on speech." Klein MTD 7. Again, this Court rejected that argument in *Thompson*, when it made clear that an "actual malice" requirement is applicable to Section 1985 claims "only when the conspiracy involved defamatory conduct" against a public official. *See* 2022 WL 503384, at *61. No such claim is alleged here.[24]

---

[24] The Defendants' cited cases do not support their argument. Both *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 243 (D.C. Cir. 2021) and *Montgomery v. Risen*, 197 F. Supp. 3d 219, 266 (D.D.C. 2016), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017), apply the "actual malice" standard to defamation claims, and then dismiss related tort claims (*e.g.*, false light, tortious interference) as a result. In doing so, those cases restate the well-established rule that "a plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim," and that where a plaintiff's "defamation claims fail, so do his other tort claims based upon the same allegedly defamatory speech." *Montgomery*, 197 F. Supp. at 267 (alterations omitted); *see Farah v. Esquire Magazine*, 736 F.3d 528, 540 (D.C. Cir. 2013). Here, the District has not advanced a defamation claim, nor are any of the District's claims related to or predicated on any allegedly defamatory speech.

47

### 4.   The District's Injuries were Caused by the Conspiracy.

Finally, several Defendants argue that the Amended Complaint does not plausibly allege that their acts caused the District's injuries because "the attack on the Capitol would have occurred regardless" and because the District "cannot plausibly demonstrate any actions of Defendants were the proximate cause of their injuries."  Klein Mot. 14.  That argument fails as well.

"Acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence."  *Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*, 657 F. Supp. 2d 104, 110 (D.D.C. 2009), *aff'd*, 383 F. App'x 1 (D.C. Cir. 2010).  And it is well-established that "once [a] conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy."  *Halberstam*, 705 F.2d at 481; *see also Ex. Rel Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 904 (D.C. Cir. 2010) (a conspirator is "liable for its coconspirators' foreseeable actions in support of the conspiracy").

Here, the Amended Complaint describes each Defendant's individual acts of violence, but also alleges that the Defendants' conspiracy as a whole engaged in acts of violence and played a leading role in unleashing the larger mob.  *See e.g.*, Am. Compl. ¶ 310 (Defendants "tore down a black metal fence that separated the crowd from law enforcement officers—thereby facilitating access to MPD officers."); ¶ 314 ("Members of the Proud Boys led the charge . . ."); ¶ 323 (Defendants "instigated a broader violent confrontation with the police.").  Because Defendants' conduct was designed to bring about, and substantially contributed to, the larger mob's violence, Defendants' conduct is a proximate cause of that violence.  *See Marsh v. Barry*, 705 F. Supp. 12, 14 (D.D.C. 1988) (explaining that correctional officials could be the proximate cause of a foreseeable prisoner riot, and the chain of causation "was not broken despite the activities of the inmates themselves").  Defendants are therefore liable not only for their own physical acts of

violence and those of their coconspirators, but also the foreseeable (and indeed desired) conduct of the larger mob. As this Court has already explained based on similar allegations, "there can be no genuine dispute at this stage that Defendants' alleged acts were the proximate cause of Plaintiffs' claimed injuries." *Thompson*, 2022 WL 503384, at \*25.

**B.      The District Has Stated Claims Under Section 1986.**

To state a claim under Section 1986, a plaintiff must allege that defendants (1) had "knowledge of a conspiracy proscribed in § 1985," (2) possessed "the means to prevent the conspiracy," and (3) refused[] or neglect[ed] to exercise such power." *Thompson*, 2022 WL 503384, at \*19; *see* 42 U.S.C. § 1986; *Bowie v. Maddox*, 642 F.3d 1122, 1128, 1132 (D.C. Cir. 2011).

Defendants make three arguments in support of their position that the District failed to adequately plead its Section 1986 claim. Each is without merit.

*First*, Defendants assert that because the District fails to plead the existence of a Section 1985 conspiracy, it also fails to adequately plead a Section 1986 claim.[25] For all the reasons articulated above, *see supra*, Section III.A, the District adequately pleaded the existence of a Section 1985 conspiracy.

*Second*, several Defendants argue that the District fails to state a Section 1986 claim because the Defendants were "minor" participants in the conspiracy who did not have the power or ability to prevent the Section 1985 conspiracy "with reasonable diligence." Steele MTD 7. Specifically, Defendant Steele argues that because "the conspiracy was a network of perhaps a dozen or more leaders who had been communicating with each other and working in tandem for approximately two months prior to January 6," the "person who had the power to prevent any

---

[25] Kuehne MTD 9; Ulrich MTD 12; Steele MTD 20-21; Meggs MTD 8; Klein MTD 10.

unlawful action was Donald Trump," not Steele.  *Id.* at 6-7.  Defendants Klein, Minuta, and Pepe—and, by joinder, Tarrio and Biggs—similarly assert that if "the Capitol Police could not stop the protests," there is nothing Defendants could "possibly have done to help stop the protests, even if they knew what was going to happen."  Klein MTD 8.  This argument is without merit.

Section 1986 does not require that a defendant possess unilateral power to prevent an entire conspiracy.  Rather it requires only that a defendant fail to "*aid in* preventing" "*any* of the wrongs" associated with a Section 1985 conspiracy.  42 U.S.C. § 1986 (emphasis added).  Courts have thus found that the failure to seize even minimal opportunities to aid in preventing tortious conduct can produce liability, including: failing to "attempt to dissuade" one's fellows from engaging in a Section 1985 conspiracy, *Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan*, 518 F. Supp. 993, 1007 (S.D. Tex. 1981), or failing to inform authorities about the existence of a conspiracy, *Peck v. United States*, 470 F. Supp. 1003, 1012-13 (S.D.N.Y. 1979).  At the pleading stage, allegations that an individual knew of a conspiracy and did nothing to stop it are sufficient to establish a failure to aid in preventing the commission of the underlying conspiracy.  *See Mitchell v. Cnty. of Nassau*, No. 05-4957-SJF-WDE, 2007 WL 1580068, at *6 (E.D.N.Y. May 24, 2007) ("[P]laintiff's allegations that she informed 'John Doe' of [the conspiracy] . . . and that he failed to take any action once so informed are sufficient, at the pleadings stage, to state a claim under section 1986.").

The Amended Complaint pleads facts more than sufficient to establish that *all* of the Defendants—including the moving Defendants—had the power to "aid in preventing" torts associated with the conspiracy and that they failed to exercise "reasonable diligence" to do so.  For example, the Amended Complaint alleges that Defendants C. Meggs, K. Meggs, Steele, Harrelson, Klein, Kuehne, Minuta, Pepe, Biggs, Ulrich, and Worrell were physically present and participated

in the storming of the Capitol.  *See* Am. Compl.  ¶¶ 128, 161, 167, 235, 248, 254, 261, 285, 308, 310, 319, 338-39, 345, 347-48, 356, 369, 376.  These Defendants could, at the very least, have attempted to "dissuade" some of those surrounding them from continuing the Attack, or assisted law enforcement.  *Vietnamese Fishermen's Ass'n*, 518 F. Supp. at 1007.  They failed to do so.

Moreover, Tarrio, as the leader of the Proud Boys, and creator and moderator of a chat group in which Proud Boys exchanged messages about the forthcoming Attack, clearly held a position from which he could have restrained or interfered with the planning and execution of the Attack.  *See* Am. Compl. ¶¶ 44, 231-34.  Instead, he egged the rioters on.  *See id.* ¶¶ 351, 353, 414.

Defendants are also alleged to have disguised the conspiracy from the authorities, rather than disclosing it, *see id.* ¶¶ 160-66 (Proud Boys appeared at the rally "incognito" and not "in colors"); ¶¶ 167-69, 239-42 (Defendants communicated on encrypted channels, which they changed in order to evade detection by law enforcement), and to have encouraged individuals to join the mob, rather than dissuading participation, *see id.* ¶¶ 204-37 (Defendants promoted their plans to attack the Capitol on public and encrypted platforms); ¶¶ 219-23, 225 (Tarrio and other Proud Boys directed use of a "top down structure" at the event and encouraged participation in the attack); ¶¶ 403-08, 413-15, 340-46 (Defendants kept in touch during the Attack and coordinated their movements through encrypted social media channels).  In short, the Amended Complaint alleges that Defendants made efforts to maximize participation in and the impact of the Section 1985 conspiracy at the heart of this action.  Those allegations clearly demonstrate a failure to exercise "reasonable diligence" to prevent the wrongs associated with that conspiracy.

Finally, certain Defendants allege—without support—that the District did not plead facts sufficient to demonstrate that they knew about the conspiracy.  *See, e.g.*, Klein MTD 8.  This argument also fails.  Each Defendant (except for Tarrio) is alleged to have gone to the Capitol on

January 6 with the intent to commit violence to prevent the certification of the results of the 2020 Presidential election, and to have taken steps in furtherance of that conspiracy by forcibly entering the Capitol building and committing acts of violence.[26]  Moreover, the Amended Complaint pleads that the Proud Boys' and Oath Keepers' leadership promoted the Attack to members and affiliates and recruited them to join the conspiracy, Am. Compl. ¶¶ 3, 94, 102–29, 155, 157, 175–77, 220; that members of the Proud Boys and Oath Keepers—including Defendants—amplified their leaders' promotion of the Attack, both publicly and in private chats with their coconspirators, *id.* ¶¶ 108–29, 149–59; and that Defendants communicated through encrypted channels widely used by Defendants and their coconspirators all throughout the Attack, *id.* ¶¶ 403-08, 413-15, 340-46. Each of those allegations provides ample indication that Defendants knew about the Attack.[27]

### C.      The District Has Stated Civil Conspiracy Claims for Assault, Battery, and Intentional Infliction of Emotional Distress.

The District has also sufficiently alleged civil conspiracy claims for assault, battery, and intentional infliction of emotional distress.  Under D.C. law, to state a claim for assault, a plaintiff must plausibly allege "an intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the victim."  *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007) (citation omitted); *see Bushrod v. District of Columbia*, 521 F. Supp. 3d 1, 29 (D.D.C. 2021) (citation omitted).  To state a claim for battery, a plaintiff must plausibly allege an "intentional act

---

[26]   The one exception is Defendant Tarrio, who is alleged to have helped plan the Attack and encouraged it from afar.  Am. Compl. ¶¶ 231-34, 351, 353, 414.  This Court has already held, based on substantially similar allegations, that "it is reasonable to infer" from Tarrio's leadership position and statements that he played a central role in organizing the conspiracy. *Thompson*, 2022 WL 503384, at *38.  That same position provided him with an opportunity to "aid in preventing" the conspiracy—an opportunity he rejected.

[27]   The Federal Rules of Civil Procedure expressly permit a party to "plead alternative theories of liability, regardless of whether such theories [are] consistent with one another."  *Scott v. District of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1996); *see* Fed. R. Civ. P. 8(d)(2).  Thus, to the extent that the Court has expressed skepticism that a Section 1985 conspirator can simultaneously be liable under Section 1986, *see Thompson*, 2022 WL 503384, at *19 n.16, both sets of claims should survive the motion to dismiss stage.

that causes harmful or offensive bodily contact." *Evans-Reid*, 930 A.2d at 937 (D.C. 2007) (citation omitted); *see Bushrod*, 521 F. Supp. 3d at 29 (D.D.C. 2021).  And to state a claim for intentional infliction of emotional distress, a plaintiff must plausibly allege "(1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Competitive Enterprise Institute v. Mann*, 150 A.3d 1213, 1260 (D.C. 2016).  A plaintiff may pursue claims not only against the immediate tortfeasor, but also against that tortfeasor's coconspirators, so long as the tortious conduct was reasonably foreseeable and done to advance the overall object of the conspiracy.  *Halberstam*, 705 F.2d at 477, 487; *see Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000).

Here, Defendants do not dispute that the Amended Complaint plausibly alleges that MPD officers (for whom the District proceeds as a subrogee) were assaulted or battered during the Attack on the Capitol.  And only Defendants C. Meggs and K. Meggs dispute that the Amended Complaint alleges that MPD officers suffered sufficiently severe emotional distress in the Attack. *See* Meggs MTD 21-22.  Instead, several Defendants argue that they cannot be liable because they did not specifically agree to commit the particular torts alleged.  Meggs MTD 15-17; Klein MTD 10-12.  Several Defendants further argue that they cannot be liable because the torts were committed by "third-party actors," rather than by Defendants or their coconspirators.  Klein MTD 11-12.[28]  Each of those arguments are without merit.

First, contrary to Defendants K. Meggs and C. Meggs' argument, the Amended Complaint adequately alleges an intentional infliction of emotional distress claim.  As the D.C. Court of

---

[28]  As with the Section 1985(1) claims, several Defendants argue that the District failed to plead facts indicating that they participated in a conspiracy, rather than "parallel" conduct.  Kuehne MTD 3-5; Steele MTD 17-20.  That argument fails for the reasons discussed above.

Appeals has explained, to state a claim for severe emotional distress, the distress must go beyond mere "mental anguish and stress" and must be "of so acute a nature that harmful physical consequences are likely to result." *Competitive Enterprise Institute*, 150 A.3d at 1260 (citation omitted). A relevant factor in determining whether distress reaches this threshold is whether a plaintiff sought "medical assistance for physical or psychological injury." *Kotsch v. District of Columbia*, 924 A.2d 1040, 1046 (D.C. 2007). Here, the Amended Complaint alleges that MPD officers "suffered extensive psychological injuries," and that "the clinical director of the Metropolitan Police Employee Assistance Program[] has worked with nearly 1,000 officers since the January 6th Attack in an effort to help them cope with the physical and emotional trauma." *Id.* ¶ 454. The Amended Complaint also alleges that the injuries to MPD officers were "severe and sustained over time," such that some officers "were still on leave months after the Attack as a result of the trauma they suffered at the Defendants' hands." *Id.* ¶ 455. Such allegations easily establish sufficient emotional distress. *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 917-18 (D.C. Cir. 2015) ("Normally, severe emotional distress is accompanied or followed by shock, illness, or other bodily harm, which in itself affords evidence that the distress is genuine and severe.") (citing Restatement (Second) of Torts § 46 cmt. k).

Defendants' argument regarding the absence of agreement to engage in the specified torts fares no better. To be liable as a coconspirator, a defendant need not agree to commit the particular torts at issue. Rather, he only need agree "to do an unlawful act or a lawful act in an unlawful manner," *Halberstam*, 705 F.2d at 487—for example, to interfere with the certification of an election. Once such an agreement has been established, a defendant can be liable even if "he neither planned nor knew about the particular overt act that caused injury, so long as the purpose of the act was to advance the overall object of the conspiracy." *Id.*

As explained above, the District plausibly alleged that Defendants entered into a conspiracy for the purpose of disrupting the Certification in violation of Section 1985(1), *see supra*, Section III.A.1. Defendants are thus vicariously liable for all reasonably foreseeable tortious acts taken by their coconspirators in furtherance of that goal. *See Halberstam*, 705 F.2d at 477, 487.

The Amended Complaint alleges that several coconspirators committed tortious acts in furtherance of that goal. For example, the Amended Complaint describes Defendants and their coconspirators attacking MPD officers as part of their effort to breach the Capitol and disrupt the Certification. *See e.g.*, Am. Compl. ¶¶ 314, 315, 319, 356, 361, 375-77, 393-402. Moreover, the tortious conduct at issue—specifically, violent altercations with police—was a reasonably foreseeable consequence of the conspiracy to disrupt the Certification. Indeed, the Amended Complaint makes clear that Defendants equipped themselves with weapons and armor, knew that the Capitol complex was closed to the public and guarded by police, and asserted that "cops are the primary threat." *Id.* ¶¶ 171-83, 215, 227-28, 255, 286. The District thus plausibly alleged that the assault, battery, and infliction of emotional distress on MPD officials were reasonably foreseeable and in furtherance of an unlawful objective. All Defendants are therefore liable for their coconspirators' tortious conduct, even if they did not specifically agree to particular acts.

Defendants' characterization of the tortious acts committed here as "third-party" conduct likewise fails, for at least two reasons. First, Defendants are simply incorrect in their characterization. The Amended Complaint does not simply allege acts of violence by an undifferentiated mob; it specifically alleges that numerous Defendants *themselves* directly engaged in relevant tortious conduct as part of a conspiracy. For example, the Amended Complaint alleges that various Defendants "forced their way past the barricades, [and] assaulted officers," "grabbed a police barricade in an attempt to wrench it from law enforcement," "sprayed a noxious substance

(seemingly pepper spray gel) toward a line of police officers," "assaulted police officers" guarding the Rotunda door, "push[ed] past law enforcement," and "grabbed" an MPD officer by the vest and "pulled him toward the mob." *Id.* ¶¶ 315, 318, 319, 356, 375, 376; *see also id.* ¶¶ 393-402. Because Defendants were engaged in a conspiracy, they are all jointly and severally liable for the actions of their coconspirators, including the tortious conduct identified above. *See Halberstam*, 705 F.2d at 474, 481; *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 31 (D.D.C. 2008).

Second, Defendants' liability is not limited to those physical acts of violence directly perpetrated by Defendants and their coconspirators. Rather, Defendants are also vicariously liable for "knowingly and substantially assist[ing]" in the tortious acts of much of the rest of the mob. *Halberstam*, 705 F.2d at 477. Here, multiple Defendants provided precisely such knowing and substantial assistance to the assault, battery and infliction of emotional distress on MPD officers by others. For example, Defendants and their coconspirators cleared away barricades and tore down fencing to "facilitat[e] access to MPD officers," urged the mob onward "with a bullhorn," "led the charge," "used [a] police barricade to help others climb the Capitol walls" and outflank police, and "direct[ed]" those around them "to overtake law enforcement." Am. Compl. ¶¶ 308, 310, 314, 319, 325, 333, 360. Because such conduct constitutes knowing and substantial assistance of the mob violence, Defendants are vicariously liable for the violence they and their coconspirators assisted. *See Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 221-23 (D.C. Cir. 2022); *Halberstam*, 705 F.2d at 478. The Amended Complaint thus sufficiently alleges acts of battery, assault and intentional infliction of emotional distress against MPD officers that are attributable to Defendants.

## IV.    The January 6 Attack Was Not Protected Speech Under the First Amendment.

This Court has already considered—and "quickly dispense[d]" with—the argument that Defendants Klein, C. Meggs, K. Meggs, Minuta, Pepe, Biggs, Tarrio, Harrelson and Worrell make

here, *see* Meggs MTD 11-12; Klein MTD 7, that violently breaching the Capitol is protected expression under the First Amendment. *Thompson*, 2022 WL 503384, at *47. The same result should follow here.

The First Amendment to the Constitution provides, in pertinent part, that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." However, "the First Amendment does not protect violence." *Thompson*, 2022 WL 503384, at *47 (quoting *NAACP v. Claiborne Hardware* Co., 458 U.S. 886, 913 (1982)). Nor does it protect "speech that caused violence or constituted threats of violence." *Id.* at 40.

This Court determined in *Thompson* that conduct substantially identical to that engaged in by Defendants in this case was outside the protections of the First Amendment. In *Thompson*, the Oath Keepers argued that their "alleged acts were protected speech, assembly, and petitioning." *Id*. at *47. The Court rejected that argument because "[t]he Oath Keepers are alleged to have acted violently by breaching the Capitol building with the rest of the riotous mob, wearing paramilitary equipment, helmets, reinforced vests and clothing with Oath Keepers paraphernalia, moving in a regimented manner as member of the military are trained." *Id.* (internal quotation marks and citation omitted). The Court explained that "[s]uch actions, if true, are not entitled to First Amendment protection." *Id*.

As in *Thompson*, the District has alleged that Defendants "acted violently by breaching the Capitol building with the rest of the riotous mob." *Id.* (quotation marks omitted); *see Claiborne*, 458 U.S. at 916. Here, Defendants "violently clash[ed] with the MPD and Capitol Police officers" guarding the Capitol, and, after gaining entry, continued their "violent rampage"—all while searching for election Certification proceedings and individuals with official functions to make good on their threats to disrupt the election Certification process. Am. Comp. ¶¶ 307, 372. These

actions are not expressions of the political rhetoric, assembly, or protest entitled to constitutional protection—they are acts of violence.[29]

With respect to the particular Defendants who moved to dismiss the District's complaint, as in *Thompson*, each has engaged in specific acts of violence that cannot be mistaken for protected speech. In its Amended Complaint, the District alleges that each of Defendants Biggs, Harrelson, Klein, C. Meggs, K. Meggs, Minuta, Pepe, Tarrio, Ulrich, and Worrell engaged in acts that spurred and threatened violence. Specifically, the District alleged:

- Defendant K. Meggs posted on social media that he saw people "talking" but not "doing" and asking people to direct message him if they wished to "join the fight," which he described as needing to take place "face to face." Am. Compl. ¶ 114.

- Defendant Ulrich coordinated with other Oath Keepers Defendants about what weapons they would bring to the Capitol, telling other group members that he would "be the guy running around with the budget AR" and that he would have a "separate backpack with [his] ammo load out with some basics that [he] can just switch too is [*sic*] shit truly the [*sic*] fan blades[.]" *Id.* ¶ 173. Ulrich, along with other Oath Keepers Defendants, purchased firearms that he transported, along with ammunition and other equipment, to the Washington, D.C. metropolitan area prior to the Capitol Attack. *Id.* ¶¶ 178, 199, ¶ 248. Once at the Capitol, Ulrich joined with other Defendants in a "military stack" formation and forced his way into the Capitol. *Id.* ¶ 369.

- Defendants C. Meggs and K. Meggs were part of a group of Oath Keepers coconspirators who wore helmets, reinforced vests, and goggles during their attack on the Capitol. *Id.* ¶ 301. Once at the Capitol, they joined with other Defendants in a "military stack" formation and forced their way into the Capitol. *Id.* ¶¶ 345-47. They then entered the Capitol and "assaulted police officers guarding the door in order to breach the building, including by throwing objects at the officers and deploying chemical irritants against them." *Id.* ¶ 356.

- Defendant Minuta, also an Oath Keepers member, rushed to join the mob, stoking and threatening violence, stating "there's violence against patriots by the D.C.

---

[29] Further underscoring that there is no First Amendment protection for the conduct alleged against the Defendants here is the fact that 16 of them have been charged with seditious conspiracy, which criminalizes a conspiracy to "put down, or to destroy by force the Government of the United States." 18 U.S.C. § 2384. To the extent the allegations that form the basis of that charge are at issue here, they militate against the application of a First Amendment defense.

Police; so we're en route . . . Patriots storming the Capitol building right now . . . war in the streets . . . let's go." *Id.* ¶ 339.  He wore paramilitary gear and joined another military "stack" formation to force his way into the Capitol.  *Id.* ¶ 369.  He was armed with bear spray and other tactical gear and joined in another military "stack" formation to force his way into the Capitol.  *Id.*

- Defendant Harrelson, another Oath Keeper defendant, transported firearms and ammunition to the Washington D.C. metropolitan area, breached Capitol barricades and maneuvered to the front of a crowd that pushed against a police line on Capitol steps, joined a "military stack" with coconspirators, and forcibly entered the Capitol, pushed past law enforcement officers, and searched the Capitol for Speaker of the House Nancy Pelosi.  *Id.* ¶¶ 178, 210, 244, 331, 347-48, 356, 375.

- Defendant Biggs, a leader of the Attack, called for Members of Congress to be "dragged out of office and hung," led and coordinated the Proud Boys' movements and activities on the day of the Attack, and tore down fences facilitating attacks on officers.  *Id.* ¶¶ 14, 161, 235, 252, 256, 258, 285, 310.  Biggs entered the Capitol on multiple occasions, pushing past law enforcement officers.  *Id.* ¶¶ 336-37, 354, 366.

- Defendant Proud Boys member Klein pushed through police barricades and then used the barricade to help other members of the mob climb the Capitol walls and gain access to an external stairwell.  *Id.* ¶ 319.  At the same time, Proud Boys member Worrell, also wearing a tactical vest, sprayed a noxious substance (seemingly pepper spray gel) toward a line of police officers guarding the Capitol's west side.  *Id.*

- Defendant Fellow Proud Boys member Pepe "overwhelmed the police and breached the outermost barricade that had been erected to protect the Capitol."  *Id.* ¶ 308.  After overcoming the police, Pepe forced his way into the Capitol.  *Id.* ¶ 373.

- Defendant Tarrio spurred on the violence.  Prior to the Attack, he encouraged violence by instructing Proud Boys members to "spread across downtown D.C. in smaller teams" than in the past, "conceal [their] intentions," "pose as a friend, work as a spy," "crush [their] enemy totally," and "keep others in suspended terror."  *Id.* ¶ 164.  During the Attack, he made several public social media posts encouraging the Proud Boys Defendants and their coconspirators to engage in further violence, including: "After I finish watching this I'll make a statement about my arrest . . . But for now I'm enjoying the show . . . Do what must be done," *id.* ¶ 349; "Don't fucking leave," *id.* ¶ 351.  He also posted a message to other Proud Boys leaders saying, "[d]o it again."  *Id.* ¶ 387.

Such actions—if proven—are plainly not entitled to First Amendment protection.

*Thompson*, 2022 WL 503384, at *47.

**V.      The Amended Complaint Does Not Violate Federal Rule of Civil Procedure 8.**

Certain Defendants argue that the Amended Complaint should be dismissed with prejudice because it is a lengthy and confusing "shotgun pleading" that violates Rule 8.  *See* Meggs MTD 22-26.  This argument is baseless and without merit.

 Rule 8 requires, for each claim for relief, a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Moreover, "[e]ach allegation must be simple, concise, and direct."  Fed. R. Civ. P. 8(d)(1).  Enforcing these rules, by way of striking or dismissing a complaint, is "largely a matter for the trial court's discretion."  *Ciralsky v. C.I.A.*, 355 F.3d 661, 669 (D.C. Cir. 2004).

The thrust of Defendants' argument is that the Amended Complaint is of "excessive length" and therefore is not "a short and plain statement of the claim."  Meggs MTD 22, 24.  But Rule 8 does not require a "short and plain *complaint*," but rather a "short and plain statement of the *claim*": it requires that "each averment of a pleading be simple and concise," not "each pleading itself." *Ciralsky*, 355 F.3d at 670 (emphases in original).  Length is not, by itself, a basis for striking or dismissing a complaint under this Rule. *See, e.g., Middlebrooks v. St. Coletta of Greater Washington, Inc.*, 2009 WL 3163061, at *1 (D.D.C. Sept. 30, 2009) (denying motion to strike a complaint under Rule 8(a) because "[a]lthough plaintiff's complaint is lengthy, it is not incomprehensible"); *Trew v. Am. Inst. of Intradermal Cosms., Inc.*, 2005 WL 1079316, at *1 (W.D. Tenn. May 3, 2005) (denying a motion to dismiss a complaint under Rule 8 that boiled down to the contention that the complaint was "just too long").  Indeed, dismissal for violating Rule 8 "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir.1995); *see Ciralsky*, 355 F.3d at 671 n.9.

The Amended Complaint does not meet this standard.   This case involves a complex fact pattern resulting in multiple claims against 37 individuals and two organizations.   The District is required to allege facts that, in addition to providing Defendants with notice of the basis of those claims, are also sufficient to makes the claims "plausible" rather than merely "conceivable." *Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009).   The Amended Complaint's detailed allegations meet that requirement.

The Defendants fail to identify any portions of the Amended Complaint that are so extraneous or confusing so as to render the pleading as a whole "unintelligible." *Simmons*, 49 F.3d at 86.   Beyond general allegations about length, the Defendants' sole specific contention is that the Amended Complaint is improper because its counts reincorporate by reference the preceding allegations.   Meggs MTD 25-26.   But that practice does not violate Rule 8.   *See, e.g.*, *Maynard v. Melton*, 2021 WL 6845008, at *4 (D.D.C. Apr. 7, 2021) (rejecting motion to dismiss on basis that the complaint violated Rule 8 because each count incorporated by reference all prior allegations of fact, stating that "mere surplusage" should "be ignored") (quotation marks omitted)).   The Defendants' argument should be rejected.[30]

---

[30]   Moreover, even if the Defendants had articulated a Rule 8 violation, and they have not, they would not be entitled to the dismissal with prejudice that they seek.  *See* Meggs MTD 26.  "[I]t will generally be an abuse of discretion to deny leave to amend when dismissing a nonfrivolous original complaint on the sole ground that it does not constitute the short and plain statement required by Rule 8." *Ciralsky*, 355 F.3d at 670.  In sum, the Defendants have not articulated a Rule 8 violation, let alone one warranting dismissal with prejudice.

## <u>CONCLUSION</u>

For all the reasons stated herein, the Defendants' Motions to Dismiss should be denied in

their entirety.

Dated: July 29, 2022

***Counsel for Plaintiff District of Columbia:***

**KARL A. RACINE, ATTORNEY GENERAL**
**FOR THE DISTRICT OF COLUMBIA**

By:     /s/ *Kathleen Konopka*
       Kathleen Konopka (D.C. Bar 495257)
       Vikram Swaruup (D.C. Bar 1670692)
       Brendan B. Downes (D.C. Bar 187888)
       400 6th St. NW
       Washington, DC 20001
       Tel: 202-724-6533
       Email: vikram.swaruup@dc.gov

**STATES UNITED DEMOCRACY CENTER**

By:     /s/ *Norman Eisen*
       Norman Eisen (D.C. Bar 435051)
       1420 K Street NW
       Washington, DC 20005
       Tel: 202-656-8178
       Email: norm@stateuniteddemocracy.org

By:     /s/ *Christine Sun*
       Christine P. Sun
       Katherine Reisner
       3749 Buchanan St., No. 475165
       San Francisco, CA 94147-3103
       Tel: 615-574-9108
       Email:christine@stateuniteddemocracy.org
          katie@stateuniteddemocracy.org

**THE ANTI-DEFAMATION LEAGUE**

By: /s/ *Eileen Hershenov*
    Eileen B. Hershenov
    605 Third Avenue
    New York, NY 10158-3650
    Tel: 212-885-5805
    Email: ehershenov@adl.org

**PAUL, WEISS, RIFKIND, WHARTON &**
**GARRISON LLP**

By: /s/ *Jeannie Rhee*
    Jeannie S. Rhee (D.C. Bar 464127)
    2001 K Street, NW
    Washington, D.C. 20006-1047
    Tel:  202-223-7300
    Fax:  202-223-7420
    Email:jrhee@paulweiss.com

By:  /s/ Aaron Scherzer
     Aaron Scherzer
     572 Valley Road, No. 43592
     Montclair, NJ 07043
     Tel: 862-367-6480
     Email: aaron@statesuniteddemocracy.org

**DECHERT LLP**

By:  /s/ Matthew Larrabee

     Matthew L. Larrabee
     1095 Avenue of the Americas
     New York, NY 10036-6797
     Tel: 212-698-3500
     Fax: 212-698-3599
     Email: matthew.larrabee@dechert.com

By:  /s/ Vincent Cohen

     Vincent H. Cohen, Jr. (D.C. Bar 471489)
     D. Brett Kohlhofer (D.C. Bar 1022963)
     1900 K Street, NW
     Washington, D.C. 20006-1110
     Tel: 202-261-3300
     Fax: 202-261-3333
     Email: vincent.cohen@dechert.com
         d.brett.kohlhofer@dechert.com

By:  /s/ Michael Doluisio

     Michael S. Doluisio
     2929 Arch Street
     Philadelphia, PA 19104-2808
     Tel:  215-994-2000
     Fax:  215-994-2222
     Email:  michael.doluisio@dechert.com

By:  /s/ Daniel Kramer
     Daniel J. Kramer
     Andrew J. Ehrlich
     Erin J. Morgan
     1285 Avenue of the Americas
     New York, NY 10019-6064
     Tel: 212-373-3000
     Fax: 212-757-3990
     Email: dkramer@paulweiss.com
         aehrlich@paulweiss.com
         ejmorgan@paulweiss.com

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Civil Procedure 5, a copy of the foregoing filing is being served electronically on those parties who have appeared and registered with the Court's ECF system.  Plaintiff is serving remaining defendants via first class mail or other permitted means.

/s/ *Jeannie S. Rhee*
Jeannie S. Rhee (D.C. Bar 464127)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel:  202-223-7300
Fax:  202-223-7420
Email:  jrhee@paulweiss.com