## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DISTRICT OF COLUMBIA,**

         Plaintiff,

      v.

**PROUD BOYS INTERNATIONAL, LLC,** *et al.*

         Defendants.

Civil Cause of Action

1:21-CV-03267-APM

Assigned to the Honorable
Judge Amit Mehta

## DEFENDANT ELMER STEWART RHODES III'S
## ANSWER TO THE AMENDED COMPLAINT WITH AFFIRMATIVE DEFENSES

Comes now the Defendant ELMER STEWART RHODES III, and hereby Answers the Complaint of the Plaintiff, along with his Affirmative Defenses.

## GENERAL ANSWER AND RESPONSES

The Amended Complaint is structured that there was a giant conspiracy which strikes RHODES as a conspiracy theory, and therefore police officers should be compensated for injuries and the District should be compensated for as-yet unidentified "other" damages.

With some exceptions of those who created much of the violence, members of the U.S. Capitol Police and Metropolitan Police Department were injured during violent confrontations with a few – very few – of the estimated 500,000 to 1 million people who came to the District of Columbia on January 6, 2021. These officers deserve to be compensated, to the extent the legal system is capable of making them whole, for the injuries they sustained. RHODES and others point out that much of the problem was actually caused by the Congress, Mayor Muriel Bowser, and a very few errant police officers. However, the fact that causation is broken as to these

Defendants does not suggest that the officers should not be cared for, provided with medical care, and healed.  But RHODES understands on information and belief that the Federal Government is responsible to pay for all of that when it calls upon the District of Columbia for help (and all the more so because the District is unavoidably the venue for both large and small demonstrations, possibly a hundred per year including small ones, aimed at the Federal Government which would have no relevance to the District other than the presence of the U.S. Government within the District of Columbia).

However, this Plaintiff is not suing those who actually injured them, at least not in this suit, except as unknown John Does 1-10.  Assuming that the Plaintiff and other officers can get access through the U.S. Capitol Police to the identifications of those actually responsible from the FBI's massive review of video recordings, those who actually assaulted officers for injuries.

The Plaintiff seeks to make all of the Defendants in this civil case liable for injury allegedly experienced by the District of Columbia (though not identified other than MPD injuries) because the injury resulted from an otherwise irrelevant conspiracy in which the District of Columbia has no standing, claim, or interest.  Although MPD participated in law enforcement activities on Federal, Legislative Branch, property at the U.S. Capitol, presumably MPD does so under a pre-existing, written agreement and presumably the Federal Government agrees to reimburse and indemnify the District for the time, work, and injuries suffered by the MPD when in the service of the Federal Government as supplementary personnel.

Defendant RHODES, by counsel, continues to request that the allegations be restated in a Second Amended Complaint without run-on compound paragraphs and sentences that assert multiple different facts within the same sentence, so that it can be more easily understood, analyzed, responded to, discussed, and decided.  In order to try to admit or deny parts of long

compound paragraphs, RHODES may note that the paragraph is compound, but continues his objection on a blanket level whether restated or not.

Defendant RHODES urges that the District of Columbia sue those people who actually did what the Plaintiff alleges, not these 39 Defendants who are either innocent or who engaged in only minor infractions, unlike the very few demonstrators who did cross over into violence.

Defendant RHODES hopes that the extensive investigation by the Federal Bureau of Investigation and the U.S. Capitol Police will identify all those who actually attacked and/or harmed police officers.  But the Plaintiff cannot sue on behalf of the Legislative Branch of the Federal Government nor on behalf of the Executive Branch.

Furthermore, with every allegation denied, the Defendant intends any denial as including a demand that the allegation be proven by competent evidence.  Rather than repeating this demand each time, Defendant applies this to all of his answers on a blanket basis.

Furthermore, throughout the Complaint's compound paragraphs, the Amended Complaint alleges actions or statements by all of the Defendants but also an unbounded population of millions of other people.  Clearly it would be impossible for Defendant RHODES to know everything that other people did or said or speak for all of the people swept up in the Complaint's over-broad implications. Therefore, RHODES can only admit or deny with regard to himself or maybe those about whom he has direct personal knowledge.    RHODES, by counsel, does not consider being aware of things only through the news the same as any other consumer of news as being something he could or should admit or deny.  He may point that out for clarity but asserts the objection as a blanket interpretation for all allegations.

Defendant also notes that some things are "known" only through news media reporting and endeavors to be clear if something is known or believed only through news reporting.

Where an allegation rests on misinterpreting, twisting, misreading, or the like a fact or statement, RHODES will outright deny the allegation as untrue.  Even where someone may have done or said something somewhat similar to what is alleged, if the allegation is a twisting or misrepresentation of what actually was done or said, RHODES will deny the allegation.

Where RHODES DENIES an allegation, particularly a compound paragraph, this is intended to and should be understood to deny any implied allegations or implications or inferences that might be drawn from the explicit factual allegations.  Defendant also denies that the factual allegation if taken as true necessarily has the meaning assigned to it by the Plaintiff as having any relevance to the case.

Furthermore, RHODES does not necessarily agree that any of the indictments can be "incorporated into the Amended Complaint by reference."  However, Defendant RHODES does not view this Answer as the ideal forum for addressing such legal questions.  RHODES notes that there may be a difference between attaching indictments to the Plaintiff's Amended Complaint, but that might be different from actually incorporating the allegations of an indictment into the Amended Complaint as live allegations of the Amended Complaint.

## ANSWERS TO INDIVIDUAL PARAGRAPHS OF THE COMPLAINT

*Answering Complaint Par. 1)*          The paragraph is compound.  Defendant accepts the allegations of the first clause as to who is suing whom, but has no direct knowledge of why the Plaintiff is suing and denies the characterizations contained within the paragraph.

*Answering Complaint Par. 2)*          RHODES DENIES each and every allegation or factual detail made or which might be interpreted from or gleaned from the paragraph, including most especially any events or characterizations which the Plaintiff may come to think are indisputable, but Defendant does dispute them. RHODES further answers that any violence

initiated by a member of the Oath Keepers would violate the Bylaws and subject the member, after investigation, to be expelled if true.

***Answering Complaint Par. 3)***        RHODES DENIES each and every allegation or factual detail made or which might be interpreted from or gleaned from the paragraph.

***Answering Complaint Par. 4)***        RHODES DENIES each and every allegation or factual detail made or which might be interpreted from or gleaned from the paragraph.

***Answering Complaint Par. 5)***        RHODES DENIES each and every allegation or factual detail made or which might be interpreted from or gleaned from the paragraph. Defendant accepts that different people and groups did different things on or about January 4-6, 2021, and that outside of his knowledge some people may have had plans or intentions he did not witness.  However, RHODES DENIES any suggestion that there was any common plan or desire or intention among the roughly 500,000 to 1 million demonstrators who visited Washington, D.C., of whom about 10,000 demonstrated at the Capitol according to the U.S. Capitol Police.

***Answering Complaint Par. 6)***        The paragraph is compound.  RHODES DENIES each and every allegation or factual detail made or which might be interpreted from or gleaned from the paragraph.

***Answering Complaint Par. 7)***        RHODES DENIES each and every allegation or factual detail made or which might be interpreted from or gleaned from the paragraph, except to the extent that it is unclear and ambiguous what a "shambles" is.  If by Paragraph 7 the Plaintiff means that there was debris or trash left behind by the crowd estimated 500,000 to 1 million people throughout the City, requiring nothing more than collecting the trash for discarding, Defendant accepts that clean-up after the protest might have been required.  However, Defendant limits this by the fact that the same is true of every demonstration, parade, or event in the

Nation's Capitol, including New Year's Eve, the 4th of July, and concert series often held on the West face of the U.S. Capitol for members of the public.

***Answering Complaint Par. 8)***        Denied as mischaracterizing the testimony.

***Answering Complaint Par. 9)***        The paragraph is compound.  RHODES DENIES that the Plaintiff can "hold the Defendants accountable under federal laws" including because the District of Columbia cannot sue for any alleged injury to federal property it does not own, does not lease, and does not occupy for use.  Defendant further denies that the allegations of Paragraph 9 describe the true motivations of the Plaintiff, which Defendant asserts are plainly to engage in pure political activism and attempt to campaign for the Democrat Party and against the Republican Party in future elections using this lawsuit as a political prop paid for at taxpayer expense.  Furthermore, the paragraph relies upon "by filing this action, makes clear that it will not countenance the use of violence against the District, including its police officers," but ignores the fact that the demonstrators went to the U.S. Capitol, not to any building of the District of Columbia, but the City's Metropolitan Police Department went to the Capitol.

***Answering Complaint Par. 10)***        The Paragraph is compound.  Defendant accepts without personal knowledge the Plaintiff's description of itself.

***Answering Complaint Par. 11)***        The Paragraph is compound.  Defendant accepts without personal knowledge the Plaintiff's description of the Proud Boys Club but notes concern that apparently "Proud Boys International, LLC" does not exist (at least not as a going concern) and never did, but was created out of mistake and excessive enthusiasm – unauthorized – by a supportive Texas lawyer.  Thus, it may be as rumored that no Proud Boys business was ever conducted by or through "Proud Boys International, LLC."

***Answering Complaint Par. 12)***        The paragraph is compound. Defendant admits the

first sentence of the Paragraph.  RHODES DENIES the rest of the Paragraph, including but not limited to the fact that the Oath Keepers have never described themselves as a militia and define a militia (being mostly former military themselves) in very precise terms that exclude the Oath Keepers within public ideas a militia.  Based on American history and law, the Oath Keepers do not recognize the concept of a self-appointed or independent militia.  In particular, the Oath Keepers define the latent or potential militia as being all able-bodied citizens, originally men (though Oath Keepers has for many years included women members in its ranks), but define any actual militia in fact as requiring a proper government authority calling up a militia.  The Oath Keepers do not understand a militia to exist apart from proper governmental authority.  A militia might be better understood by those raised on Western movies and shows as being like a posse called up by the Sheriff to provide additional manpower to the Sheriff's abilities alone.  These distinctions are extremely significant in that a militia properly exists to enforce existing law, not to vary from existing law, in support of lawful authority when standing authorities are unable or unwilling to carry out existing law.  The militia (think again of a posse called up by a County Sheriff in a Western) does not act on its own initiative.

*Answering Complaint Par. 13)*        Defendant does not know and takes no position from any personal knowledge as to Defendant Ryan Ashlock.

*Answering Complaint Par. 14)*        Defendant does not know and takes no position from any personal knowledge as to Defendant Joseph Randall Biggs, except that he offered public commentary.

*Answering Complaint Par. 15)*        Defendant does not know and takes no position from any personal knowledge as to Defendant Marc Anthony Bru.

*Answering Complaint Par. 16)*        Defendant having only short-term and minimal

involvement in the Oath Keepers mainly in Florida, Defendant has only limited knowledge of Thomas Caldwell in that (a) Caldwell is not a member of the Oath Keepers, but (b) Caldwell offered the use of his farm more than once as a camp ground for Oath Keepers traveling through or near North Central Virginia, (c) Caldwell was a supporter of the Oath Keepers though not a member, and (d) Caldwell was for reasons unknown to Defendant lumped into the criminal prosecution with Defendant as a co-Defendant.

*Answering Complaint Par. 17)*     Defendant does not know and takes no position from any personal knowledge as to Defendant William Chrestman.

*Answering Complaint Par. 18)*     Defendant does not know and takes no position from any personal knowledge as to Defendant Enrique Colon.

*Answering Complaint Par. 19)*     Defendant does not know and takes no position from any personal knowledge as to Defendant Donovan Ray Crowl.

*Answering Complaint Par. 20)*     Defendant does not know and takes no position from any personal knowledge as to Defendant Nicholas DeCarlo.

*Answering Complaint Par. 21)*     Defendant does not know and takes no position from any personal knowledge as to Defendant Charles Donohoe.

*Answering Complaint Par. 22)*     Defendant does not know and takes no position from any personal knowledge as to Defendant Matthew Greene.  Defendant understands that the paragraph is referring to Proud Boys member Matthew Greene from New York and not Oath Keepers member Michael Greene from Indiana.

*Answering Complaint Par. 23)*     Defendant takes no position from any personal knowledge as to Defendant Joseph Hackett.  He is an Oath Keepers member from Florida. RHODES does not know Hackett's awareness of this lawsuit.

8

***Answering Complaint Par. 24)***        The paragraph is compound.  Defendant RHODES admits the allegations of the paragraph that Harrelson is an Oath Keepers member from Florida. RHODES he denies that any of the Oath Keepers participated in any January 6th attack. RHODES further answers that Harrelson and Dolan were the first two Oath Keepers to arrive at the Capitol escorting as private security VIPs and RHODES and other Oath Keepers found Harrelson and Dolan dressed in ordinary street clothes at the Capitol, when no one could find the stage platform set up at "Area 8" for the permitted rally where the Oath Keepers were supposed to provide security.

***Answering Complaint Par. 25)***        Defendant does not know and takes no position from any personal knowledge as to Defendant Arthur Jackman.

***Answering Complaint Par. 26)***        The paragraph is compound.  Harrelson takes no position from any personal knowledge as to Defendant Joshua James.  RHODES in Texas was aware of Joshua James in Alabama.  Defendant objects to any mischaracterization or exaggeration of the coerced plea deal and statement of offense by James.  Defendant objects to any reference to any plea statement of offense by James without also including James' answer to cross-examination in testimony.

***Answering Complaint Par. 27)***        RHODES does not know and takes no position from any personal knowledge as to Defendant Jonathan Peter Klein.

***Answering Complaint Par. 28)***        RHODES does not know and takes no position from any personal knowledge as to Defendant Christopher Kuenke.

***Answering Complaint Par. 29)***        Defendant knows that Connie Meggs from Florida is Kelly Meggs' wife but takes no position on the allegations of this compound paragraph about her from any first-hand knowledge.

*Answering Complaint Par. 30)*      Defendant knows Kelly Meggs as an Oath Keepers' member from Florida but takes no position on the allegations of this compound paragraph about him.  Kelly Meggs was not in leadership in the Oath Keepers until about 10 days before January 6, 2021, when he was placed on the group leadership for Florida.

*Answering Complaint Par. 31)*      ADMITTED, although RHODES is innocent of any charges.

*Answering Complaint Par. 32)*      RHODES knows David Moerschel from Florida to a limited extent but takes no position on the allegations of this compound paragraph about him.

*Answering Complaint Par. 33)*      Defendant does not know and takes no position from any personal knowledge as to Defendant Ethan Nordean.

*Answering Complaint Par. 34)*      Defendant is aware that Bennie Parker is an Oath Keepers' member from Ohio but takes no position from any personal knowledge as to Defendant Robert Ochs.

*Answering Complaint Par. 35)*      Defendant does not know and takes no position from any personal knowledge as to Defendant Bennie Alvin Parker, even though he is an Oath Keepers member from Ohio.

*Answering Complaint Par. 36)*      Defendant does not know and takes no position from any personal knowledge as to Defendant Sandra Ruth Parker, even though she is an Oath Keepers member from Ohio.

*Answering Complaint Par. 37)*      Defendant does not know and takes no position from any personal knowledge as to Defendant William Joseph Pepe, even though he is an Oath Keepers member from New York.

*Answering Complaint Par. 38)*      Defendant does not know and takes no position

from any personal knowledge as to Defendant Dominic Pezzola.

      *Answering Complaint Par. 39)*      Defendant does not know and takes no position

from any personal knowledge as to Defendant Zachary Rehl.

      *Answering Complaint Par. 40)*      ADMITTED, except that the contents of the

documents references are DENIED.

      *Answering Complaint Par. 41)*      Defendant takes no position from any personal

knowledge as to Defendant Jon Ryan Schaffer, even though he is an Oath Keepers member from

Indiana.

      *Answering Complaint Par. 42)*      Defendant does not know and takes no position

from any personal knowledge as to Defendant Daniel Lyons Scott.

      *Answering Complaint Par. 43)*      Defendant knows Laura Steele from Florida to a

limited extent but takes no position on the allegations of this compound paragraph about her.

      *Answering Complaint Par. 44)*      Defendant is aware of Enrique Tarrio from Florida,

as the leader of the Proud Boys Club, but does not know him, and therefore takes no position on

the allegations of this compound paragraph about him.

      *Answering Complaint Par. 45)*      Defendant is aware of Brian Ulrich as an Oath

Keepers member from Georgia, but takes no position from any personal knowledge as to he

details of the paragraph's allegations.

      *Answering Complaint Par. 46)*      Defendant is aware of Edward Vallejo as an Oath

Keepers member from Arizona, but takes no position from any personal knowledge as to he

details of the paragraph's allegations.

      *Answering Complaint Par. 47)*      Defendant does not know and takes no position

from any personal knowledge as to Defendant Jessica Marie Watkins, even though she is an Oath

Keepers member from Ohio.

*Answering Complaint Par. 48)*        Defendant takes no position on the allegations of this compound paragraph about Christopher John Worrell.

*Answering Complaint Par. 49)*        Defendant knows Graydon Young from Florida to a limited extent but takes no position on the allegations of this compound paragraph about him.

*Answering Complaint Par. 50)*        Defendant accepts the Plaintiff's own definition of the Plaintiff's claim, without waiving rights to potentially bring a third-party claim against others who might not fit within the Plaintiff's definition of John and Jane Does 1-50.

*Answering Complaint Par. 51)*        Defendant accepts the Plaintiff's own definition of the Plaintiff's claim and the categorization of some Defendants as "Individual Defendants."

*Answering Complaint Par. 52)*        Denied

*Answering Complaint Par. 53)*        Denied

*Answering Complaint Par. 54)*        The paragraph is a statement of law to which an answer is not required but which seems correct.

*Answering Complaint Par. 55)*        The paragraph is a statement of law to which an answer is not required but which seems correct.  Further developments might alter the diversity analysis and Defendant does not mean to foreclose reconsideration if the claims change.

*Answering Complaint Par. 56)*        The paragraph is a statement of law to which an answer is not required but the RHODES DENIES the factual characterizations and assertions of the paragraph.  Transparently the allegations presented by the Plaintiff are overwhelmingly about events, plans, agreements, etc. taking place in various states around the country and not in D.C. The very basis of the Plaintiff's claim is the theory that Defendants planned all around the country to come to demonstrate at the Capitol.

*Answering Complaint Par. 57)*        DENIED.  However, Defendant will repeatedly point out the sleight of hand perpetrated by this and other plaintiffs, politicians, activists, and journalists.  The Oath Keepers have been the victims of violence perpetrated by others.  Plaintiff and others demonstrate their complete awareness of this fact by the curiously tortured language used to discuss the violence directed at the Oath Keepers members.  Where the Oath Keepers members intentionally protect vulnerable and victimized event attendees by standing between them and their would-be attackers, many try to mischaracterize this as violence associated with the Oath Keepers.  This is no different from saying security guards at large events are frequently associated with or involved in violence where they protect the crowds, VIPs, and performers. The odd language used shows that the Plaintiff knows it is misrepresenting the truth.

*Answering Complaint Par. 58)*        DENIED.[1]

*Answering Complaint Par. 59)*        DENIED.

*Answering Complaint Par. 60)*        DENIED.

*Answering Complaint Par. 61)*        DENIED.

*Answering Complaint Par. 62)*        DENIED.

*Answering Complaint Par. 63)*        DENIED, although if the unidentified, unsourced quote is accurate it clearly shows the opposite of what the Plaintiff is claiming as to defensive actions only.

*Answering Complaint Par. 64)*        DENIED        .

*Answering Complaint Par. 65)*        DENIED.

*Answering Complaint Par. 66)*        DENIED.

*Answering Complaint Par. 67)*        Defendant has no knowledge of any of the details about the Proud Boys internal organization addressed in the paragraph, but notes that the

---

[1]        Please take note of the general answer explanation concerning implied allegations or taking inferences.

Chairman of the Proud Boys Club has denied any connection to the Proud Boys International LLC or its bylaws as being unauthorized and never actually used by the Proud Boys.

**Answering Complaint Par. 68)**     See Answer to 67.

**Answering Complaint Par. 69)**     Defendant accepts from what he has seen publicly in the actions of the Proud Boys that the Chairman Enrique Tarrio hold the most senior role in the organization. But he has no other knowledge about the structure or working of the Proud Boys.

**Answering Complaint Par. 70)**     Defendant accepts from what he has seen publicly in the news and in their actions of the Proud Boys that the organization is run by local chapters. Further, RHODES answers that the United States does not and may not regulate what people wear.  RHODES is not aware of any requirement for U.S. citizens to display their affiliations.

**Answering Complaint Par. 71)**     Defendant has not followed Matthew Greene's actions and is not aware of his legal actions, except that he read second hand that he was cross-examined in the Proud Boys case.  RHODES notes that there is a Michael Greene who is an Oath Keepers whereas Matthew Greene is a Proud Boys member.

**Answering Complaint Par. 72)**     Defendant understands that under cross-examination in the trial of *United States v. Nordean, et al*, Mathew Greene rejected the claims of the prosecutors in connection with his plea deal and statement of offense.  Defendant insists that Greene's answers to cross-examination be included.

**Answering Complaint Par. 73)**     DENIED.  Once again, the Oath Keepers has never described, defined, or thought of itself as a militia, and the Oath Keepers' clear teaching on what is a militia excludes the Oath Keepers.  The Oath Keepers was created to help first responders, military and other public servants remember and understand their oaths to the U.S. Constitution,

understand the U.S. Constitution, and their duties to obey only lawful orders.  The need for this was stimulated by actual examples of active-duty military carrying out plainly illegal orders such as torture in the Iraqi war.  The Oath Keepers also developed into a public-service organization helping with hurricane and other disaster relief.  The Oath Keepers teach that there is no militia, only a potential or latent militia, until called up to serve by a proper government authority.  The Oath Keepers consider themselves more like a potential posse serving governmental authority's legitimate needs and not as independently operating militia.

*Answering Complaint Par. 74)*        DENIED.  See Answer to Paragraph 73.  However, RHODES further answers that the actions of the Department of Justice and all agencies of Government since the civil war on the streets from 2014 through 2020, and in particular since November 9, 2020, actually confirms "that the federal government will use a major destabilizing event—like a pandemic or terrorist attack—as an excuse to institute martial law, force citizens into detention camps, and strip them of their right to keep and bear arms in order to enslave them under a one-world socialist government."  While accusing the Oath Keepers of believing these things, the Federal and State governments are actually doing these things in plain sight.

*Answering Complaint Par. 75)*        DENIED.  See Answer to Paragraph 73.  However, RHODES further answers that many of the Oath Keepers – especially with their training and experience previously in the military or law enforcement – do exercise their constitutional rights protected by the Second Amendment to the U.S. Constitution which the District of Columbia unconstitutionally denies to its own residents.

*Answering Complaint Par. 76)*        Admitted that just like any other organization the Oath Keepers' main rules and procedures are set forth in the group's Bylaws with lesser rules and procedures formally passed for each State chapter.  To avoid any misunderstanding,

Defendant is not aware of any rules or procedures of the Oath Keepers or State chapters that conflict with those established publicly in the Group's Bylaws, nor which would authorize the conspiracy theories asserted by the Oath Keepers' critics.

*Answering Complaint Par. 77)*        DENIED.  The Oath Keepers is a non-profit corporation incorporated in the State of Nevada and consider the "trustees" referenced as its Board of Directors.  However, once again, the tortured language of the Plaintiff like others by failing to identify whom might start a civil war, the Plaintiff demonstrates complete lack of awareness that they are misrepresenting any statements or quotes.  Stating that a hurricane is coming can in no way be taken to suggest that the speaker wants there to be a hurricane.  Putting up boards on the windows to survive the hurricane is not causing it nor wishing it.

*Answering Complaint Par. 78)*        Denied as stated.  The national Oath Keepers organization is typically subdivided in State chapters (if a particular State has the level of involvement that will pragmatically support a separate State chapter).  The Oath Keepers is not a militia and does not have any subsidiary groups that are militia.  RHODES does not recall using the phrase stated but may have said it to encourage participation and leadership.

*Answering Complaint Par. 79)*        The paragraph is compound.  The first sentence is DENIED as not merely false but fantastical and offensive.  Furthermore, nothing about the Oath Keepers involves demonstrating any commitment to the organization.  The Oath Keepers is a civic and service-oriented volunteer organization.  The Oath Keepers encourages current and former military members, law enforcement officers, and firefighters to stay involved volunteering for the community.  The Oath Keepers encourages a commitment to the U.S. Constitution and the rule of law in contrast to, for example, in the Iraqi war when some military officers forgot their teaching to obey only lawful orders.  The second sentence is too vague,

engaging in the typical rumor approach of "somebody said this, I heard someone else tell me that someone else told me that someone else said it." However, the statement, if said by someone, emphasizes the defensive mindsight of the Oath Keepers that "not looking to pick a fight but ready when it happened."

> ***Answering Complaint Par. 80)*** DENIED.

> ***Answering Complaint Par. 81)*** Defendant has no knowledge of this allegation, which he would be aware of if the Plaintiff's attempt to suggest a culture of violence were accurate. RHODES further answers that the Oath Keepers were created in 2009 but the Plaintiff claims an incident in 2010. RHODES further answers that the Oath Keepers contains many military veterans a few of whom may choose to keep mementos of their military service. This has nothing to do with the Oath Keepers and no one who possesses an unlawful weapon would be allowed to remain in the Oath Keepers upon discovery. I, Stewart Rhodes, would expel them.

> ***Answering Complaint Par. 82)*** The paragraph is compound. The allegations of the first paragraph are ADMITTED, except that Defendant does not know what is meant by an "armed standoff" despite personally being there, and suspects that the Plaintiff and others are using a term they don't understand. The Oath Keepers came to support victims of threatened violence by personnel of the U.S. Department of the Interior outside of the DOI's authority. The first half of the second sentence is ADMITTED. The second half of the second sentence is DENIED in that the land belonged to the State of Nevada, not to the U.S. Federal government and the Department of Interior had no authority to issue any orders, nor to engage in armed "self help" by threatening citizens with guns. RHODES witnessed that local Sheriffs demanded that the Bureau of Land Management agents retreat from the standoff and that the Sheriffs and Sheriffs' deputies drew their weapons on the Bureau of Land Management agents and

commanded the U.S. Department of the Interior (BLM) agents to leave the Sheriffs'

jurisdictions.  Faced with the local authority of law enforcement opposing DOI bullies risking

trouble, the armed Department of the Interior personnel were run off by armed, local Sheriffs.

  ***Answering Complaint Par. 83)***  The paragraph is compound.  The first sentence is

ADMITTED.  The second sentence is ADMITTED and RHODES further answers that not only

was it true not just claimed but the Oath Keepers were invited enthusiastically by the private

businesses who – like businesses in the District of Columbia in 2017 through 2020 – were being

abandoned by their government and suffering arson and looting and destruction because of the

policies of the Democrats running Ferguson, Missouri – the same policies pursued by the

Democrat-run District of Columbia.  One Black woman cried and begged thanking the Oath

Keepers for saving her minority-owned small business (store) when the government of Ferguson

abandoned her to the rioters.  The third sentence is ADMITTED, but not only on rooftops.  The

first half of the fourth sentence is ADMITTED in that the Oath Keepers are not still there and

eventually left in an orderly fashion when their service had been concluded.  The second half of

the fourth sentence is DENIED in that the police leadership of Ferguson, Missouri,

enthusiastically thanked the Oath Keepers for helping restore and maintain law and order and

protecting human life and property.  In Ferguson, as in every other city where the Oath Keepers

served, they extensively coordinated ahead of time with local law enforcement.  The Oath

Keepers do not just show up unannounced, but work diligently to "deconflict" with local law

enforcement and to ensure that their plans are in support of and helpful to local authorities.

  ***Answering Complaint Par. 84)***  See Answer to Paragraph 83.  The paragraph is

compound.  The first half of the first sentence is ADMITTED.  The second half of the first

sentence is DENIED.  The Oath Keepers do not wear military garb.  Defendant further notes that

there are no actual "fashion crimes" and the Oath Keepers find that their distinctive outfits help defuse disputes by assuring both sides that they are guarding events and signals to those being attacked whom to turn to. RHODES further answers that protective gear would not have been necessary if the District of Columbia had not pandered to, encouraged, coddled, and tolerated violent Left-wing and anarchist rioters in attacking people, burning down stores, looting, burning police cars, etc. from no later than January 2017, through the violent attacks on the White House in May to June 2020, and the attacks on demonstrators on November 14, 2020, and December 12, 2020.  The Plaintiff's failure to maintain law and order and peace made wearing protective outfits necessary for protection against the Plaintiff's allies in ANTIFA and other anarchist and left-wing protest groups.

   *Answering Complaint Par. 85)*        DENIED.  It is unconstitutional to convict someone of statements made that do not qualify the strict requirements of *Brandenburg v. Ohio*.  If Daniel Hayden was convicted of something, it was not for making statements protected by the First Amendment, which do not qualify as inciting *imminent* violence.  Among other problems, the courts have held that *imminent* violence requires physical presence at the site of where those incited might actually start violence.  Here, if the statements were made Hayden's mother should wash his mouth out with soap, but Hayden could not be convicted of mere statements alone.

   *Answering Complaint Par. 86)*        DENIED.  The Oath Keepers are not and never have been a "vigilante" force.  On the contrary, Defendant notes that the announcement alleged says:  Such individuals will form a pool of trained, organized volunteers who will be able to serve as the local militia under the command of a *patriotic* governor loyal to the Constitution…"  Thus again, the Oath Keepers see themselves and are organized to come to the assistance of lawful governmental authority like a posse, not like an independent militia.

*Answering Complaint Par. 87)*       DENIED.  The Oath Keepers were invited –
sometimes begged – to help individuals and businesses being threatened, intimidated, attacked,
burned, and vandalized by ANTIFA, mis-named Black Lives Matters groups, and other anarchist
and left-wing rioters.  Defendant notes that one of the prime offenders of failing to protect the
residents and businesses of Washington, D.C. was the Plaintiff District of Columbia.  This is
relevant especially with regard to the Affirmative Defense of Contributory Negligence first
proffered by counsel for Thomas Caldwell.  The Oath Keepers does not engage in any vigilante
activity, but coordinates extensively with local law enforcement before any final decision to
assist at any event. I still can remember the Black woman crying with gratitude and thanking us
for saving her business from Leftist and anarchists street thugs, whom the District of Columbia
befriends, coddles, supports, and encourages.

*Answering Complaint Par. 88)*       DENIED.

*Answering Complaint Par. 89)*       DENIED.

*Answering Complaint Par. 90)*       DENIED.  The indictment is a legal instrument to
which an answer is not required.  However, the implication is that the superseding indictment
had anything to do with Jon Ryan Schaffer's plea deal.  To say that Schaffer's plea deal
stimulated the superseding indictment would require that someone illegally leaked the grand jury
deliberations to the Plaintiff.  Note that Oath Keepers' members in the trial asked the Judge to
lawfully release specific parts of the grand jury's deliberations and presentations by prosecutors,
but was denied.  Therefore, any implication as to why any superseding indictments were issued
is denied.

*Answering Complaint Par. 91)*       DENIED.  The Defendant notes that the
superseding indictment speaks for itself as unfounded and false allegations.

**Answering Complaint Par. 92)**        Defendant accepts that the plea deal speaks for itself.

**Answering Complaint Par. 93)**        Denied that this paragraph accurately reflects the plea deal or Statement of Offense, and further noting that on cross-examination James disavowed all of the statements or implications of the paragraph.  Specifically, every witness called by either the prosecution or the defense team testified decisively that no plan ever existed and Rhodes never had any plan or give them any plan other than to defend lawfully permitted rallies from attacks from Antifa.  RHODES further answers that the *counting* (not certification) of the Electoral College votes by the presiding officer (Vice President Mike Pence elected to play that role) *in the presence of* — not *by* — the Joint Session of Congress had already recessed before the Oath Keepers arrived and thus government personnel "who were participating in or supporting the Congressional certification of the Electoral College vote, including Members of Congress" had already left and were not intimidated or coerced by the Oath Keepers because they were gone.  The Oath Keepers did not arrive until after they were gone.  If the Oath Keepers were intending to interfere with the counting of Electoral College votes starting at 1:00 PM we would have shown up at 12:30 PM not at 2:30 PM.  RHODES further answers that no transfer of presidential power takes place on January 6 every four years – only the counting of votes – and that the actual transfer of presidential power takes place on January 20 every 4 year automatically by operation of law by the clock striking 12:00 noon.  Therefore, there is no possibility of stopping the transfer of presidential power in our American system of government.  Neither James nor any other Oath Keepers member had any contact with or interaction with any "government personnel who were participating in or supporting the Congressional certification of the Electoral College vote."

***Answering Complaint Par. 94)***        DENIED.

***Answering Complaint Par. 95)***        DENIED.

***Answering Complaint Par. 96)***        DENIED.  President Donald Trump asked the

debate moderator Chris Wallace "whom do you want me to condemn?  What do you want me to

call them?"  Joe Biden suggested "the Proud Boys."  Trump echoed "Proud Boys."  Thus, Trump

(unfairly) _condemned_ the Proud Boys upon the invitation of Joe Biden.  Trump made no mention

of the Proud Boys until Joe Biden named them.

***Answering Complaint Par. 97)***        DENIED.

***Answering Complaint Par. 98)***        DENIED.  Like any organization engaging in public

relations "spin" the Proud Boys sought to exploit the mention for public relations advantage, but

never believed that Trump – who had just _condemned_ them on national television at Joe Biden's

urging – was agreeing with the Proud Boys about anything.

***Answering Complaint Par. 99)***        The paragraph is compound.  The first half of the

first sentence –shifting gears on the meaning of the word "militia" is ADMITTED.  The first half

of the first sentence correctly identifies one role of the Oath Keepers as being "a militia that

could be "called forth 'to execute the Laws of the Union, suppress Insurrections and repel

Invasions.'"  Thus, the Oath Keepers were not a militia unless "called forth" by a duly

constituted authority to restore law and order and keep the peace.  The second half of the first

sentence is DENIED.  The Plaintiffs and other conspiracy theorists admit that the Oath Keepers

declared "All he has to do is call us up. We WILL answer the call." However, this was about

maintaining the peace against the District of Columbia's political allies ANTIFA, Black Lives

Matter, and other anarchist and left-wing rioters.  This had nothing to do with preserving

anyone's power other than preserving the law.  The second sentence is ADMITTED, in that the

Plaintiff allowed left-wing and anarchist rioters to run roughshod over the City, leaving the

District of Columbia prior to November 8, 2020, as a war zone in the streets.        A militia is an

independently-operating quasi-military group.  If called up by a lawful government authority, the

Oath Keepers would not be a "militia" but a "posse."  The difference is highly significant

because in such a case any group would be under the authority of the lawful official of the

government.

      *Answering Complaint Par. 100)*        DENIED.  However, once again, the Plaintiff fails

to comprehend that most Republicans, Libertarians or opponents of the Democrat Party expected

a violent civil war against them, by the Democrat Party administration, at the initiative of the

Democrat Party, and expected to be the victims of Democrat Party violence.  Most Americans on

the right expected, as shown in their statements, massive gun confiscation and a resulting civil

war.  The Plaintiff alleges a heavily doctored quote about "choosing sides" thus presupposing

that there is already a civil war happening by then with sides.  The Oath Keepers may have

expected the Biden Administration (those behind it competent enough to act) to launch a civil

war against them, but RHODES never had these views and was unaware that this was a subject

of belief by Oath Keepers.  In fact, the actual behavior of the Government since then has

confirmed the accuracy of the eery prophetic warnings.

      *Answering Complaint Par. 101)*        DENIED, particularly in the unconstitutional abuse

of referring to unnamed, unidentified "Oath Keepers" saying things, which is no better than Sen.

McCarthy claiming to hold in his hand a list of communists in the U.S. State Department (which

in hindsight he probably did) but which he would not publicly disclose.  However, the Oath

Keepers discussed being prepared for civil war to be waged against them by the political allies of

the District of Columbia.

***Answering Complaint Par. 102)***        DENIED.  Although President Trump did claim to
have won the 2020 presidential election – and he did in fact win the 2020 presidential election at
a minimum because the rules were changed during the election in violation of Article II, Section
1, of the U.S. Constitution which requires that only the state legislatures can set the rules, this
paragraph is not what Trump said on November 4, 2020.  Trump described the trajectory of vote
totals throughout the hours after the polls closed, following the sophisticated models of experts,
the premature declaration of states before the actual vote totals could be reliably known, and the
suspicious activities that took place in states.  Trump described the entire sequence of events and
left it to the listener to draw conclusions.  Over the subsequent days and weeks as information
developed further, Trump stated the now clear conclusion that the changes in the rules and other
irregularities produced an inaccurate tally of the popular votes in several key states. Mountains
of evidence were presented to courts – but ignored.  For example, in the State of Georgia, Trump
and his campaign filed a 34 page Complaint on December 3, 2020, with ***1,978 pages of evidence***
***attached***, in *Trump v. Kemp,* Case No. 1:20-cv-05310, in the U.S. District Court for the Northern
District of Georgia.   On January 2, 2021, the parties engaged in an obligatory Rule 26(f) "meet
and confer" telephone call which has been consistently lied about.   See "Georgia investigation
of Trump: Yet another scam," World Net Daily,   https://www.wnd.com/2023/03/georgia-
investigation-trump-yet-another-scam/

***Answering Complaint Par. 103)***        Defendant is without knowledge of Joseph Biggs'
social media statements or habits.

***Answering Complaint Par. 104)***        Defendant does not recall but believes the first two
sentences of the allegations of the paragraph are likely true.   (Recall that the FBI routinely
confiscated the smart phones and computers of those being arrested or merely witnesses.)

However, no one has ever to Defendant's knowledge suggested refusing to accept accurate, correct, legitimate results of the 2020 presidential election but has demanded accuracy in the election results.  One again, no one watching the rioting by left-wing and anarchist street thugs from 2014 (really starting in 1999) through 2020 fails to understand that the United States has been in a civil war by the Left against the legitimacy of the United States of America for years. The Plaintiff and other critics of the Oath Keepers do not want to grasp that many conservatives were preparing to defend themselves against the Left's war on America.

*Answering Complaint Par. 105)*        Defendant was not aware of any such posting by Enrique Tarrio, but notes that it seems the quote shows Tarrio drawing a clear line between defending against illegal activity (which Tarrio approved of) in contrast to initiating any illegal activity (which Tarrio rejected and disavowed).  The alleged statement by Tarrio making a strong distinction between others being the cause of any civil war and the Proud Boys defending the country against one should earn the admiration of every American.

*Answering Complaint Par. 106)*        Defendant cannot answer the ambiguous paragraph in terms of what "most" outlets means, but primarily because the American system of governance does not run on media projections.  The Oath Keepers of all people would be strongly aware that media projections do not decide elections.  Elections are decided by accurate, honest, reliable counts of only legitimately-cast ballots by persons who are alive and qualified to vote in the precinct where they are registered, pursuant to rules established by only the State legislature under Article II, Section 1, of the U.S. Constitution.  Letting news media declare the winner of a presidential election is as far removed from a legitimate election as one can fathom.

*Answering Complaint Par. 107)*        DENIED

*Answering Complaint Par. 108)*        Defendant has no knowledge of the allegations of

this paragraph, but notes that the focus on State capitols conflicts with the Plaintiff's narrative of plans to attack the U.S. Capitol in Washington, D.C. Furthermore, if the Chair of the Proud Boys declared a break with Donald Trump over the Proud Boys' plans and future actions, this would disassociate Donald Trump from any activities of the Proud Boys (whom the Plaintiff and others falsely try to associate with the Oath Keepers).

**Answering Complaint Par. 109)** DENIED, in that the paragraph misrepresents and twists the Call to Action openly published by Stewart Rhodes, which speaks for itself, and that RHODES was not privy to. After all, who publishes a plan for insurrection openly on one's own page on the internet? Moreover, at its peak the Oath Keepers had 40,000 dues-paying members (before being deplatformed and de-banked and unable to collect dues). The Oath Keepers was not in need of nor focused upon recruiting new members. Most members approached the Oath Keepers spontaneously, subject to vetting procedures.

**Answering Complaint Par. 110)** Defendant has no knowledge of the allegations of this paragraph concerning conversations within Ohio. Although Watkins was an energetic and motivated leader Watkins operated somewhat autonomously among contacts.

**Answering Complaint Par. 111)** The paragraph is compound. The first sentence is ADMITTED. The second sentence is ADMITTED, except that Defendant has no knowledge of any "January 6th Attack" and nothing like that was discussed on the conference call. The third sentence is DENIED as the conversation had nothing to do with the lawful transfer of presidential power, which happens under our Constitution on January 20 every four years, not on January 6. The conversation had nothing to do with preparing to use force, except in petitioning the President and Commander in Chief to invoke the [ANTI] Insurrection Act to defend the White House against ANTIFA, Black Lives Matter, anarchist, and Left-wing rioters whom

Rhodes expected to once again attack the White House.  RHODES argued passionately that

spineless Chairman of the Joint Chiefs of Staff Gen. Mark Milley, sometimes quipped by

political wags as "Thoroughly Modern Milley" in reference to "The Pirates of Penzance," would

refuse to defend the White House and allow the rioters to enter the White House and assassinate

the President.  Thus, the Oath Keepers discussed on November 9, 2020, plans to respond to a call

for help from the Commander in Chief to restore order.  Rhodes also discussed extensively his

petition to Trump to declassify everything so that government officials could be blackmailed

with information already made public.  The rest of the paragraph is ADMITTED, except that the

insurrection referred to would be carried out by anarchists like ANTIFA and Leftists like the

misnamed Black Lives Matter street gang, and except that Kelly Meggs mostly provided

information and answered questions.

   *Answering Complaint Par. 112)*      RHODES ADMITS the compound paragraph

except that he called upon Kelly Meggs to present the results of his standard pre-event research,

one of Kelly Meggs' consistent roles for any event in any location.  It was always standard

procedure of the Oath Keepers to perform broad-based research on the details of any city where

they conducted any kind of event.  The paragraph shows the Oath Keepers diligently seeking to

obey the laws of the District of Columbia.

   *Answering Complaint Par. 113)*      Not being a Florida Oath Keepers' member,

RHODES has no knowledge to admit or deny the allegations.

   *Answering Complaint Par. 114)*      RHODES has no knowledge to admit or deny the

allegations.  He knows Kelly Meggs but did not follow every message Meggs posted.

   *Answering Complaint Par. 115)*      ADMITTED.  However, Rhodes further answers

that he put Michael Greene ("Whip") in charge of activities in Washington DC January 4-6,

2021.  However, Greene was coming from Indiana while non-Oath Keepers member Caldwell

lived in middle Virginia.  Rhodes further answers that the Oath Keepers always did

reconnaissance and research into every location where they joined or provided security for an

event, most especially to ensure that Oath Keepers members would obey the local laws.

    ***Answering Complaint Par. 116)***    Defendant has no knowledge of what Enrique

Tarrio posted on November 12, 2020.

    ***Answering Complaint Par. 117)***    DENIED.  Never at any time did any Oath Keepers

ever discuss "plans to forcibly oppose the lawful transfer of presidential power" or anything of

the sort.  If an Oath Keepers' member had planned to use force other than for self defense, other

than to discuss the actions of others, a process of expelling such a person would have been

started.  During the trial of *United States v. Stewart Rhodes, et al.*, every single witness –

including all of the witnesses called by the prosecution – confirmed that there was never any plan

to approach, go to, enter or attack the U.S. Capitol and no plans to interfere with the counting of

Electoral College votes.  Moreover, it is an impossibility to oppose the lawful transfer of

presidential power on January 6 because presidential power is transferred on January 20

automatically by operation of law merely by the clock striking 12:00 noon.  Thus the allegation

is not only false but ridiculous and absurd.  Furthermore, wanting to get the election correct

would be opposing the *unlawful* transfer of presidential power.

    ***Answering Complaint Par. 118)***    Defendant has no knowledge of Defendant

Nordean's posts.

    ***Answering Complaint Par. 119)***    Defendant has no knowledge of Defendant Tarrio's

posts on November 16, 2020.  However, the alleged quotes have proven to be true in reality, as

the Proud Boys have in fact become political prisoners due to attacks from the Left in and out of

government.

*Answering Complaint Par. 120)*        Defendant has no knowledge of Defendant Watkins conversations with a curiously unnamed Oath Keepers "recruit" (read possible undisclosed confidential human source (CHS)?) but further answers that the Plaintiff and others appear to be unable to comprehend people talking about defending themselves from attack by the government.

*Answering Complaint Par. 121)*        DENIED.  Unconventional warfare training is illegal in the state of Florida and it did not occur.  RHODES understands that Defendant Jeremy Brown invited Oath Keepers to a briefing on how to avoid being framed by the government, drawing on the unconventional warfare techniques waged against enemies in Iraq, Afghanistan, and other countries by the U.S. military.  RHODES understands that those who attended out of courtesy to Brown left shaking their heads concluding "Well, that will never happen" here in the United States and found Brown's warnings unrealistic.  Turns out, Jeremy Brown was exactly correct because the U.S. Government did use unconventional warfare against its own citizens on or about January 6, 2021.  The Oath Keepers should have heeded his warnings, such as by staying far away from the chaos at the U.S. Capitol and not entering the building.

*Answering Complaint Par. 122)*        Defendant has no knowledge of non-Oath Keepers Defendant Thomas Caldwell's text messages with Defendant Watkins but further answers notes that the Plaintiff and others appear to be unable to comprehend people talking about defending themselves from attack by the government.  Furthermore, if the quotes are accurate they are eerily prophetic and are coming true.

*Answering Complaint Par. 123)*        Defendant has no knowledge of Defendant Joe Biggs' posts on November 24, 2020.

      ***Answering Complaint Par. 124)***    Defendant has no knowledge of Defendant Tarrio's posts on November 25, 2020

      ***Answering Complaint Par. 125)***    Defendant has no knowledge of Defendant Nordean's posts on November 27, 2020.

      ***Answering Complaint Par. 126)***    Defendant has no knowledge of Defendant Rehl's posts on November 27, 2020.

      ***Answering Complaint Par. 127)***    The paragraph is compound.  Defendant has no knowledge of the various allegations in the paragraph.  That would have been a local Florida chapter matter.

      ***Answering Complaint Par. 128)***    ADMITTED. And indeed the prediction of the Biden Administration's civil war against its citizens is in fact occurring, initiated against patriots like the Oath Keepers by Democrats, anarchists, and Leftists.

      ***Answering Complaint Par. 129)***    DENIED.  Although the Defendant did not attend, his understanding is that there was a presentation of violent tactics that the Government could be expected to be used against patriots like the Oath Keepers, with the patriots being innocent victims and the Government being violent aggressors.  The Oath Keepers should have listened to these warnings and stayed away from government entrapment.

      ***Answering Complaint Par. 130)***    DENIED.

      ***Answering Complaint Par. 131)***    The paragraph is compound.  The first sentence is ADMITTED except that the singling out of only some of the attendees and groups involved is misleading and distorting of the truth and is therefore denied.  The second sentence is DENIED as stated.  The Proud Boys were violently attacked by members of Antifa, the so-called Black Lives Matters, anarchists, and other Leftists while trying to protect innocent conservative

demonstrators.

  ***Answering Complaint Par. 132)***  The paragraph is compound.  The first sentence is ADMITTED that the District of Columbia's favored allies in ANTIFA, Black Lives Matter, and other Leftist and anarchist groups did vastly increase their violent attacks on innocent demonstrators, and the Proud Boys and the Oath Keepers stood between the violence of the Left and the innocent demonstrators on the right, left defenseless by the District of Columbia's unconstitutional laws on guns.  The second sentence's singling out of only some of the attendees and groups involved is misleading and distorting of the truth and is therefore DENIED.  The third sentence is DENIED in that Defendant has learned that the Proud Boys were attacked by members of Antifa, the so-called Black Lives Matters, anarchists, and other Leftists.

  ***Answering Complaint Par. 133)***  The paragraph is compound.  The allegations of the paragraph are admitted to the extent of Defendant learning of these events long after the fact, in which some Proud Boys and other patriots were violently attacked without provocation by members of Antifa, the so-called Black Lives Matters, anarchists, and other Leftists.

  ***Answering Complaint Par. 134)***  Defendant has no personal knowledge of any such events, denies them from his understanding, but understands that one (1) banner was seen and taken down from a church and burned, but not because of anyone hunting for anything. Furthermore, the Proud Boys are famously disorganized and undisciplined and get in trouble when they don't follow their leadership, which they usually do not.  The Proud Boys did not "fan out" but scattered in uncoordinated, unplanned, unrelated ways, making them vulnerable to violent attacks from the Left. I, as the leader of the Oath Keepers, repeatedly warned the Oath Keepers to not be like the Proud Boys in terms of being disorganized, with all respect to those patriots for their efforts to defend innocent and vulnerable demonstrators against attacks.

*Answering Complaint Par. 135)*        The paragraph is compound even within its one run-on sentence.  RHODES gave such a speech as he had written and publicly posted many times on the Oath Keepers' website and elsewhere, and admits that President Trump should invoke the Insurrection Act which the Plaintiff and almost everyone else fails to understand (apparently for lack of interest in reading it).  Of course, despite the paranoid conspiracy theories of uninformed Leftists, the [ANTI] Insurrection Act does not create the power to change existing law.  There is no such thing as martial law or suspending the Constitution in American law, tradition, or historical design (even if a few times some have failed to comprehend that).  The [ANTI] Insurrection Act provides additional manpower when existing law cannot be enforced due to insufficient numbers of personnel or perhaps an official is refusing to follow the law as happened a few times in our history like Shay's Rebellion.  However, never did RHODES ever suggest any plan "to prevent President Biden from taking office" as opposed to get the election results accurate and correct.  I was focused at all times on two goals in this sphere of activity:  **First** that Antifa and other anarchists would once again riot at the White House as they had actually done in May-June 2020 but that weak General Mark Milley and other Trump opponents would refuse to defend the White House.  This fear was based on Milley's disgraceful behavior and comments following the May-June 2020 insurrectionist attack on the White House, worrying that he should not have joined his Commander in Chief in a badly-needed show of confidence by walking to the burned church at Lafayette Square.  Leaders of nations around the world, friends and enemies alike, were seeing the White House under attack from the outside, but did not know what might be happening inside.  If Gen. Milley were not a shallow hack, it would have been his first duty to the U.S. Constitution to join his Commander in Chief in demonstrating to the world, both hostiles and friendlies, that all was under control, the President was well and in command, and

the United States military was able to respond as normal to any situation around the world.
China could have chosen that moment of vulnerability during the attack on the White House to
invade Taiwan.  Iran could have seized that moment to attack Israel.  Gen. Milley's presence side
by side with the Commander in Chief walking calmly in the front of the White House was his
highest duty in that moment to defend the United States and maintain military deterrence.
RHODES was thus consistent and persistent in offering that patriots like the Oath Keepers could
be called up as militia by the lawful government officials to step in and defend the White House
and the President if paralyzed approval-seekers like Milley refused to.  **Second**, RHODES was
convinced (and he was not alone) that most of the key officials, judges, politicians, etc., had been
compromised by blackmail material warping their conduct in office.  Rhodes urged Trump in
public postings and letters (having no direct channel to Trump) that Trump declassify everything
across the board.  (Recall that a year and a half earlier Trump had announced that he was going
to do that.)  Rhodes thought that if all the blackmail material were released, that the enemies of
this country foreign and domestic could no longer use any of it to blackmail America's judges,
officials, and politicians.  Rhodes did want everything released so that none of it could have any
influence any more.  Rhodes did advocate that this would help produce honest and accurate
elections.  But his messages were not about preventing a duly-elected President-elect from taking
office.

  *Answering Complaint Par. 136)*    ADMITTED.  However, RHODES' comments
clearly advocate against the less desirable option of the nation's society degenerating into more
conflict, and advocated for a peaceful resolution of disputes through RHODES' suggested
solution. Arguing that option A will be disastrous and therefore we should pursue option B does
not mean preferring option A.

***Answering Complaint Par. 137)***        DENIED.  <u>First</u>, Kelly Meggs was not in leadership in the Oath Keepers at that time and had no authority to enter into any agreement with the Proud Boys. Kelly Meggs can talk to anyone he wants, but the Oath Keepers as an organization or its leadership never entered into any such agreement with the Proud Boys.  (Note that this is different from the Oath Keepers' common practice of "de-conflicting" with local law enforcement and other groups during planning ahead of an event.  Making sure everyone knew who would be there and not to misidentify others at an event or protest is just sound planning.) <u>Second</u>, being a Florida Oath Keeper, which is also where the Chair of the Proud Boys Club lives in Miami (although Florida is a huge State, the third most populous), Kelly Meggs and other patriots were encouraging Governor Ron DeSantis to pass legislation that was pending to stop the insurrectionist, violent riots by members of Antifa, the so-called Black Lives Matters, anarchists, and other Leftists that had raged as a bloody, violent, and deadly civil war of the Left from 2014 to 2020.  Those same rioters announced public threats to riot in Florida if Gov. DeSantis moved towards outlawing their rioting.  In response, patriots and patriot groups in Florida discussed defending Floridians and Florida government officials against the Leftists and anarchists.  This had nothing whatsoever to do with January 6 or the 2020 presidential election.

***Answering Complaint Par. 138)***        Admitted, using 1:42 a.m. as an approximation and Defendant knowing only long after the tweet that there was such a tweet at some point in time sent by someone in Trump's name. RHODES further answers that Defendant is aware of many parties promoted as billed to be "wild" parties and fails to grasp what could be wrong with a "wild" protest, particularly those approved by the U.S. Park Police and USCP.  In any event, the Oath Keepers were there to provide security and escort peaceful attendees at any such events. They were not there to protest or engage in a wild party.

***Answering Complaint Par. 139)***       The paragraph is compound.  RHODES DENIES the opinion expressed in the first clause, as Trump did not consult with RHODES and RHODES does not know Trump's private thoughts at 1:42 AM.  Defendant admits the second part, the first full sentence after the opinion, except that under the Constitution the presiding officer (with the Vice President choosing to serve in that role in 2021) counts the Electoral College votes cast in the various States in the presence of the Joint Session of Congress.  Oddly, Congress does not count the votes.  Congress is charged with witnessing the Vice President counting the votes. Finally, the Congress is required to convene at 1:00 PM on January 6 every four years. However, it is common for Congress to break up is work by recessing and reconvening. Congress even pretends that it is the same "legislative day" days later.  Therefore, there was no requirement for Congress to conclude the Vice President's counting of the Electoral College votes on January 6, 2021.  Furthermore, if anyone wanted to interfere with the Joint Session, they would best arrive prior to 1:00 PM, not at 2:30 PM.

***Answering Complaint Par. 140)***       DENIED, particularly in the vagueness as stated. The Defendants here have no relationship with the random – unnamed -- people supposedly making unsourced statements.

***Answering Complaint Par. 141)***       DENIED.  See Answer to paragraph 137.  The comment taken out of context appears to be accurate, but useless and meaningless out of context. However even the wording of the comment by Kelly Meggs screams at us that it has nothing to do with January 6.  "Well we are ready for the rioters" should have alerted this Plaintiff, other Plaintiffs, prosecutors, politicians, and news media that Kelly Meggs comment is referring to rioters in the State of Florida whom patriots in Florida, acting within Florida, planned to defend Floridians and authorized representatives against threatened riots.  Kelly Meggs was not then  in

Oath Keepers leadership and he had no authority to enter into any alliance with anyone.  Had I known that Kelly Meggs was doing this, particularly talking stupidly about discussions, I would never have elevated him to leadership of the Florida chapter.  I say this with all respect that Kelly Meggs is a great guy in many ways.  But any Oath Keepers member who had been around for any length of time would have been fully aware of my extreme concern and hesitation about forming any alliances, how I had negotiated with a group to help in Portland but walked away from the negotiations when not satisfied (they would not take action to thoroughly disavow any rumors of associating with racists in the past).

*Answering Complaint Par. 142)*     DENIED.  In fact, every witness called in the criminal trial *United States v. Stewart Rhodes, et al.*, whether a witness called by the prosecution or by the defense, uniformly rejected the existence of any plan, conspiracy, or coordination.  Furthermore, Oath Keepers planning to initiate violence, as opposed to defend against it, would have been kicked out of the Oath Keepers, subject of course to a procedure of determining the truth and fairly considering it.

*Answering Complaint Par. 143)*     DENIED.  Again, Meggs did not become a leader of the Florida chapter until after this.  Meggs became a leader because the person I had chosen became sick and had to drop out.

*Answering Complaint Par. 144)*     DENIED.  RHODES further answers that even if the disjointed fragments referred to were accurate and mean what the Plaintiff hopes they meant, they are a hopeless jumble of unrelated topics.  RHODES further answers that "there" refers to Tallahasee, Florida, not Washington, D.C.  RHODES further answers that Kelly Meggs had no authority to enter into any such plan or agreement with the Proud Boys and the Oath Keepers never approved or even seriously considered any such arrangement.  Knowing Kelly Meggs to

be a motivated and diligent patriot, had I known of this I would have had to review it as a proposal, not as an actual agreement.  I certainly would have spoken to Enrique Tarrio myself as I had done in the past about other events (by phone, I met Tarrio only on January 5, 2021.)

*Answering Complaint Par. 145)*        ADMITTED.  However, RHODES further answers that each year millions of people travel to the Nation's Capitol and the economy of Washington, D.C. depends upon it.  Many a "wild" bachelor or bachelorette party occurs in Washington, D.C.  Therefore, RHODES DENIES the implications that the Plaintiff is attempting to make.  RHODES described plans to "commit tourism" and attend a large rally in Washington, D.C.

*Answering Complaint Par. 146)*        DENIED.  However, RHODES further answers that the Plaintiff, as with the DoJ, seems to have used an apparent screen shot from Kelly Meggs without actually reading it.  Consistent with Kelly Meggs' usual role as one of the Oath Keepers who research venues where the Oath Keepers are attending an event, Meggs states in this apparent screen shot:

> DC is no guns.  So mace and gas masks, some batons.  If you have armor that's good.  During the day it's kind of boring but when it starts getting dark Game on."

Thus if the fragmented screen shot were accurate, it would show Kelly Meggs determined to faithfully and carefully obey the laws of the District of Columbia… not exactly a plan for violence or insurrection.  Further, Meggs refers to the difference between activities during the day and those at night.  Thus, the Oath Keepers clearly had no intention of going to the U.S. Capitol on the afternoon of January 6, 2021.  Finally, RHODES further answers that no Oath Keepers actually brought any mace or gas masks or batons to the District of Columbia.  Therefore, Meggs' advisory of what is allowed in D.C. and what is not allowed is clearly only guidance on how to faithfully obey the laws of D.C., not a plan or intention, but a statement of

likely threats they would face from perceived lawless groups like Antifa

*Answering Complaint Par. 147)*        DENIED.  The proposed plan refers to riots anticipated in Tallahassee, Florida.

*Answering Complaint Par. 148)*        DENIED.  RHODES further answers that there was no attack involving any of the Oath Keepers and no plan for any attack.  The Oath Keepers did not wear any tactical gear, in that the Oath Keepers actually know what tactical gear means.

*Answering Complaint Par. 149)*        DENIED.

*Answering Complaint Par. 150)*        The paragraph is compound.  The first sentence is ADMITTED.  The allegations of the second paragraph are DENIED.

*Answering Complaint Par. 151)*        DENIED.

*Answering Complaint Par. 152)*        RHODES has no knowledge of such actions or statements by Young.

*Answering Complaint Par. 153)*        RHODES has no knowledge of such actions or statements by Meggs focused on Florida or the Southeast chapters.

*Answering Complaint Par. 154)*        The paragraph is compound.  DENIED in that there was no January 6th Attack and no activity, statement, conservation, or phone call about any January 6th Attack ever occurred among the Oath Keepers.  The first parts of the sentence are ADMITTED.  RHODES further answers that every event the Oath Keepers were ever involved in used careful planning.  However, such planning was of mundane logistics, where suitable hotels would be, who was driving with whom, where are the landmarks to find your way upon arriving, etc.  None of the meetings had anything to do with attacking anything or anyone or President-elect Biden.

*Answering Complaint Par. 155)*        Defendant has no knowledge of the substance of the

allegations concerning the Proud Boys.

      ***Answering Complaint Par. 156)***    Defendant has no knowledge of the substance of the allegations concerning the Proud Boys.

      ***Answering Complaint Par. 157)***    Defendant has no knowledge of the substance of the allegations concerning the Proud Boys.

      ***Answering Complaint Par. 158)***    Defendant has no knowledge of the substance of the allegations concerning the Proud Boys.

      ***Answering Complaint Par. 159)***    Defendant has no knowledge of the substance of the allegations concerning the Proud Boys.

      ***Answering Complaint Par. 160)***    DENIED.

      ***Answering Complaint Par. 161)***    Defendant had no knowledge of the substance of the allegations at the time but learned of this in the nature of rumor or conventional wisdom after the fact.  RHODES further answers that the idea that there is anything nefarious about Proud Boys members coming in ordinary clothing is absurd, baffling, and ridiculous.  There are no fashion crimes in America.  The United States of America does not have a national dress code.  In fact, RHODES further answer that this decision by the Proud Boys only leads to the obvious legal conclusion that Chair of the Proud Boys Enrique Tarrio had decided that attendance at events in January 6, 2021, were to be disassociated from the Proud Boys.  Banning the use of Proud Boys "colors" (identifiable clothing and insignia) clearly meant (and no other meaning makes any sense) that if people went to D.C. on January 4-6, 2021, they were not going as members of the Proud Boys but as independent individuals.  The organization itself disavowed any role in the January 6 protests.  This is significant to RHODES because of course many are trying to falsely connect the Proud Boys to the Oath Keepers.

*Answering Complaint Par. 162)*    See Answer to Paragraph 161.

*Answering Complaint Par. 163)*    See Answer to Paragraph 161.

*Answering Complaint Par. 164)*    Defendant has no knowledge of the substance of the allegations concerning the Proud Boys, except that review of events after the fact show that the Proud Boys did none of those things.

*Answering Complaint Par. 165)*    See Answer to Paragraph 161.

*Answering Complaint Par. 166)*    See Answer to Paragraph 161.

*Answering Complaint Par. 167)*    The paragraph is compound.  RHODES DENIES that there was any attack.  Defendant can only admit that the Oath Keepers communicated with each other, as any group would do. RHODES further answers that most of the people participating on internet based chat groups were not in Washington, D.C., on January 6, 2021, but were describing what they were watching on television news and giving their uniformed opinions.  Being a member of a chat group, like being someone's "friend" on Facebook, in no way equates to someone actually seeing anyone else's message.

*Answering Complaint Par. 168)*    DENIED.  Any discussion of publicly-available, off-the-shelf software apps for communication had nothing to do with the presidential election but were standard and routine for the Oath Keepers over its 11 year history.  Defendant denies that there was any conspiracy to thwart the presidential election.  Defendant further answers that getting the presidential correct and accurate would be to thwart obvious efforts in violation of Article II, Section 1 of the U.S. Constitution to steal the 2020 presidential election.

*Answering Complaint Par. 169)*    Defendant has no knowledge of the substance of the allegations concerning the Proud Boys.

*Answering Complaint Par. 170)*    DENIED.  On December 25, 2020, Kelly Meggs

was not in leadership of the Oath Keepers.  As the Oath Keepers always did in every city for
every event, several members often including Kelly Meggs researched the venue and advised
Oath Keepers' members as to every detail about the location, including what is allowed and not
allowed.  In no way is Kelly Meggs' report a suggestion for what anyone in the Oath Keepers
should do, but only the parameters of what is legal and not legal in any given locality that the
Oath Keepers visit.  But what individual Oath Keepers might bring has always been each
individual's decision.

*Answering Complaint Par. 171)*    DENIED.  Consistent with the Oath Keepers 12
years of tradition and practice, certain Oath Keepers, primarily Kelly Meggs, always researched
the local conditions of any venue the Oath Keepers visited.  Meggs' report, as well as Rhodes'
response repeating it, was never an instruction or recommendation that anyone bring anything,
but only a report on what was legal or illegal in the District of Columbia, the same as with any
other state and city the Oath Keepers visited over the preceding eleven years. Oath Keepers
members knew they were under no obligation to do anything, but were being advised of what
was permissible in jurisdiction compared to what might get the in trouble.  The Oath Keepers is a
voluntary service organization, not a blood cult.

*Answering Complaint Par. 172)*    RHODES ADMITS that for his day job business of
security services training, he purchased the items.  However, RHODES further answers that if
there had been a plan by the Oath Keepers to "attack" or try to take control of the U.S. Capitol on
the afternoon of January 6, 2021, Rhodes would not be purchasing night vision goggles for an
attack planned to take place around 1 PM in the afternoon.  Furthermore, Rhodes did not in fact
take any night vision goggles into the District of Columbia.  Furthermore, Rhodes would have
ordered night vision goggles much earlier if they had anything to do with protests on January 6,

2021.

***Answering Complaint Par. 173)***        The paragraph is compound.  The first sentence is

admitted, however RHODES further answers that the disjointed fragments supposedly from

Ulrich prove that there was no plan and no conspiracy to attack or occupy the U.S. Capitol

building.  If the purpose of coming to Washington, D.C. was to attack or occupy the Capitol,

then it would indeed be "crazy" to pack two different backpacks, the second holding ammunition

that he could switch to if the shit truly hits the fan blades.  Why would Ulrich want two different

backpacks if attacking the Capitol were the plan?  Why would the ammunition backpack be for

only "if the shit truly hits the fan?"  Again:  "truly."  Clearly this is evidence of Rhodes often-

stated, public concerns that Antifa and other anarchists would attack the White House, Milley

would not defend the White House, and Trump might call up the Oath Keepers as the best-

prepared potential posse to defend the White House.  The second sentence is admitted, but

RHODES further answers that Ulrich did not actually bring any AR-15, budget or otherwise, to

Washington, D.C. on or about January 4-6, 2021.  Thus, clearly Ulrich is joking at his own

expense about owning a "budget AR."  Astonishingly, and to the surprise of every second

amendment supporter, the District Plaintiff is actually correct in the third sentence despite the

District of Columbia spreading misinformation about "semi-automatic weapons" as implying

machine guns.  It is refreshing that the District of Columbia actually does know that an AR-15 is

a perfectly ordinary rifle even if it is cosmetically made to look like it means business.[2]  Second

Amendment defenders will want to refer to this in any future political debates.

***Answering Complaint Par. 174)***        ADMITTED, except of course the paragraph is

vague about whom it is talking about and any dark implication that transporting guns across state

---

[2]        That is, a robber might be intimidated, whereas a police officer or other government
official would know better.

lines is anything improper is wrong.  RHODES further answers that the discussion shows the lack of any advance planning other than Abraham Lincoln's adage about his own growth:  "If I prepare, my day will come."  If the Oath Keepers had been needed, it is better to be prepared.

*Answering Complaint Par. 175)*      ADMITTED, except that there was no "additional" weaponry and firearms left in Virginia, because there were no weapons or firearms brought into the District of Columbia by any of the Oath Keepers.

*Answering Complaint Par. 176)*      DENIED.  There was no attack planned.  The disjoined fragments cited out of context actually disprove the Plaintiff's case, once again clarifying that the Oath Keepers were prepared to respond to violence, not to cause it.

*Answering Complaint Par. 177)*      Defendant has no knowledge of the substance of the allegations.  However, if someone had applied specifically to be involved in the QRF, I would have felt something was wrong.  Walden however clearly understood (or misunderstood) the QRF as involving medical assistance and first aid, listing his credentials as an Emergency Medical Technician.  That was indeed a very important part of what the Oath Keepers did for 12 years, including in natural disasters.

*Answering Complaint Par. 178)*      ADMITTED, if we just say "VIRGINIA" and do not attempt to confuse the situation.  Defendant does not know what items other people transported to Virginia.  There was no inventory or catalog of whatever people wanted to bring with them.  The paragraph is misleading in discussing the "Washington, D.C., metropolitan area" when Oath Keepers meticulously avoided bringing any weapons into D.C.

*Answering Complaint Par. 179)*      ADMITTED that RHODES bought weapons for his work providing security training services, all of which RHODES left in Virginia.

*Answering Complaint Par. 180)*      ADMITTED that RHODES bought weapons for his

work providing security training services, all of which RHODES left in Virginia.

*Answering Complaint Par. 181)*        ADMITTED that RHODES bought weapons for his

work providing security training services, all of which RHODES left in Virginia.

*Answering Complaint Par. 182)*        ADMITTED that RHODES bought weapons for his

work providing security training services, all of which RHODES left in Virginia.

*Answering Complaint Par. 183)*        RHODES has no knowledge of the allegations

about the Proud Boys.  However, RHODES further answers that the Oath Keepers have never

possessed nor used any "military-style communications equipment."  Knowing what that means,

RHODES is extremely certain that Proud Boys have never seen any such equipment, would not

know how to use it, and have never had access to any such equipment.  RHODES further

answers that the contradiction in the Amended Complaint is curious.  On the one hand, the Proud

Boys are accused of wearing street clothes in the District on January 6, 2021.  Now, the Proud

Boys are accused of wearing "tactical" vests.  Nothing owned or used by either the Proud Boys

or the Oath Keepers qualifies as a "tactical vest."  The final sentence refers to "protective gear"

which is quite another matter, and likely true.

*Answering Complaint Par. 184)*        DENIED, particularly where the Plaintiff

intermingles unrelated Defendants and there was no planned attack.  However, RHODES further

answers that the Plaintiff alleges that unnamed persons coordinated "plans to travel to and stay in

or near the District."  In other words, the Defendants are accused of tourism.  The economy of

the Plaintiff depends upon tourism.  Any suggestion that coming to listen to Donald Trump give

a speech does not support any alleged crimes.  RHODES further answers that it was widely

discussed that those among the Oath Keepers intending to travel to Washington, D.C. (and

indeed those who talked themselves out of making the trip) expected all of the hotels to be sold

out.  Therefore, when an Oath Keepers member found a hotel with space available, they frequently booked 2 or 3 rooms and then passed the extras off to other members trying to find a room.  This was not a plan of coordination, but pessimism that available rooms could be found.

*Answering Complaint Par. 185)*     DENIED.  See Answer to Paragraph 184.

*Answering Complaint Par. 186)*     See Answer to Paragraph 184.

*Answering Complaint Par. 187)*     See Answer to Paragraph 184.  However, the quote alleged further debunks the Plaintiff's theory.  Watkins stating that "If Trump activates the Insurrection Act I'd hate to miss it[.]"  That is "IF."  This indicates that there was no plan to attack or take-over the U.S. Capitol building but rather preparation for whether Trump might invoke the Insurrection Act.  RHODES further answers that it does no good for people who have not read the Insurrection Act to talk about something they have not taken the time to read and understand.  Someone should actually read the law before analyzing it further.

*Answering Complaint Par. 188)*     Defendant believes from hearsay and recollection that the allegations are correct and RHODES further answers that everything described and everything done was 100% legal and lawful.  RHODES further answers that no weapon of any kind in any Quick Reaction Force was ever used or brought into the District of Columbia.

*Answering Complaint Par. 189)*     Defendant has no knowledge of the conversations alleged.

*Answering Complaint Par. 190)*     Defendant has no knowledge of the conversations alleged.   However, RHODES further answers that if the alleged statements are accurate, they disprove the Plaintiff's claims by focusing on activities at night when the Plaintiff and others allege a plan to stop the Electoral College counting at or around 1:00 PM on the afternoon of January 6, 2021.

*Answering Complaint Par. 191)*   Defendant has no knowledge of the conversations alleged.

*Answering Complaint Par. 192)*   Defendant has no knowledge of the conversations alleged.

*Answering Complaint Par. 193)*   Defendant has no knowledge of the conversations alleged, but imagine that the snipped taken out of context refers to Caldwell's farm in central Virginia.  RHODES further answers that the reference to "night hunting" whether literal or figurative is inconsistent with a determined plan to attack the U.S. Capitol to stop the counting of Electoral College votes at 1:00 PM on January 6, 2021.

*Answering Complaint Par. 194)*   ADMITTED.

*Answering Complaint Par. 195)*   Defendant was not aware of the conversations alleged.  Although he could have seen the conversation with his friend Kelly Meggs, he does not recall seeing such a conversation.  RHODES further notes that he could have obtained a map of Washington, D.C. without getting it from Kelly Meggs.  Maps of Washington, D.C. are available on the internet for instant viewing or can be purchased at gas stations.  However, RHODES further answers what was intended by "heavy weapons" but Defendant is not aware of any weapons possessed or carried by Oath Keepers that are heavy weapons more than ordinary rifles. Perhaps Caldwell might have referred to a collection of weapons that in the aggregate weighed a lot.  RHODES further answers that a supposed landing at the tidal basin would be a ridiculous concept because when someone lands by boat, they now have no land transport to walk or carry anything.  The idea of a water landing would not work because the people involved would have to walk for miles without a car carrying heavy items.  "If the shit truly hit the fan," roadways in the City would be jammed and taxi cabs, Uber cars, Lyft cars, etc. would have been unavailable.

It was a fanciful topic of interest by some people, but never a serious or workable plan or a part of any plan.  At best, it might have been an improbable way of coming to the aid of the Commander in Chief at the White House from the Tidal Basin or the river near the Memorial Bridge after a long hike, but would be completely unworkable for attacking the U.S. Capitol which is not near to any body of water.

*Answering Complaint Par. 196)*     Defendant has no knowledge of the conversations alleged.

*Answering Complaint Par. 197)*     Defendant understands this to be true but lacks first-hand knowledge of the details of their travel plans.

*Answering Complaint Par. 198)*     DENIED.  Kelly and Connie Meggs, and others, known to RHODES, took routine gun safety training with other friends and Florida Oath Keepers in <u>September 2020</u> having nothing to do with any event on January 6, 2021, at a time when Donald Trump's successful re-election in November 2020 was believed to be 100% certain.  Furthermore, there was no need nor nature of "confessing" anything.  The Meggs openly promoted their September 2020 group safety training.  Kelly Meggs has described the gun training as "How not to accidentally shoot yourself" training.  However, RHODES further answers that the training center clearly engages in hyperbole and schmaltz as part of its over-the-top marketing and public relations efforts. But underneath the exaggeration, it is just ordinary gun safety training.

*Answering Complaint Par. 199)*     The paragraph is compound.  RHODES DENIES the allegations of the paragraph.  No Oath Keepers brought any weapon into the District of Columbia.  All Oath Keepers planning to come to D.C. were sternly warned that the District of Columbia is a gun-free zone and that was hardly a secret to those interested in the Second

Amendment through many court cases.  Oath Keepers were instructed not to bring any firearms into the District of Columbia.  RHODES further answers that a "semi-automatic handgun" means a handgun.  All guns since the American Revolution are "semi-automatic" guns.  Any gun that does not need to be reloaded for _each_ shot is a "semi-automatic gun," including a Colt 45.  There are no handguns in the world today that are _not_ "semi-automatic."

**_Answering Complaint Par. 200)_**      The paragraph is compound.  Defendant has only vague awareness of these travel plans and cannot admit or deny.   However, RHODES further answers that travelling to unspecified locations is entirely lawful and that the economy of the Plaintiff District of Columbia depends upon visitors travelling to D.C.

**_Answering Complaint Par. 201)_**      Defendant has no knowledge of the substance of the allegations concerning the Proud Boys.  However, RHODES further answers that volunteering to provide supplemental security for "wild" parties like "wild" protests is perfectly lawful.

**_Answering Complaint Par. 202)_**      Defendant has no knowledge of the substance of the allegations concerning the Proud Boys.

**_Answering Complaint Par. 203)_**      Defendant has no knowledge of the substance of the allegations concerning the Proud Boys.

**_Answering Complaint Par. 204)_**      DENIED.  Among other things, the paragraph is vague.  As any event approaches, and people pay more attention, promotion normally increases.  But RHODES does not know who the paragraph refers to or in what way.

**_Answering Complaint Par. 205)_**      ADMITTED.  RHODES further answers that this is one of the applications of the Insurrection Act and that people should actually read the [ANTI] Insurrection Act.  The Act provides for calling up what is in effect (a more familiar term to American movie-goers for decades) a posse, under the authority of lawful government official.

**Answering Complaint Par. 206)**       RHODES in Texas did not monitor the Southeast chat group.  RHODES further answers that he was aware generally that some of the Oath Keepers like approximately 500,000 to 1 million other people were planning to travel to the Nation's Capitol for lawful, permitted, peaceful rallies in support of Donald Trump.  RHODES further answers that at its peak the Oath Keepers had around 40,000 dues-paying members so the Oath Keepers who went to Washington, D.C. on January 4-6, 2021, were actually a tiny minority of all Oath Keepers members.  (Rhodes further explains, from his understanding, that censorship and cancel culture deprived the Oath Keepers of the internet and banking mechanisms to charge dues, so the organization now has no money, so the group currently has no bank account and no funds, but it did at the time.)

**Answering Complaint Par. 207)**       The paragraph is compound.  The first sentence is ADMITTED, the quote is at least a rough approximation of what RHODES said.  However, as to the final sentence RHODES has never discussed the use of military force to stop the transfer of presidential power, but getting an election correct would be seeking to stop the _unlawful_ transfer of presidential power in violation of who actually won the election.  Again there is no presidential power at all transferred on January 6 every four years.  That happens on January 20.

**Answering Complaint Par. 208)**       ADMITTED, except that Rhodes and all Oath Keepers leaders and members made clear that the possibility to "take to arms in defense of our God given liberty" was at all times referring to responding to expected calls for help from government authorities who had been repeatedly overwhelmed by Leftist and anarchist street violence from 2012 (really since 1999 in "the Battle in Seattle" on the streets of Seattle) through 2020, with the Oath Keepers pressed into service to restore order, keep the peace, and enforce the law at the direction of, under the authority of, and directed by authorized government

officials.

*Answering Complaint Par. 209)*      Defendant has no knowledge of the substance of the allegations.  However, RHODES further answers that the website's content was available for the whole world to read, with the hope (probably unlikely) that maybe even Donald Trump would read the various posts.  RHODES further answers that the Oath Keepers' website was later censored and cancelled by internet platforms – not by the Oath Keepers themselves.

*Answering Complaint Par. 210)*      The paragraph is compound.  The first sentence is DENIED as phrased.  The "OKFL" chat was primarily as the name implies for *Florida* Oath Keepers but the paragraph is vague.  It is true that Florida members of the Oath Keepers communicated in the OKFL Hangout Chat at some point in time from the days of the dinosaur up through 2021, and possibly with some friends from other States.  The second sentence is DENIED.  Rhodes has never advocated for, planned for, tolerated, or approved of any use of force other than to defend victims of Left-wing and anarchist violence directed against conservatives or in self defense.  Rhodes has never advocated for stopping the *lawful* transfer of presidential power, but for *accuracy* and integrity in the election procedures and vote counts to ensure the lawful transfer of presidential power and oppose the *unlawful*, erroneous transfer of presidential power to someone who clearly did not win the 2020 election, if only by the rules being changed in violation of Article II, Section 1, of the U.S. Constitution.

*Answering Complaint Par. 211)*      RHODES ADMITS that the snippets quoted were taken out of context from a larger conversation.

*Answering Complaint Par. 212)*      RHODES ADMITS that the snippets quoted were taken out of context from a larger conversation.

*Answering Complaint Par. 213)*      Since Thomas Caldwell was not an Oath Keepers

member and known to RHODES, RHODES was not following everything that Caldwell posted or did not post and does not know about the substance of the allegations.  However, again, Caldwell's exercise of free speech to express his opinions is a guaranteed right under the First Amendment.  However, RHODES further answers that Caldwell is accused, perhaps inaccurately, of suggesting a million patriots "in the streets" – not at the U.S. Capitol.  So as late as January 1, 2021, there was no plan or conspiracy for Oath Keepers to go to the U.S. Capitol, at least none known to Caldwell.

   ***Answering Complaint Par. 214)***      ADMITTED.  However, RHODES further answers that the "something other" meant attacks by Antifa and other anarchists.

   ***Answering Complaint Par. 215)***      RHODES does not know about the substance of the alleged conservations.  However, the nation watched the attacks on the White House by ANTIFA and Left-wing rioters, and indeed all the nations of the world both friend and foe alike, watched the United States leadership under siege and possibly not in control of the nation's nuclear arsenal, military, or foreign policy world-wide, while DC (MPD) police officers stood down and allowed the rioting to continue throughout 2020.

   ***Answering Complaint Par. 216)***      ADMITTED, except that obviously Vallejo was being fanciful in his descriptions, not literal.

   ***Answering Complaint Par. 217)***      ADMITTED although RHODES does not know if the alleged quotes are accurate word for word; RHODES is only vaguely aware of the substance.  Again, RHODES further answers that the Oath Keepers' website was taken down by internet companies – not by the Oath Keepers – and verifying its past content even on the Wayback Machine (which is clumsy and sometimes incomplete) is harder than one would imagine.

   ***Answering Complaint Par. 218)***      RHODES does not know about the substance of the

alleged conservations among the Proud Boys.  RHODES further answers that the alleged

communications – if true and accurately stated – would confirm that as of December 20, 2020,

there was no plan and no certainty about what the Proud Boys planned to do on January 6, 2021.

*Answering Complaint Par. 219)*     RHODES does not know about the substance of the

alleged conservations concerning the Proud Boys.

*Answering Complaint Par. 220)*     RHODES does not know about the substance of the

alleged conservations concerning the Proud Boys.

*Answering Complaint Par. 221)*     RHODES does not know about the substance of the

alleged conservations concerning the Proud Boys.  However, RHODES further answers that the

United States of America does not have a national dress code, no one has to wear Proud Boys

"colors" (distinctive dress and/or insignia).  U.S. citizens are not required to wear things to

publicly identify their beliefs, politics, or group membership in the nature of the Nuremberg

Laws.  RHODES further answers noting that Tarrio's directive that the Proud Boys should not

wear any indication of membership in the Proud Boys that the Chair of the Proud Boys was

disassociating any attendance at events in Washington, D.C. January 4-6, 2021 from the

organization the Proud Boys.  That is, attendance at the events of January 4-6, 2021, was not to

be a project of the Proud Boys but individual activities of individual persons.  This is of no

concern to RHODES except to the extent that the Plaintiff or others attempt to fabricate a

supposed conspiracy between the groups.

*Answering Complaint Par. 222)*     RHODES does not know about the substance of the

alleged conservations concerning the Proud Boys.  See also Answer to Paragraph 221.

*Answering Complaint Par. 223)*     RHODES does not know about the substance of the

alleged conservations concerning the Proud Boys.

**Answering Complaint Par. 224)**     RHODES does not know about the substance of the alleged conservations concerning the Proud Boys.

**Answering Complaint Par. 225)**     RHODES does not know about the substance of the alleged conservations concerning the Proud Boys.

**Answering Complaint Par. 226)**     RHODES does not know about the substance of the alleged conservations concerning the Proud Boys. However, because the Plaintiff and others try to fabricate an imagined conspiracy between the separate organizations, RHODES further answers that he was not and never has been aware of any such document or plan described in it. If there were a 1776 plan and if there were some coordination between the Oath Keepers and the Proud Boys, I would know about it.  No such plan ever existed.  The 1776 Returns document is a false flag and fabrication by members of the U.S. Government, probably not the FBI.

**Answering Complaint Par. 227)**     RHODES does not know about the substance of the alleged conservations concerning the Proud Boys. However, because the Plaintiff and others try to fabricate an imagined conspiracy between the separate organizations, RHODES further answers that he was not and never has been aware of any such document or plan described in it. RHODES further answers that what the Oath Keepers and Proud Boys actually did – if we accepted the most absurd extremities of allegations – is completely inconsistent with the 1776 Returns document, further confirming that it is a fabrication to try to frame patriots.

**Answering Complaint Par. 228)**     RHODES does not know about the substance of the alleged conservations concerning the Proud Boys. However, because the Plaintiff and others try to fabricate an imagined conspiracy between the separate organizations, RHODES further answers that he was not and never has been aware of any such document or plan described in it. RHODES further answers that the MPD obviously issued a permit for march on City streets and

road closures were obvious.

*Answering Complaint Par. 229)*     RHODES does not know about the substance of the alleged conservations concerning the Proud Boys.  However, because the Plaintiff and others try to fabricate an imagined conspiracy between the separate organizations, RHODES further answers that he was not and never has been aware of any such document or plan described in it.

*Answering Complaint Par. 230)*     RHODES does not know about the substance of the allegations concerning the Proud Boys.

*Answering Complaint Par. 231)*     RHODES does not know about the substance of the allegations concerning the Proud Boys.

*Answering Complaint Par. 232)*     RHODES does not know about the substance of the allegations concerning the Proud Boys.

*Answering Complaint Par. 233)*     RHODES does not know about the substance of the allegations concerning the Proud Boys.

*Answering Complaint Par. 234)*     RHODES does not know about the substance of the allegations concerning the Proud Boys.  However, RHODES further answers that once again the alleged conversation contradicts the idea that as of January 3, 2021, there was any plan, agreement, or conspiracy regarding any events on January 4-6, 2021, in Washington, D.C. Recall that the Plaintiffs and others falsely allege some coordination between Oath Keepers (such as RHODES) and Proud Boys.  So if the Chair of the Proud Boys did not know of a precise plan as of January 3, 2021, the Oath Keepers didn't either.

*Answering Complaint Par. 235)*     RHODES does not know about the substance of the alleged conservations.  However, RHODES further answers that other than rough language the idea that law makers who break the law should be punished is hard to find fault with, provided

that all actions against law-breakers is done according to law and due process in a court of law.

*Answering Complaint Par. 236)*         RHODES does not know about the substance of the allegations concerning the Proud Boys.   However, RHODES further answers that the allegation that Proud Boys Chair Tarrio "wanted to wait until January 4th to make final plans" contradicts any suggestion that the Oath Keepers and the Proud Boys shared any plan, agreement, or conspiracy prior to January 4, 2021, and invalidates the bulk of the allegations by this Plaintiff and many others.  RHODES further answers that RHODES did not decide to travel to Washington, D.C. until the evening of January 3, 2021, so he did not travel to D.C. under any plan shared with Proud Boys.

*Answering Complaint Par. 237)*         See Answer to Paragraph 236.  Again, Tarrio on January 4, 2021, is asking what another person is proposing.  Tarrio is inquiring of what plans the leaders are discussing and proposing as late as 2 days before January 6, 2021, indicating that there was no plan or conspiracy.

*Answering Complaint Par. 238)*         RHODES knows of the events alleged only through news coverage.

*Answering Complaint Par. 239)*         RHODES does not know about the substance of the allegations about the Proud Boys.

*Answering Complaint Par. 240)*         RHODES does not know about the substance of the allegations about the Proud Boys.

*Answering Complaint Par. 241)*         RHODES does not know about the substance of the alleged conservations.  However, RHODES further answers that once again the alleged conversation contradicts the idea that as of January 4, 2021, there was any plan, agreement, or conspiracy regarding any events on January 4-6, 2021, in Washington, D.C.  Or if there was any

plan, it was cancelled.

***Answering Complaint Par. 242)*** RHODES does not know about the substance of the allegations about the Proud Boys. However, RHODES further answers that once again the alleged conversation contradicts the idea that as of January 4, 2021, there was any plan, agreement, or conspiracy regarding any events on January 4-6, 2021, in Washington, D.C.

***Answering Complaint Par. 243)*** DENIED as to the Oath Keepers. Regarding the Proud Boys RHODES does not know about the substance of the allegations. However, RHODES further answers that the Complaint emphasizes that there was no plan but then claims that the Proud Boys and Oath Keepers "made good on their plans" – the plans that from the allegations and statements they clearly did not have. RHODES further answers that there was no coordination or planning or agreement between the Proud Boys and Oath Keepers regarding events in Washington, D.C., on or about January 4-6, 2021.

***Answering Complaint Par. 244)*** The allegations of the paragraph are vague. RHODES accepts that the allegations of the paragraph are generally true, but non-specific. RHODES did not inventory or analyze what various people brought with them and left in Virginia. RHODES is not familiar with the Washington, D.C. area, and believes that the hotel was the Comfort Inn Ballston. RHODES understood that – as always for any event anywhere since 2009 – some Oath Keepers had brought weapons "in case the s*%t hits the fan." However, RHODES did not chronicle or take inventory of what anyone else was doing on this topic. As to Quick Reaction Force "teams" RHODES answers that neither the Plaintiff nor other critics understand what a QRF is. It has nothing to do with "teams." Vallejo and I agreed to have Vallejo merely watch the items at the hotel that people wanted to leave in Virginia so that janitorial staff or others would not have unsupervised access to anything, and because Vallejo

felt he was not physical fit enough at that moment to walk for miles around Washington, D.C. So it was agreed that he would stay at the hotel and supervise any and all items of any kind that for whatever reason individual Oath Keepers did not want to carry with them into the District of Columbia.  Vallejo was not part of a "team" as being some action figure or unit.

**Answering Complaint Par. 245)**       RHODES ADMITS the general substance of the conversation, recalling that the FBI seized smart phones and computers of charged Defendants and suspected witnesses alike.

**Answering Complaint Par. 246)**       RHODES was not part of that conversation between Kelly Meggs and Vallejo.

**Answering Complaint Par. 247)**       RHODES does not know about Caldwell doing these particular things or not.  Since Caldwell was not an Oath Keeper, this sounds unlikely.  A subset of Oath Keepers would always research any venue in any city for any event since 2009 that the Oath Keepers were going to be serving in.  RHODES further answers that "around the Capitol" means "Area 8" where the U.S. Capitol Police had issued a permit for one of six rallies for the afternoon of January 6, 2021, and which the Oath Keepers had agreed to provide volunteer security for.

**Answering Complaint Par. 248)**       RHODES does not recall the name of the hotel – again smart phones and computers were confiscated by the FBI – but the allegations of the paragraph sound about right.  RHODES probably stayed at a Hilton Garden Inn but is not terribly familiar with the geography of the suburbs around Washington, D.C.  It might have been in Vienna or in Fairfax.  RHODES has no precise knowledge of these allegations other than multiple versions presented at criminal trials, as he did not take inventory as to where other Oath Keepers were staying.  RHODES further answers that the Oath Keepers who traveled to

Washington, D.C. expected all of the hotels to be swamped and full, which is why sometimes an Oath Keepers member finding rooms available reserved 2 or 3 rooms to grab them for the use of their friends.

**Answering Complaint Par. 249)**     RHODES has no knowledge of these allegations concerning the Proud Boys.  However, RHODES further answers that Mathew Greene of the Proud Boys is a different person from Michael Greene of the Oath Keepers.

**Answering Complaint Par. 250)**     RHODES has no knowledge of these allegations concerning the Proud Boys.  However, RHODES further answers that radios still remain legal in the United States of America.

**Answering Complaint Par. 251)**     RHODES has no knowledge of these allegations concerning the Proud Boys.  However, RHODES further answers that radios still remain legal in the United States of America, unlike some movies RHODES has seen from European history.

**Answering Complaint Par. 252)**     RHODES has no knowledge of these allegations concerning the Proud Boys.

**Answering Complaint Par. 253)**     RHODES has no knowledge of these allegations concerning the Proud Boys.  However, RHODES further answers that radios are legal in this country.

**Answering Complaint Par. 254)**     RHODES has no knowledge of these allegations.

**Answering Complaint Par. 255)**     RHODES has no knowledge of these allegations.

**Answering Complaint Par. 256)**     RHODES has no knowledge of these allegations. RHODES further answers that once again the alleged conversations if true and accurate would show the lack of any clear plan as of 9:17 PM on January 5, 2021.

**Answering Complaint Par. 257)**     RHODES has no knowledge of these allegations.

58

***Answering Complaint Par. 258)***        RHODES has no knowledge of these allegations. However, RHODES further answers that the Complaint alleges that "at approximately the same time" (9:17 PM) Joe Biggs announced that "We have a plan" implying that prior to 9:17 PM the day before January 6, 2021, there was no plan.  Similarly, the paragraph alleges that Donohoe responded: "What's the plan so I can pass it to the MOSD guys," presumably after 9:20 PM on January 5, 2021.  So the Proud Boys did not come to Washington, D.C. pursuant to any plan.

***Answering Complaint Par. 259)***        RHODES has no knowledge of these allegations.

***Answering Complaint Par. 260)***        RHODES has no knowledge of these allegations.

***Answering Complaint Par. 261)***        RHODES has no knowledge of these allegations.

***Answering Complaint Par. 262)***        DENIED, unless the allegations referenced concern violence planned by Antifa, Black Lives Matter, anarchists, or left-wing rioters.

***Answering Complaint Par. 263)***        RHODES knows of these allegations only through news reports but denies that Tarrio's arrest has anything to do with "law enforcement officials [making] substantial efforts to disrupt and prevent [any] planned violence in advance and – unless violence planned by Antifa, Black Lives Matter, anarchists, or left-wing rioters. The record is clear that law enforcement officials did not make substantial efforts to disrupt or prevent any violence, but on the contrary engaged in a widespread "stand down" with seriously under-staffed (compared to normal days) and uninformed (with little to no sharing of intelligence) law enforcement officers of the District of Columbia and U.S. Capitol Police making almost no efforts to prepare for January 6, 2021, or respond until the riots by a very small number of the 10,000 demonstrators at the Capitol had already spun out of control.

***Answering Complaint Par. 264)***        RHODES does not have any knowledge of these alleged conversations or actions but in the alternative 1) denies the content of these alleged

communications as being transparently false, left-wing, paranoid conspiracy theories and

defamation of peaceful protestors or 2) admits but wonders why the FBI did not disseminate this

information to MPD and the USCP so they could have properly prepared.

*Answering Complaint Par. 265)*     DENIED.   Information found by RHODES is that

the FBI internally had extensive information about upcoming demonstrations but utterly failed to

pass that information along to anyone governmental or public who should have been told about

it.   RHODES further answers that the subject and content of the information reported within the

FBI was about the likelihood of violence by Antifa and other anarchist or left-wing

organizations.  During the criminal trial, RHODES became aware of information that Sam

Andrews and other groups (the Salt and Light Brigade and certain media outlets) may have been

promoting aggressive forms of protest, but he to date has encountered no evidence that patriots

were traveling "to the District to commit violence and "war" on January 6, 2021," and RHODES

further answers that no patriots did in fact travel to the District of Columbia "to the District to

commit violence and "war" on January 6, 2021."

*Answering Complaint Par. 266)*     DENIED, unless the allegation refers to information

that parts of the FBI utterly failed to share with anyone.  However, RHODES further answers

that the maps referred to are available (instantly) on the internet including from the Architect of

the Capitol because the Capitol is a public building and a museum which is open to the public.

This would be like the FBI discovering that maps of the United States are for sale at gas stations.

*Answering Complaint Par. 267)*     The paragraph is compound.   RHODES has no

knowledge of the allegations concerning the Proud Boys.

*Answering Complaint Par. 268)*     DENIED.  RHODES has no knowledge of the

allegations concerning the Proud Boys.

*Answering Complaint Par. 269)*     DENIED.   RHODES further answers again that if someone wanted to "target[] in part a process established by federal law to count the certified electoral votes" convening at 1 PM, such person would have arrived at the Capitol at 12:30 PM or earlier, not at 2:30 PM.

*Answering Complaint Par. 270)*     DENIED, in that the only activities required are for the presiding officer to count the Electoral College votes while the Joint Session of Congress watches.  There are duties imposed, but not on Members of Congress other than to attend. Of course many do not attend for various reasons, as is customary with Congressional business, and in the days of horses and buggies would be even more normal. The 12th Amendment requires Congress to assemble on a certain day, designated by law as January 6, but Congress has always functioned with some of its members absent.  In fact, a process of asserting a quorum exists specifically because there are always or almost always some Members of Congress absent. Therefore, even the directive to assemble is not a binding duty upon any particular Member of Congress.  However, it is common practice in Congress to recess proceedings and reconvene later.  Therefore, the Congress could have convened at 1:00 PM on January 6, 2021, and then immediately recessed to another day.  The Vice President as President of the Senate, should he choose to attend in that role, which Vice Presidents frequently do not, is required to count the votes in the presence of Congress.  Members of Congress have the opportunity – but not the duty – to object to the inclusion of certain Electors or slates of Electors, or which slate of Electors is the correct one, or the vote total of the Electoral College from each State.

*Answering Complaint Par. 271)*     Admitted expect that the functions described occur on December 12, not January 6, and in the State capitols, not in Washington, D.C. (except to the extent that the three (3) Electors specifically for the District of Columbia also meet the same as for the various States in State capitols all across the nation).  Therefore, this process had already

occurred and been completed well before January 6, 2021.

      ***Answering Complaint Par. 272)***     ADMITTED.  See Answer to Paragraph 270.

However, RHODES further answers that the Constitution empowers each House of Congress to

set its own rules and procedures.  One of those rules or procedures is the common practice of

Congress to recess and continue particular business on another day.  Therefore, while the

Constitution requires Congress to assemble at 1:00 PM and "that date" is set as January 6, every

four years, there is no requirement or expectation that the activities mentioned will conclude on

January 6 in any given year.  Once the Congress has met for even 1 minute at 1:00 PM (Congress

was in fact late on January 6, 2021, as often), Congress is free to recess immediately and retire to

engage in discussions, consultations, horse-trading, deal-making, debates, or visit the District of

Columbia's many fine drinking establishments or go play golf, as they may desire.  Therefore,

the actions described cannot be obstructed when it is common place for Congress to break up and

conduct is business into different sessions spread across different days[3].  Furthermore, there is no

requirement as to *where* the Congress must "be in session."  Congress could assemble on the

beach in Key West, Florida, if they wished.  Note that the identity of the "President of the

Senate" changes depending upon whether the Vice President of the United States of America

chooses to be in attendance on any particular day or whether another Senator must substitute for

the actual President of the Senate.  That is, the President of the Senate means whomever is the

presiding officer over the U.S. Senate at the time.

      ***Answering Complaint Par. 273)***     ADMITTED.  However, RHODES further answers

that the paragraph and the constitutional provisions quoted debunk the narrative of the Plaintiff,

Department of Justice, and others that any "presidential power" is "transferred" on January 6.

---

[3]    Note that in a recent impeachment, the U.S. Senate assembled at 1:00 PM on the required day following
receipt from the U.S. House of Articles of Impeachment, then immediately went into recess within a minute.  This
allowed the Senate about 4-5 days in which to plan and organize its next steps.

*Answering Complaint Par. 274)*        RHODES lacks knowledge of the allegations asserted, but from general information and news reports further answers that Tarrio's condition of bail included a requirement for him to remain outside the District of Columbia after a 24 hour period of time (presumably but not explicitly stated to collect his belongings from his hotel). From news reports and other information, Tarrio fully and faithfully complied with the Court's order setting the terms of bail, and left the District of Columbia in about 8 hours – less than the required 24 hours -- after conferring with potential attorneys and coordinating the cancellation of his planned speech to be delivered lawfully on the U.S. Capitol Grounds for "Latinos for Trump."

*Answering Complaint Par. 275)*        DENIED.  The documentary film crew mentioned recorded a video, which may be viewed on YouTube at "GREETING NOT A MEETING: Enrique Tarrio (Proud Boys) and Stewart Rhodes (Oath Keepers) Jan. 5, 2021" at https://www.youtube.com/watch?v=cMr1GKhC5bY The video shows Oath Keepers leader Stewart Rhodes providing security for attorney Kellye SoRelle who (Kellye) wanted to talk to Enrique Tarrio about Tarrio finding an appropriate lawyer.  On the video, Rhodes says something to the effect of "pleased to meet you" (indicating that Rhodes and Tarrio had never meet in person prior to January 5, 2021) for all of about 6 seconds.  Rhodes then steps away, turns his back on Tarrio and the group around Tarrio, and continues to provide security by scanning the parking garage looking out away from Tarrio and Kellye SoRelle and others.  A woman takes over the conversation and extensively discusses with Tarrio Tarrio's logistical plans to leave the District of Columbia.  The woman offers to arrange a car for Tarrio that will not be known or noticed and is surprised to learn that Tarrio plans to immediately drive North to Baltimore, Maryland, not to fly on an airplane, and not to drive South toward his home in Miami,

Florida, through Virginia.  The "meeting" is undeniably about how Tarrio is going to get his luggage out of his hotel and his travel plans leaving Washington, D.C. after being delivered by a National Geographic film crew led by Nick Quested and who has not been disclosed as a confidential human source by the Department of Justice.  Rhodes is not part of the meeting as shown on video.  There is clearly no mention of the Capitol or any event on January 6, 2021.

*Answering Complaint Par. 276)*        RHODES has no knowledge of these events except that he has heard of Tarrio's description that Tarrio went to Baltimore, Maryland, the evening of January 5, 2021, which meant he left in about 8 hours from release on bail although he was allowed 24 hours by the D.C. Superior Court.

*Answering Complaint Par. 277)*        The paragraph is compound.  RHODES ADMITS that an estimated 500,000 demonstrators peacefully assembled at the Ellipse area of the U.S. park known as the Washington Mall, South of the White House.  The Oath Keepers were invited to assist with security and logistics at the Ellipse rally.  However, when they arrived they discovered that the rally organizers had over-estimated the need for security and over-staffed the function.  Nevertheless, the Oath Keepers were given VIP passes and ushered in to sit at the VIP section of the Ellipse rally.  RHODES further answers that an enormous contingent of Chinese-Americans and other Asian-Americans protesting the Communist Party of China, gathered at the Ellipse park area on the Washington Mall near the White House and near the Washington Monument and spread all around the Washington Mall and surrounding areas.  No one engaged in, thought about, planned for, mentioned, or even considered any violence, which is DENIED.

*Answering Complaint Par. 278)*        DENIED, unless the "action" referred to is correctly understood as defending innocent and peaceful Trump supporters – unarmed in the "gun free zone" of the District of Columbia – from violent attacks from Antifa, other anarchists, misnamed

Black Lives Matter rioters, and other Leftist rioters and violent street thugs.  Furthermore,
RHODES does not understand what the paragraph is alleging that people "traveled together or
otherwise convened" which appears to be just another way of saying 500,000 to 1 million
demonstrators committed tourism and came to their Nation's Capital.

      ***Answering Complaint Par. 279)***      Admitted that the statement was made by Rhodes.
RHODES further answers that Rhodes statement of the conditional, contingent use of a QRF
"waiting … in case of worst case scenarios" further proves that the Oath Keepers had no plans
for any violence or to attack, enter, or occupy the Capitol, but were prepared in the event of
"worst case scenarios" inflicted by Antifa, anarchists, misnamed Black Lives Matters rioters, or
other Left-wing rioters.

      ***Answering Complaint Par. 280)***      RHODES has no knowledge of the matters alleged
in the paragraph concerning the Proud Boys.

      ***Answering Complaint Par. 281)***      ADMITTED, although he did not take precise note
of the time when he left.

      ***Answering Complaint Par. 282)***      The paragraph is compound.  RHODES admits the
first sentence, assuming his vague recollection is correct that the name of the hotel was in fact
the Comfort Inn Ballston.  RHODES DENIES the second sentence in that is vague and non-
specific.  RHODES did not take inventory or keep records of who brought what to the hotel, only
what RHODES personally brought with him.  RHODES does not know who is seen in the
photographs, and notes that none of the items shown are gun cases but are common, household
plastic storage containers and a large duffel bag.  None of those containers would be ideal for
weapons or ammunition.  RHODES ADMITS the final sentence of the paragraph in the context
of a Quick *Reaction* Force only to be used "in case the S*%T hits the fan."

***Answering Complaint Par. 283)***      The paragraph is compound.  RHODES DENIES

the allegations as being a hopelessly chopped-up soup of snippets losing all meaning of the

discussions.  RHODES further answers that his statement "hoping very much that that doesn't

happen" negates the idea that there was any plan, agreement, or conspiracy to do anything on or

about January 6, 2021, rather than being prepared to react to threats.  Furthermore, RHODES

DENIES the implication or attempted inference that the very real threat of social conflict and

how to avoid it is evidence of any wrong-doing or agreement to cause – rather than prevent,

discourage, or block – armed conflict.

***Answering Complaint Par. 284)***      The paragraph is compound.  RHODES ADMITS

the first sentence of the paragraph.  The second sentence is DENIED.

***Answering Complaint Par. 285)***      RHODES has no knowledge of the events alleged

concerning the Proud Boys other than (often incomplete) news coverage.

***Answering Complaint Par. 286)***      RHODES has no knowledge of the events alleged

concerning the Proud Boys other than (often incomplete) news coverage.  However, RHODES

further answers that there were flimsy paper signs 11 inches by 14 inches affixed to portable bike

racks, which were no longer intact, in place, or visible by the time the Oath Keepers Defendants

arrived.

***Answering Complaint Par. 287)***      The paragraph is compound.  RHODES has no

knowledge of the events alleged concerning the Proud Boys.  RHODES further answers that he

is not aware of any attack referred to being addressed in the video or in the real world.  But he

and his counsel have seen the video long after January 6, 2021.  Eddie Block's 2 hour plus video

recording (which is available on the internet, but not necessarily on YouTube) shows quite a

different story than alleged.  The video shows Proud Boys walking around a giant rectangle

patrolling – explicitly – for any signs of ANTIFA poised to attack, walking away from the Capitol at one point and stopping to take photographs. Photographs of the Proud Boys and others curiously always show them looking away from the Capitol towards the Capitol. The alleged quote in the last sentence is not accurate or what is said on the video from RHODES's knowledge.

*Answering Complaint Par. 288)* RHODES has no knowledge of the conversations alleged concerning the Proud Boys, but understands that only about 50 to 100 Proud Boys were in Washington, D.C. on January 6, 2021, however a couple hundred random members of the crowd joined them in marching along the Washington Mall. This is why there is a vast difference between the very small number of Proud Boys shown on Eddie Block's video marching all around the Capitol many blocks away, compared to the vastly larger group marching together at a later time. The difference is the unassociated Trump demonstrators who joined in with the Proud Boys.

*Answering Complaint Par. 289)* DENIED. Trump said "I know that many of you are going to walk down to the Capitol" referring to pre-existing plans for 6 demonstrations on Capitol Grounds that the USCP had issued permits for back in December 2020. As the head of the Oath Keepers, I know that rallies on the Capitol Grounds had been promoted for weeks. Conspiracy theorists cut off the "I know" and the qualifier "many of you" to make it falsely appear that Trump raised the suggestion for the first time about pre-existing plans for rallies at the Capitol. RHODES further answers that Trump could not be heard clearly by the crowds at the Ellipse and that cell phone service and data usage was extremely poor and limited due to the large crowds and most people did not know what Trump was saying because of unintelligible sound. See https://www.youtube.com/watch?v=76w7RPLwYIs for the distorted sound system.

RHODES further answers that to his knowledge Trump clearly referred to pre-existing plans for rallies at the Capitol and said "I know that many of you are going to walk down to the Capitol…" because rallies had been promoted at the Capitol grounds for weeks. RHODES was not privy to communications by the President or anyone else because his phone was not functional, possibly because of undisclosed collections and/or network congestion.

*Answering Complaint Par. 290)*        DENIED.  Again, RHODES further answers that Trump could not be heard by the crowd at the Ellipse.  The Plaintiff, like most of the political world and news media, appears to be quoting from the microphone feeds at the podium, which could not be heard clearly by the crowds.  They did not know what he was saying during most of his speech, although the garbled public address system was very loud.  See:

https://www.youtube.com/watch?v=76w7RPLwYIs   Trump's speech was not broadcast on local radio.  And the cell phone system was overwhelmed.  And to the best of RHODES's knowledge nobody yelled anything (including because the crowd and the speeches were too loud) much less anything about taking the Capitol, other than perhaps Ray Epps.  Defendant RHODES further answers that – like most of the crowd that wandered off because they could not understand what Trump was saying – RHODES was not physically present at the Ellipse to hear any such comment by Trump (which he has since learned was near the end of that speech) nor could he hear it on local radio since it was not broadcast nor could he hear it over the internet with cell phone towers overwhelmed by the crowds.  Instead, RHODES escorted some VIPs from the Ellipse area much earlier to the location where a rally had been permitted by the U.S. Capitol Police.  They could not find the stage that was supposed to be set up at "Area 8" of the U.S. Capitol Grounds.  Therefore, this was not a church-like "responsive reading."  No one except Ray Epps said any such thing.  Nobody said anything like "LET'S TAKE THE CAPITOL!" at or

near the rally at the Ellipse unless the Plaintiff might be referring to Ray Epps and other suspicious actors, provocateurs, and/or undisclosed CHS.

**_Answering Complaint Par. 291)_**     DENIED.  See Answer to paragraph 290.

**_Answering Complaint Par. 292)_**     DENIED, nobody said anything like "STORM THE CAPITOL!" or " INVADE THE CAPITOL BUILDING!" or "Let's take the Capitol! " at or near the rally at the Ellipse unless the Plaintiff might be referring to Ray Epps and other suspicious actors, provocateurs, and/or undisclosed CHS.

**_Answering Complaint Par. 293)_**     Most of the attendees at Trump's speech left early because Trump could not be understood through the public address sound system.  RHODES believes that Watkins and other Oath Keepers began on the last personal security detail (PSD) from the ellipse to the Capitol, but had to divert to retrieve their protective gear (PPG) to a location where they stored it as instructed by Secret Service.  The protectees, guarded by Oath Keepers Thomas Burgess, Jason Dolan and RHODES, none of whom wore PPG, continued at an expedited pace to the licensed event on Capitol grounds at "Area 8" of the U.S. Capitol.  Notice that the Oath Keepers had to take off much of their gear because they were coordinating and consulting with the Secret Service and leave the gear outside of the VIP area.

**_Answering Complaint Par. 294)_**     Defendant was not paying attention to Trump's speech while he was gathering the security detail at the ellipse. Having reviewed it much later DENIES the allegations of the paragraph.

**_Answering Complaint Par. 295)_**     The paragraph is compound.  Again, Trump referred to the pre-existing plans announced weeks earlier for rallies on the U.S. Capitol Grounds.  Various groups applied for  – and received – permits in December 2020 for events on the U.S. Capitol Grounds for the afternoon of January 6, 2021, from the U.S. Capitol Police.

RHODES does not know about the allegations concerning the Proud Boys.

     ***Answering Complaint Par. 296)***     DENIED.  RHODES would not describe people randomly wandering from one place to another a "march."  RHODES further answers that most of the people who gathered at and around the U.S. Capitol, estimated at 10,000 by USCP Deputy Chief (then) Pittman, were either never at Trump's speech at the Ellipse or left before Trump finished his speech.

     ***Answering Complaint Par. 297)***     RHODES is not aware of Watkins' post.  This paragraph appears to refer to a system by which Watkins was talking to people scattered across the country who were watching events only on television news and commenting. The recordings of this Zello audio chat distinctively do not have any crowd noise.  The background noise is so quiet one could hear a pin drop.  These are clearly people who were not at the Capitol.

     ***Answering Complaint Par. 298)***     Defendant has no first-hand knowledge of the claims of the paragraph about the Proud Boys.

     ***Answering Complaint Par. 299)***     Defendant has no first-hand knowledge of the claims of the paragraph about the Proud Boys.  RHODES further answers that there is nothing wrong with anyone's choice of clothing or their use of walkie-talkies or the like.

     ***Answering Complaint Par. 300)***     Defendant has no first-hand knowledge of the claims of the paragraph about the Proud Boys.  However, RHODES DENIES the implication or attempted inference that anyone outside of occupied Europe in the 1940s is required to wear clothing to declare their politics, group membership, affiliations, or beliefs.

     ***Answering Complaint Par. 301)***     The paragraph is compound.  The first sentence is DENIED.  The Oath Keepers' distinctive uniforms are protective but mostly informative providing easy and immediate identification to hurricane victims and victims of other natural

disasters, as well as Leftist attackers.  None of that is "paramilitary."   In response to the second sentence, Defendant admits that the named persons donned their standard, routine, normal outfits as they have for 12 years, but DENIES that they wore the items as characterized by the Plaintiff and others. Furthermore, RHODES DENIES that any of the Oath Keepers committed any violent acts and DENIES that the Oath Keepers planned any violent acts or prepared for any violence. RHODES further DENIES any implied allegation that the Oath Keepers used any communication device different from what everyone uses.

   *Answering Complaint Par. 302)*        The paragraph is compound.  All U.S. citizens have authorization to enter the public U.S. Capitol, a meeting place between the public and its representatives and a national museum, is not less than for all U.S. citizens.  The U.S. Capitol is guarded 24 hours a day, like any of the Smithsonian museums and other public buildings. But "secured" does not mean closed.  During business hours the Capitol is open to the public.  The U.S. Capitol hosts thousands of school children in tours every year along with visits by other tourists.  There are no permanent security barriers nor any permanent signs that entry is restricted.  Visitors to the U.S. Capitol do not require any authorization and may enter merely to enjoy the national art such as the iconic painting of General George Washington crossing the Delaware and our national documents on display.  That is, visitors to the Capitol are not required to give any reason to the U.S. Capitol Police for their visit.  A U.S. citizen can enter the U.S. Capitol for no reason at all.  Public viewing galleries are physically built in to the Capitol building as the central focus of the Capitol.  The very structure of the building revolves around the public's access to view its representatives in session.  The Capitol is as public, more so, than a court trial in progress.  Members of the public may enter at any time during business hours to meet or seek an appointment with their elected Representatives and Senators, listen to hearings

in progress, or even merely to have lunch in the cafeterias or dining rooms or to admire the art.

*Answering Complaint Par. 303)*       RHODES has no personal knowledge of the

allegations of the paragraph, but believes that if the MPD assists with the security of the U.S.

Capitol.  There appears to be a statute that gives MPD limited jurisdiction to assist at the Capitol.

However, RHODES assumes that it would have to be under a memorandum of understanding or

agreement pursuant to which the Legislative Branch of the U.S. Government is obligated to fully

and completely reimburse members of the MPD for their work as well as any injuries regrettably

experienced. It should also be noted that MPD closed off access streets and other exits that

deviated from the directed path to the Capitol.  This further suggests that the District of

Columbia issued a permit for a march on city streets.

*Answering Complaint Par. 304)*       DENIED.  The Oath Keepers did not reach the U.S.

Capitol until 2:26 PM and walked up the East Central stairs from 2:33 PM to 2:40 PM.

*Answering Complaint Par. 305)*       DENIED.

*Answering Complaint Par. 306)*       DENIED.  Greene – if the paragraph is referring to

Oath Keeper member "Whip" or Michael Greene (as opposed to Proud Boys member Matthew

Greene) -- was not at the U.S. Capitol.  However, RHODES has no knowledge of Greene's

private thoughts or opinions, nor is Greene an expert on crowd behavior or how crowd behavior

in Afghanistan correlates to American crowds.  RHODES does not know Proud Boys member

Matthew Greene. RHODES further answers that liability does not depend upon crowds or

moods, but on the individual conduct of specific people.

*Answering Complaint Par. 307)*       DENIED. If anyone other than the Defendant said

or did any such things, RHODES has no knowledge of it.  However, RHODES understands that

the U.S. Capitol Police did not call MPD for back-up until 12:58 PM (see paragraph 444) so the

Defendants could not have "clashed" with MPD officers at or prior to 12:53 PM (see paragraph 308).

      ***Answering Complaint Par. 308)***     RHODES has no knowledge of the allegations about the Proud Boys alleged in the paragraph.

      ***Answering Complaint Par. 309)***     RHODES has no knowledge of the allegations about the Proud Boys alleged in the paragraph.

      ***Answering Complaint Par. 310)***     RHODES has no knowledge of the allegations about the Proud Boys alleged in the paragraph.

      ***Answering Complaint Par. 311)***     RHODES has no knowledge of the allegations about the Proud Boys alleged in the paragraph, other than from news reports seen after the fact.

      ***Answering Complaint Par. 312)***     RHODES has no knowledge of the allegations about the Proud Boys alleged in the paragraph.  However, RHODES further answers that neither Biggs, the Proud Boys present or other demonstrators had actually, in fact, "taken the Capitol." Certainly they had not taken the Capitol if the Amended Complaint means prior to 1:00 PM (see paragraph 313).  The reality that the alleged statement is counter-factual indicates to RHODES that Biggs – if he made the statements – was engaging in hyperbole and marketing for what RHODES assumes might have been his podcast or something like that, by spreading excitement.

      ***Answering Complaint Par. 313)***     ADMITTED, except that from news reports the Congress actually was late in convening by around 12 minutes, which is significant because Congress could have immediately recessed again and planned out its next steps and reconvened on another day.  There was no requirement for Congress to complete the counting of Electoral College votes on January 6.  The Congress is famous for holding "legislative days" that last many days and are recorded as the first day when in fact the session is spread over many days.

***Answering Complaint Par. 314)***        The paragraph is compound and confuses and jumbles facts.  RHODES denies that the John Doe with a bullhorn remains unidentified, but was in fact a co-conspirator with Ray Epps, as proven on video recordings.  The DoJ clearly knows who the provocateur is because they are not looking for him.  Furthermore, while the paragraph claims that it occurred "At approximately the same time" or around 1:00 PM, RHODES did not reach the U.S. Capitol until almost 3:00 PM and the other Oath Keeper Defendants (if they came to the Capitol at all) did not arrive until 2:26 PM on the East side and walked up the stairs around 2:33 PM, reaching the veranda at the top of the East stairs at 2:37 PM.  The paragraph apparently describes (seen later by RHODES on news) what happened on the West side, although none of the Oath Keepers were on the West side.  To the best of RHODES's knowledge, again from reviewing videos and news coverage, none of the Defendants climbed barriers, except perhaps by a few pushing aside bike racks near the Peace monument / fountain, but none are known to RHODES.  RHODES does not know what the Proud Boys did but from reviewing videos and news coverage denies that the Proud Boys led anything on January 6, 2021.  RHODES denies that what other members of the crowd did has any relevance to RHODES or any of these Defendants.   Quite simply, like the child's joke about a man searching for his car keys under the street lamp a mile away from the car because the lighting is better, the DOJ, the Plaintiff, and others blame innocent people because it furthers their political agenda, not on account of any truth.

***Answering Complaint Par. 315)***        DENIED as to the Oath Keepers.  The paragraph describes events on the West side of the Capitol.  The Oath Keepers were on the East side.  The Oath Keepers did not force their way past any barricades, nor see any barricades, on the East side of the Capitol.  RHODES is without knowledge as to the allegations concerning the Proud Boys.

***Answering Complaint Par. 316)***        RHODES is without knowledge as to the

allegations concerning the Proud Boys.  RHODES understands from reviewing discovery much

later that the MOSD apparently was part of the Proud Boys.  RHODES further answers the

statement "Find some eggs and rotten tomatoes" – because that would be impossible to go

shopping in the middle of the demonstration – warns us that the comments are not to be taken

literally.  Since either people brought eggs and rotten tomatoes with them or they would have to

find a convenience store to buy them at, this also confirms the lack of any planning or

conspiracy.  The comments are ironic humor, maybe not very good humor, but an attempt at dry

humor nonetheless.

***Answering Complaint Par. 317)***        RHODES is without knowledge as to the

allegations concerning the Proud Boys.  But RHODES further answers that if the statements

were made as described, they contradict the Complaint.  The Proud Boys clearly did not, in fact,

storm the Capitol (whatever that means) and clearly did not "take" the Capitol.  Therefore, the

statements are clearly hyperbole and exaggeration, conflating a famous quote with improper

usage of "infamy," that is most likely intended as "click bait" to promote social media presence.

These quotes are not evidence of the truth of the statements made as marketing for podcasts.

***Answering Complaint Par. 318)***        RHODES is without knowledge as to the

allegations concerning the Proud Boys.

***Answering Complaint Par. 319)***        RHODES is without knowledge as to the

allegations concerning the Proud Boys.

***Answering Complaint Par. 320)***        DENIED as stated or misrepresented.  Harrelson

arrived at the U.S. Capitol with Jason Dolan shortly before 2:00 PM, and were the first Oath

Keepers to arrive.  The rest of the Oath Keepers who went to the Capitol arrived at 2:26 PM on

the East side.  Rhodes was at a friend's hotel at 1:30 PM until long after 2:30 PM resting and

warming up from the cold, windy, stormy weather at the Ellipse-area rally.  In response to an

Oath Keepers member in another city, I responded that I was in the District of Columbia.  The

patriots were demonstrating around the Capitol.  However, this had nothing to do with any plan

by the Oath Keepers.  Indeed, the alleged statements that "the patriots are taking it into their own

hands" based on new developments.

  ***Answering Complaint Par. 321)***  Admitted based on news reports seen after the fact

except that the characterization as "restless" is imprecise opinion.

  ***Answering Complaint Par. 322)***  RHODES was not aware of the substance of this

paragraph's allegations, perhaps because cell phone service was overwhelmed around the

Capitol, including access to the internet or data transfer apps.  Again, however, Rhodes was

warming his feet at a friend's hotel room at the time.

  ***Answering Complaint Par. 323)***  RHODES is without knowledge as to the

allegations concerning the Proud Boys.

  ***Answering Complaint Par. 324)***  RHODES is without knowledge as to the

allegations concerning the Proud Boys.  However, none of the Oath Keepers were at the Capitol

by 1:37 PM.

  ***Answering Complaint Par. 325)***  RHODES is without knowledge as to the

allegations concerning the Proud Boys.  However, the compound paragraph describes events on

the West side of the Capitol, not the East side where the Oath Keepers were.

  ***Answering Complaint Par. 326)***  RHODES is without knowledge as to the

allegations concerning the Proud Boys.

  ***Answering Complaint Par. 327)***  ADMITTED, except that Kenneth Harrelson and

Jason Dolan were the first to arrive at the U.S. Capitol shortly before 2:00 PM. Other Oath

Keepers arrived at 2:26 PM and reached the doors at 2:40 PM. Rhodes was in a friend's hotel

room until nearly 3:00 PM. Therefore, the alleged statements cannot be accurate. Rhodes was

not describing any first-hand knowledge but only his commentary of news coverage from afar.

***Answering Complaint Par. 328)***        RHODES is without knowledge of these

allegations. The "Stop the Steal 16" channel consisted of people watching the news on television

around the country and not people present in the District of Columbia. RHODES did not see any

such messages.

***Answering Complaint Par. 329)***        See Answer to Paragraph 328. However, Watkins

could not have been one block away from the Capitol at 2:00 PM yet arrived only at 2:26 PM.

***Answering Complaint Par. 330)***        RHODES has no knowledge of messages between

Caldwell and Watkins but Watkins was not at the Capitol around 2:00 PM. Harrelson and Jason

Dolan were the first to arrive among the Oath Keepers.

***Answering Complaint Par. 331)***        DENIED. As shown on numerous videos, Kenneth

Harrelson and Jason Dolan escorted as security VIPs from the Ellipse to Area 8 of the U.S.

Capitol Grounds where the U.S. Capitol Police had issued permits for lawful demonstrations to

be held on the afternoon of January 6. However, on arriving, Harrelson and Jason Dolan with

VIPs in tow (or actually following the VIPs) could not find any stage or evidence of any planned

rally where they understood Area 8 to be. The VIPs gave up on finding the rally site and seeing

a tumult at the East Capitol center stairs wandered over to see what was going on. RHODES and

Jason Dolan felt obligated to stay with them. All of them stood on the grass for a time on the

East side of the Capitol in the center and then slowly and calmly walked up the stairs where

demonstrators were loud but orderly and peaceful. Upon reaching the steps, Harrelson remained

at the base of the steps while Dolan went up to investigate a disturbance and to confer with police about it.  One of the functions of the Oath Keepers has always been to provide first aid. While making his way through the crowd, Dolan was attacked by trained suspicious actors including Ricky Christopher Willden while other suspicious actors like Israel Easterday boxed Dolan in and pushed him towards a riot policeman while trained John Does pushed the riot policeman towards Dolan, manufacturing physical contact as the officer was pushed into Dolan. Unidentified photographers—potentially MPD undercover officers—photographed the scene of the Dolan attack while other suspicious actors including Ronald Loerke, James Haffner, Megan Paradise and John Does including #LemonyKickit, #LemonZest, #PencilBeardInsider, #BlondeSprayer and #GooseinGray coordinated a push through on the steps.

    *Answering Complaint Par. 332)*       DENIED.  RHODES was in his friend's hotel room. RHODES came to the Capitol much later after learning that the Oath Keepers at the Capitol could not find the stage for the rally permitted for "Area 8" amidst the large, chaotic crowd. RHODES then jumped up and  went over to salvage the situation.  First, RHODES further answers that there was no restricted area of the Capitol Grounds.  A restricted area requires notice to the public, visible to those affected.  Second, the Oath Keepers had authorization to attend the permitted demonstration on the U.S. Capitol Grounds as security volunteers.  Because human beings generally cannot fly through the air, permission to attend any of six (6) permitted demonstrations necessarily gives authorization to walk across the Capitol Grounds to and from or between the permitted demonstrations.  Third, by the time the Oath Keepers arrived there were no signs providing notice of any restriction.  The flimsy paper signs had all been removed and/or trampled.  Because the Capitol Grounds are normally open to the public as a national park, without notice of a temporary restriction visible to the public, there was no restricted area.

Fourth, there can be no restricted area which is not clearly identifiable.  One could not know if they are on one side of an invisible line or the other.  Further, RHODES answers that he sent a message that Oath Keepers should come *to him* – not to the Capitol – and leave the Capitol with Rhodes leading Oath Keepers away from the Capitol.  Since Oath Keepers were already inside the U.S. Capitol, Rhodes demand that Oath Keepers come *to him* meant to *leave* the Capitol, get out, and meet Rhodes to leave the area.

      ***Answering Complaint Par. 333)***     RHODES is without knowledge as to the allegations.  RHODES did not arrive around 3:00 PM.  However, the photograph in Figure 14 appears to show the West side of the Capitol, whereas the Oath Keepers were on the East side.

      ***Answering Complaint Par. 334)***     RHODES is without knowledge as to the allegations concerning the Proud Boys.  However, from RHODES's review of videos many months later it is clear that none of the Proud Boys were the first to enter the U.S. Capitol building and hundreds, probably a thousand, unknown demonstrators entered the Capitol building before any Proud Boys member entered the building.  For example, it was nearly 3:00 PM before Proud Boys Philadelphia leader Zachary Rehl and West Virginia Proud Boys leader Finley entered the Capitol.

      ***Answering Complaint Par. 335)***     RHODES is without knowledge of these allegations concerning the Proud Boys except insofar as to say that Pezzola seems to have entered with a group of trained John Does that included #RedonRedGlasses, who is seen both standing next to Ashli Babbitt when she was shot and also next to Pezzola breaking the window with him.  So #RedonRedGlasses is like Forest Gump showing up everywhere (or like Ray Epps).  However, from his review of videos and information long after the fact, it is clear that others entered the Capitol building through other entrances before this point in time.

**Answering Complaint Par. 336)**        RHODES is without knowledge as to the allegations concerning the Proud Boys.

**Answering Complaint Par. 337)**        RHODES is without knowledge as to the allegations concerning the Proud Boys.  However, RHODES further answers that the erratic and uncoordinated manner in which supposedly coordinating people followed different paths wandering around uncoordinated inside the Capitol and left at different times through different exit paths rebuts the narrative of the Complaint that there was any plan or conspiracy. Furthermore, if the alleged statement is an accurate recording, Biggs clearly did not take the Capitol and the alleged statement is counter-factual.  Therefore, Biggs was clearly embellishing and exaggerating for effect.

**Answering Complaint Par. 338)**        DENIED.  However, the paragraph suggests that Oath Keepers "learned" that someone else had breached the Capitol. The Oath Keepers were protective gear and distinctive outfits but do not have "tactical gear."  I do not believe that Minuta had bear spray.

**Answering Complaint Par. 339)**        The paragraph is compound.  RHODES ADMITS the first half of the first sentence.  RHODES DENIES Minuta swerved around law enforcement or around barricades, which had all been removed by suspicious actors before RHODES, Walden, and James reached the Capitol.  There was no assault that RHODES is aware of.[4]  The second sentence is ADMITTED as a rough approximation of Minuta's statements.  However, RHODES further answers that the paragraph makes clear that Minuta, Walden, and James had not arrived yet and therefore could not know the exact details of what was happening at the U.S. Capitol.  The statement referred to was made without knowledge of the actual circumstances at the U.S. Capitol beyond the level of rumor.

---

[4]        And indeed, there are only four lights.

*Answering Complaint Par. 340)*      DENIED.  RHODES had no involvement whatsoever in coordinating anything on January 6, 2021, but left that to Michael Greene, who has extensively denied the allegations.  Texan Rhodes was at that time in a male friend's hotel room warming up from the very cold, windy day.  RHODES further answers that it is overwhelmingly clear that "the mission" was to provide security for speakers and attendees at the rallies for which the U.S. Capitol Police and U.S. Park Police had issued permits.  Thus, anyone who was at the Capitol was "off mission."  Rhodes urged getting Oath Keepers "back on mission." Their mission was to protect VIPs and vulnerable demonstrators from ANTIFA attacks.  RHODES instructed all Oath Keepers to report *TO HIM* – not to the Capitol.  RHODES explained that he was on the South Side of the Capitol.  No one entered or attempted to enter the Capitol from the South Side of the building.  RHODES not only demanded that Oath Keepers come to him, but in fact that is what they actually did.  The Oath Keepers who had gone inside exited the Capitol building and formed up on RHODES.  RHODES then led the Oath Keepers *away* from the Capitol and instructed them to go back to their hotels and suggested that they meet at an Olive Garden restaurant in Virginia for dinner.  Shortly after this message, whatever paranoid conspiracy theory it suggests to the Plaintiff, the Oath Keepers (those who ever went inside) left the Capitol and met up with RHODES.  RHODES there admonished the Oath Keepers for being dumb asses (verbatim) for going into the Capitol.  When asked if RHODES had gone into the Capitol Rhodes repeated "no, because I am not a dumb ass."  Kelly Meggs sheepishly admitted that Rhodes was right.  RHODES further answers that when RHODES sent this message several of the Oath Keepers were already at that time inside the Capitol building. So whatever the message suggests to the over-active imagination of the Plaintiff, those Oath Keepers had to leave the Capitol building to comply and rendezvous with RHODES.  Therefore,

in no way was RHODES planning to have Oath Keepers meet him and then turn around and go right back inside again.

**Answering Complaint Par. 341)**      RHODES was not with these Oath Keepers at the time, but understands that they arrived at the Capitol at 2:26 PM and started to calmly walk up the East central stairs at 2:33 PM.   These Oath Keepers noticed Harrelson and Dolan, waved to them, and walked up the stairs because they were rejoining Harrelson and Dolan, and could not talk over the noise of the crowd, not due to any pre-existing plan.  RHODES further answers that he understands that these Oath Keepers arriving on the grounds gathered in a circle in order to pray.

**Answering Complaint Par. 342)**      ADMITTED, except that as noted by the Plaintiff in paragraph 343 RHODES was busy trying to reach someone at the Capitol to get an update on the Oath Keepers providing security at the demonstration at "

**Answering Complaint Par. 343)**      ADMITTED, that RHODES called Kelly Meggs from the friend's hotel room where he was resting to check on the security detail at the permitted demonstration at "Area 8" after starting to hear news of a chaotic crowd at the Capitol. RHODES does not know the exact time because the FBI seized all electronic devices of January 6 Defendants and witnesses.

**Answering Complaint Par. 344)**      RHODES does not know when Kelly Meggs received RHODES' messaged intended to direct Oath Keepers to him, away from the Capitol in the North, but he knew little about the configuration of the Capitol, he had lost his bearings and had mistakenly directed them to the South.  Recall that the FBI confiscated smart phones and computers of Defendants and witnesses alike.  RHODES further answers that because the phone systems were overloaded, many have documented – including FBI testimony – that the times on

text messages were often not accurate.  However, if the times are accurate, Kelly Meggs ignored

my message and entered the Capitol at 2:40 PM instead of joining up with me on the South side

of the Capitol. Therefore, the allegations of the Amended Complaint disprove the existence of

any coordination or plan.

>    ***Answering Complaint Par. 345)***      DENIED.  Those Oath Keepers who entered the

Capitol entered around 2:41 PM and were already inside the building before Stewart Rhodes

arrived from a friend's hotel.  It was not after but before.  RHODES has no idea what the

Plaintiff or others mean by a "military stack."  (RHODES knows what a stack is, but is pretty

sure none of the Oath Keepers' critics do.)  If there were a military stack, it would look and be

nothing like what happened on January 6, 2021.  RHODES further answers that the Oath

Keepers wore distinctive outfits but did not own or possess "battle gear."  RHODES is not even

sure what "battle gear" is within the meaning of the Plaintiff's criticisms and suspects the

Plaintiff and others don't know either.  RHODES has no knowledge of the rest of the allegations

of the compound paragraph.

>    ***Answering Complaint Par. 346)***      DENIED.  RHODES attempted to call Kelly Meggs

but there was no conversation because the crowd noise was too loud or system congestion

prevented the calls from getting through.  Even if there was a technical connection on the phone,

there was no conversation due to the surrounding noise.

>    ***Answering Complaint Par. 347)***      DENIED.  Although RHODES was not there, each

person putting their hand on the person ahead of them is an accountability technique used in

grade schools and by families attending sporting events.  It does not constitute a "stack" and it is

not an "organized" or "coordinated" fashion. It is simply some people walking in a line.

>    ***Answering Complaint Par. 348)***      DENIED.  RHODES answers that there was no

"stack" and Harrelson and Dolan did not join any stack.  They merely met up with their friends who had been led to them and flushed towards them by John Does while another John Doe identified as #Insider486 dashed behind Harrelson.  Minutes prior to the East Rotunda Doors at the top of the East central stairs swinging open from inside at 2:38:30, Oath Keepers were summoned on the pretext of supposedly providing assistance to police by Lawrence Ligas, #Insider486 while #PreyingSnake and other John Does ushered and corralled them towards the door.  The 17 foot high, 10 ton, solid bronze Columbus Doors were left open. And when the inner doors opened the crowd thought they could enter and surged forward, sweeping Harrelson and Dolan through the open door, where they were welcomed by two police officers of the USCP with an admonition only not to break anything and where Officer Anthony Warner fist bumped protestors.  Other Oath Keepers followed them shortly after.  Inside the Rotunda, as shown on French television from the **Keep In News Agency**, someone (apparently Kelly Meggs) was calling out for Oath Keepers to gather together and pray in the center of the Rotunda.  The video shows that these Oath keepers did not enter the Capitol in a coordinated or organized fashion or in any stack, but were shoved through the door by the crowd and left scattered all over the place.  The Oath Keepers then wandered aimlessly around the Capitol, went in different directions, and exited the Capitol through different entrances at different times.

*Answering Complaint Par. 349)*        RHODES is without knowledge as to the allegations concerning the Proud Boys.

*Answering Complaint Par. 350)*        RHODES is without knowledge as to the allegations concerning the Proud Boys.  However, RHODES further answers that the U.S. Congress had already recessed by 2:13 PM EST, according to then Parliamentarian Thomas Wickham, who testified to that on October 19, 2022.

***Answering Complaint Par. 351)***      RHODES is without knowledge as to the allegations concerning the Proud Boys.  However, RHODES further answers that the alleged quote debunks the idea that the Proud Boys had a pre-existing plan.

***Answering Complaint Par. 352)***      RHODES believes that Vallejo posted something like this, but was not aware of it at the time, including because smart phone access to the internet was overwhelmed and inoperable due to the size of the crowds.  (The down-side of advances in smart phones is that owners tend to use them more intensively such as to monitor the internet.)

***Answering Complaint Par. 353)***      RHODES is without knowledge as to the allegations concerning the Proud Boys.

***Answering Complaint Par. 354)***      RHODES is without knowledge as to the allegations concerning the Proud Boys.  However, RHODES further answers that Congress recessed at 2:13 PM according to Parliamentarian Thomas Wickham.

***Answering Complaint Par. 355)***      RHODES is without knowledge as to the allegations concerning the Proud Boys, but from his review of discovery and videos find this to be extremely improbable.  Perhaps the Plaintiff and others fail to comprehend that the Capitol is not a one story building.  Therefore, movements within the building have to be viewed in a three-dimensional space in understanding where people were headed.

***Answering Complaint Par. 356)***      DENIED.  See Answer to Paragraph 348. RHODES further answers that Figure 16 shows that these Oath Keepers were scattered throughout a pre-existing crowd, not moving in any organized or coordinate fashion or any "stack."  Video recordings show that no force was involved, except when the crowd shoved a police officer into Jason Dolan.  The police officers guarding the door welcomed the Oath Keepers into the Capitol.  This is not opinion.  That is fact.  It is shown on the Government's

own video recordings.  Video recordings show two police officers clearly distinguishing Oath Keepers from others, checking their uniforms, and preferentially allowing the Oath Keepers in to the building while trying to keep others out.  At one point, a police officer grabs hold of an Oath Keepers' vest and pulls him through the crowd into the Capitol building. RHODES denies that the Oath Keepers own or wear "combat gear."  RHODES further answers that the Plaintiff is confusing events on the West side of the Capitol.  Where the Oath Keepers were on the East Side, center, there were no chemical irritants used by either police or demonstrators and nothing was being thrown by either police or the demonstrators.[5]

***Answering Complaint Par. 357)***        RHODES has no knowledge of Watkins' messages with people scattered around the United States watching television news from their homes and expressing their opinions from hundreds or thousands of miles away on the "Stop the Steal J6" Zello Channel.  Having heard recordings of this channel discussion, RHODES notes that it is striking that there is no background noise in these audio recordings.  The demonstrations at the Capitol were very loud.  The lack of any crowd noise on the Zello audio recording should have alerted a biased Department of Justice that those Zello recordings had nothing to do with events at the U.S. Capitol or anywhere in Washington, D.C., on or about January 6, 2021.

***Answering Complaint Par. 358)***        RHODES DENIES that any of the statements quoted are true, whether stated by Watkins or not.  If Watkins said any such thing, it was bravado and hyperbole or the result of adrenaline     and not the truth.

***Answering Complaint Par. 359)***        RHODES has no knowledge of Young's comments except that they are wildly inaccurate.  RHODES further answers that the Joint Session of

---

[5]        A journalist stringer reports a demonstrator signaling first for permission and then lightly tossing a water bottle up to a U.S. Capitol policeman on the East side central veranda, a floor above ground level, which the USCP officer then gratefully drank and passed around to share a sip among his colleagues.  There were 10,000 people doing different things.  And there are only four lights.

Congress had recessed at 2:13 PM and the Oath Keepers who entered did not enter the U.S. Capitol until 2:40 PM.  Thus, it is manifestly absurd to claim that they were "trying to obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote" that had convened at 1:00 PM and had already recessed before they arrived.  Anyone who wanted to obstruct the counting of Electoral College votes would have arrived at or before 1:00 PM, not at 2:40 PM.

*Answering Complaint Par. 360)*     RHODES is without knowledge as to the allegations concerning the Proud Boys.  RHODES further answers that he has no idea what "storming" means and is confident that the Plaintiff and others don't know either.  Furthermore, the statement "We just went ahead and stormed the Capitol" suggests that that was not the plan.

*Answering Complaint Par. 361)*     DENIED.

*Answering Complaint Par. 362)*     DENIED, especially as to the interpretation suggested by the Plaintiff. RHODES is not aware of any "back" door on the East sid.

*Answering Complaint Par. 363)*     RHODES has no knowledge about the allegations concerning the Proud Boys.

*Answering Complaint Par. 364)*     DENIED.  RHODES does not know what Caldwell posted at some unidentified place, but RHODES further answers that Caldwell never went through any doors and stayed outside on the Capitol grounds.  Therefore, Caldwell would not know and would not mean by "we" the Oath Keepers.  Caldwell might have been hyping something he did not know or talking about the entire crowd of hundreds of people as "we." RHODES further answers that although Thomas Caldwell is a great guy and a great patriot, he never belonged to the Oath Keepers and does not speak for the Oath Keepers nor is he privy to all of the decisions and policies and positions of the Oath Keepers.

*Answering Complaint Par. 365)*      RHODES is without knowledge as to the allegations concerning the Proud Boys.  RHODES further answers that through later review of discovery and the Proud Boys' trial he has become aware of a video showing Zachary Rehl, Finley, and others debating whether or not they wanted to go into the Capitol, which apparently they did at 2:53 PM.  Therefore, the Proud Boys were undecided and had no plan up through 2:53 PM.  However, RHODES further answers that the Congress recessed at 2:13 PM.

*Answering Complaint Par. 366)*      RHODES is without knowledge as to the allegations concerning the Proud Boys.

*Answering Complaint Par. 367)*      RHODES is without knowledge as to the allegations concerning the Proud Boys.  However, RHODES further answers after research and review after January 6, 2021, that the Rayburn House Office Building must refer to the "Latinos for Trump" rally at the Russell Senate Office Building where Tarrio had been scheduled to speak.  It is clear that the Proud Boys never went anywhere near the Rayburn House Office Building.  Therefore, "revolutionaries" refers to patriotic speakers at the lawful rally..

*Answering Complaint Par. 368)*      DENIED.

*Answering Complaint Par. 369)*      DENIED.

*Answering Complaint Par. 370)*      DENIED.  RHODES further answers that the paragraph further confirms that there was no plan or agreement or conspiracy, because James and Minuta were making it up as they went along.

*Answering Complaint Par. 371)*      ADMITTED, from later review of the Eddie Blocks video.   However, RHODES further answers that if the statements alleged are accurate, they further confirm the unlawful police brutality and excessive use of force by the District of Columbia's Metropolitan Police Department that transformed a peaceful demonstration into a

few violent confrontations in a few small, isolated areas.

     *Answering Complaint Par. 372)*     DENIED.  RHODES further answers that the video recordings reviewed after the fact as discovery shows that demonstrators who entered the U.S. Capitol wandered around in random, disconnected, uncoordinated, separate, and dissociated ways demonstrating no plans or intentions whatsoever.  RHODES further answers that there was never any violent rampage, unless by the MPD forcing and squeezing demonstrators into the Rotunda from which they could not exit.  RHODES further answers that in Figure 18 we see U.S. Capitol Police walking calmly with the demonstrators shown (the USCP has their backs to the demonstrators as they walk in a group, entirely unconcerned and at rest).  Some of the demonstrators are carrying flags, which gives the impression of something more than the reality. RHODES further answers that the Electoral College vote count is required by law to convene at 1:00 PM so arriving at 2:40 PM shows that the Oath Keepers were certainly not "actively seeking out the official election certification proceedings and individuals with official functions in an effort to disrupt the election certification process with threats and violence."

     *Answering Complaint Par. 373)*     RHODES is without knowledge as to the allegations concerning the Proud Boys.

     *Answering Complaint Par. 374)*     RHODES is without knowledge as to the allegations concerning the Proud Boys or Chrestman.

     *Answering Complaint Par. 375)*     The paragraph is compound.  Each allegation is denied, except that the Oath Keepers members exited the building, and meeting up with were led by Rhodes away from the Capitol.  RHODES further answers that the MPD in particular squeezed demonstrators into the Rotunda, blocking the exits, so that the demonstrators were not able to get out.  If the Oath Keepers had any plans to do anything alleged, they would not have left the building after only a short time.  RHODES further answers that the Government's own

video recordings show law enforcement officers preferentially allowed Oath Keepers to enter the U.S. Capitol in contrast to others, even stopping to inspect the uniforms of people and then waving identified Oath Keepers through the crowd and into the building.  A couple of times on the Government's own video recording a police officer puts his hand on an Oath Keeper to stop and examine his credentials and then approves the Oath Keepers member entering the building. The Oath Keepers had no interest in Nancy Pelosi.  Indeed, the Plaintiff like the Department of Justice and other conspiracy theorists incorrectly allege that the Oath Keepers came to stop the "certification" (Electoral College count).  If that were true, Nancy Pelosi would be on the floor of the House Chamber, as anyone would know if they came to the Capitol planning to disrupt the proceedings.  They did not come to disrupt proceedings they did not know about, obviously.  But then, in contradiction, the same conspiracy theorists allege that Oath Keepers were out searching for Nancy Pelosi.  RHODES further answers that maps of the U.S. Capitol in detail are readily available for instant viewing on the U.S. Capitol and available for purchase.  If the Oath Keepers had any of the plans falsely claimed it was a strange plan not to even download a map off the internet.  Indeed, RHODES understands that maps of the Capitol are posted – unlike warning signs of occasional restricted entrance – all over the interior of the building.

*Answering Complaint Par. 376)*        The paragraph is compound.  Each allegation is denied.  RHODES refers to explanations above that the USCP and MPD forced demonstrators into the Rotunda (meaning that the rest of the building was cleared for security purposes), but then blocked all the entrances and failed to set up an exit route, so that the demonstrators were smashed inside the Rotunda, delayed inside the building, and unable to leave.  The wrongful nature of this is that law enforcement repeatedly blame demonstrators for not leaving even while law enforcement prevented the outcome they profess to have sought.

*Answering Complaint Par. 377)*     The paragraph is compound.  Each allegation is denied to the best of RHODES's knowledge.

*Answering Complaint Par. 378)*     Denied on the basis of being vague given that different things were happening at different times. The Government has been furiously and frantically imprecise and evasive about who, what, and where any demonstrators "first" entered the U.S. Capitol.  The Government is evasive because the facts prove their conspiracy theories false.  RHODES further answers that he does not know "When the mob first broke into the Capitol," recalling that the Capitol is 750 feet long and the size of a small ocean-going cruise ship.  It has a great many entrances and exits and windows, apparently none of them but the Columbus Doors sufficient to the task of defending the Capitol.

*Answering Complaint Par. 379)*     The paragraph is compound.  RHODES accepts that the first sentence is true without first-hand knowledge from news reporting.  Of course, the 12th Amendment says that the presiding officer counts the Electoral College votes, not that he presides over the counting.  Congress only watches.  RHODES has no knowledge of the allegations of the second sentence.  RHODES further answers that statements, chants, or threats by "a crowd" are not relevant to any of the Defendants in this or any January 6 related case.  It is not possible to sue "the crowd."  It is not possible to prosecute "the crowd."  A "crowd" cannot share an idea in common nor say something.  Individuals say things.  Crowds do not. Nevertheless, RHODES neither saw nor heard anything of the sort as a first-hand witness nor from reports of Oath Keepers.

*Answering Complaint Par. 380)*     RHODES answers that the paragraph describes the rights of every American to petition the government for redress of grievances, which is a right guaranteed to every U.S. citizen under the First Amendment to the U.S. Constitution.  Even if the

conduct appears to violate the terms of a statute, the statute would be unconstitutional.  Proud

Boys member Matthew Greene's guilty plea as well as the original allegations violates the U.S.

Constitution.  The statute applied, as applied, violates the U.S. Constitution (because any part of

it that is valid is already covered by other statutes, leaving only the pure First Amendment

activity).  The Judiciary has repeatedly and stubbornly upheld the rule that even disagreeable,

crude, rude, unpleasant, or impolite speech, even incorrect speech, is constitutionally protected.

"The answer to bad speech is more speech" is the foundational principle of the United States of

America decreed by our U.S. Supreme Court.

     *Answering Complaint Par. 381)*     DENIED, primarily in the first instance for being

vague.  As the events unfolded, Pence and Congress were evacuated from the chambers and then

the building and thus the risk to them – having been evacuated – was actually decreased. But

mainly RHODES answers that again the Plaintiff, like the DoJ and others, is essentially trying to

sue a crowd and/or hold these Defendants responsible for the actions of others.  Discussions of

crowds or unnamed people is ineffective in either civil or criminal law.

     *Answering Complaint Par. 382)*     RHODES is aware of these disturbing events only

through news coverage well after the facts.  RHODES never entered the Capitol building.  None

of the Oath Keepers were in that area of the building.  RHODES further answers that the door to

the Chamber would be viewed by security camera footage, and the Government could prosecute

those actually responsible for beating on the door, but would rather prosecute innocent people in

whom there is more political profit.  RHODES further denies any of the Defendants named in

this lawsuit "beat on the doors and attempted to force their way through the barricades," but were

nowhere near the doors to the House or Senate chambers.  RHODES further answers that the bid

to emotionally inflame the circumstances should be tempered by how many of those Members of

Congress and others mocked, insulted, and denigrated President Donald Trump when a violent insurrection occurred at the White House in May to June 2020, and the Secret Service whisked Trump into a safe bunker below ground.  While the attack on the House chambers doors is one of the few horrible examples of the few places where a few of the 10,000 demonstrators turned violent, it would be wrong for those who mocked Trump for being whisked away from a violent mob of rioters at the White House to demand more sympathy than they were willing to extend to others.  RHODES further answers that if the Plaintiff's and other conspiracy theorist's narrative were true that demonstrators wanted to disrupt the hearing, the Members of Congress could have simply walked out the front entrance because that would be what it is said the demonstrators wanted.  If it were true that the crowd (there we go again) wanted to stop the "certification" vote, the safest place for Members of Congress would be leaving the Capitol (RHODES is not advocating this, merely answering as to the inconsistencies of the allegations).

     *Answering Complaint Par. 383)*     Denied in that the evacuation of the Members of Congress *began* at 2:13 PM according to the testimony of Thomas Wickham, at the time.  The Oath Keepers Defendants did not enter the Capitol, which they did peacefully and non-violently, at approximately 2:41 when the immediately prayed in a circle, until 2:40 PM, until coming to the assistance of Officer Harry Dunn.  The Defendants wandered in the Capitol to take a look and then very quickly left on their own initiative without law enforcement officers having to do anything.

     *Answering Complaint Par. 384)*     The paragraph is compound.  RHODES DENIES any knowledge of or any relevance of what "many individuals" did.  None of the named Defendants to RHODES's knowledge "breached the House and Senate chambers."  RHODES further answers that the galleries of the Senate Chamber and of the House chamber are open to

the public and were literally built into the center of the architecture of the Capitol to allow the public to view and monitor their Members of Congress debating and voting on bills. The Capitol is structurally designed to allow the public unfettered access to their representatives so that nothing is done in secret, just like a courtroom trial. Nevertheless, Jackman – whom RHODES does not know – entering the Senate gallery (if he did) is not "breaching" the Senate chamber. RHODES further answers that taking a picture of oneself is not illegal, walking up a flight of stairs is not illegal, and walking with a hand on Biggs' shoulder is not illegal as long as Biggs did not object.

**Answering Complaint Par. 385)**       DENIED. RHODES further answers that once again the Plaintiff's like the Department of Justice is trying to impose collectivist liability and prosecuting a crowd collectively. This collectivism is in contradiction to American law.

**Answering Complaint Par. 386)**       RHODES has no knowledge of what some unknown "an individual' posted or these communications or the underlying substance stated. However, RHODES answers further that by 2:58 PM he had left the Capitol building. RHODES further answers that he does not know what people storming the Capitol means, which he mentions because he is confident that the Plaintiff, DoJ, and others do not know what it means either and are simply using nonsense phrases to confuse and distract. RHODES further answers that relating to the snippet taken out of context from a larger conversation, RHODES was not responding to some unknown "an individual" but merely expressing his frustration with the political corruption of members of Congress unwilling to follow the U.S. Constitution's process of examining Electoral College votes.

**Answering Complaint Par. 387)**       RHODES is without knowledge as to the allegations concerning the Proud Boys.

*Answering Complaint Par. 388)*        DENIED, including because RHODES cannot answer for what "thousands of others" did or did not do, nor should he have to, but also because the allegations are false regarding RHODES and anyone he knows about.  RHODES further emphasizes that the paragraph is focused on the grounds not the building.  The paragraph would be even less true concerning the building.  RHODES further answers that litigants in the United States may not sue a crowd nor can the government prosecute a crowd.  RHODES further answers that associated Figure 29 near dusk on a cold, cloudy January day is misleading in that by that time the sun had set, the photograph shows the Capitol in twilight, and the photograph shows clouds of smoke (apparently tear gas or a similar gas) released by MPD.  The people shown in Figure 29 are also almost entirely MPD officers with a few demonstrators holding out flags.  Although there are a few stragglers among the demonstrators, the Capitol West face is shown occupied and controlled by MPD officers.

*Answering Complaint Par. 389)*        The paragraph is compound.  The first sentence is DENIED.  The Joint Session apparently *did not* reconvene until approximately 8:09 PM according to RHODES's research and review of information after the fact on later days.  But it is false that the Joint Session *could not* reconvene.  No information has ever been provided or submitted to substantiate that other than vague, unsupported, inadmissible opinions.  There has been no evidence or proof whatsoever that the Joint Session of Congress "could not reconvene until approximately 8:00 PM."  All that has been offered is conjecture, speculation, and opinion.

*Answering Complaint Par. 390)*        DENIED.

*Answering Complaint Par. 391)*        The paragraph is compound.  The first sentence is ADMITTED (though not with any specific precision about the distance in feet).  RHODES further answers, however, that the first sentence debunks the fanciful and imaginary conspiracy

theory that Rhodes called Oath Keepers together to break into the Capitol.  As noted elsewhere James (like other Oath Keepers) had already been inside the Capitol building before Stewart Rhodes arrived.  RHODES called Oath Keepers _out_ of the building to form up on him and together leave Capitol Hill, go back to their hotels, rest up, and if they wished join for dinner at the Olive Garden in Arlington, Virginia, where many of them (not all) did in fact have dinner. RHODES answers further that Rhodes asked Oath Keepers to meet him at the Southern end of the Capitol, where no one entered the Capitol other than MPD SWAT teams.  See:  MPD SWAT officers in riot gear entering the Southernmost door of the U.S. Capitol at around 3:35 PM as reporter left ahead of the 4:00 PM curfew of 6 blocks around the Capitol:

https://www.youtube.com/watch?v=IKNMIqgzHRc and

https://www.youtube.com/watch?v=yxarGO57Ris  and

https://www.youtube.com/watch?v=m4JrAfCjC88 .  However, RHODES may have been mistaken about the geography of the Capitol in his message calling on Oath Keepers to meet him outside the building.  RHODES does not know being unfamiliar with the Capitol and Washington D.C. from Florida.  However, RHODES further answers that where Rhodes messaged the Oath Keepers to meet him at the "South Side of the Capitol," if he were actually at the Northeast corner instead, none of the Oath Keepers would have found him (in the wrong place).  The second sentence is DENIED.  RHODES further answers that in fact in all of the Oath Keepers present then and at that time's hearing Rhodes admonished the Oath Keepers, especially Kelly Meggs, who went into the Capitol building for being "dumb asses."  Kelly Meggs apologetically agreed.  At that moment, someone (maybe Kelly Meggs) asked Rhodes if he had gone into the building.  Rhodes answered "No, because I'm not a dumb ass."  RHODES further answers that the second sentence is preposterous because the Oath Keepers did not do

anything (i.e., accomplish anything) inside the Capitol building and it would make no sense for Rhodes to say he was glad they had gone into the building to do absolutely nothing at all. Even if the Oath Keepers had intended to accomplish anything in the Capitol, they did not. So why would Rhodes be happy that they accomplished nothing? It is possible that conspiracy theorists could be referring to (inaccurate) rumors that reached Kelly Meggs that "a young girl" had been shot inside the Capitol. One of the primary functions of the Oath Keepers has always been to provide first aid and medical support at national disasters and conflicts, so when challenged by RHODES that it was a stupid thing to do to go into the Capitol, and there was some mumbling about someone being shot, RHODES may have grudgingly and reluctantly accepted that making sure no one needed medical attention might have been warranted.

*Answering Complaint Par. 392)*        RHODES is without knowledge as to the allegations concerning the Proud Boys.

*Answering Complaint Par. 393)*        DENIED. RHODES did not see or witness any such thing personally from his vantage point. RHODES further answers from his later research and review of discovery information and news reports that some Defendants and law enforcement officers improperly and unwisely (on both sides) got sucked into mutual brawls triggered by acts of police brutality against demonstrators, particularly beating and shooting demonstrators who could not respond by leaving because there was no way for them to leave through the crush of the crowds behind them. RHODES further answers that the Plaintiff's Figure 30 in its Amended Complaint depicts law enforcement officers – with the District of Columbia's MPD officers at all times being the most poorly-behaved of all in every circumstance on January 6, 2021 – forcing demonstrators into the Rotunda while not allowing them to leave the building. Video from many angles and sources, including the "Keep in News

Agency" news video lasting about 2 ½ hours under contract to French TV, shows what happened

in Figure 30, where the demonstrators are being crushed and injured by the out-of-control and

illegal acts of MPD officers who have blocked any path of exiting the Capitol.  At one point in

the "Keep in News Agency" video,  labeled by the DoJ 210107 LAURA USA CAPITOL

WASHINGTON, French Reporter Laura Giesweller asks in the Rotunda another demonstrator if

she can get by she is trying to get out and a chorus of other demonstrators in the Rotunda roars

"We are all trying to get out!"  Again, that is preserved on TV-quality video.  See starting around

1:08 time stamp on the video (which is not the actual time of day).  But the MPD would not let

them out of the Rotunda.  Therefore, photographs of people jammed into the Rotunda are being

misrepresented as examples of violence.  Because of this further incident of MPD excessive

force, lack of wisdom, and misbehavior, the circumstances once again were inflamed provoking

problems, the exit from the building was delayed, and people were injured. As demonstrators

were injured, their efforts to defend themselves injured MPD members as well.  Again, this is

'caught on tape.'

> ***Answering Complaint Par. 394)***      DENIED.  However, RHODES understands that
MPD officers did do these things.

> ***Answering Complaint Par. 395)***      DENIED.  However, RHODES understands that
MPD officers did do these things.

> ***Answering Complaint Par. 396)***      The paragraph is compound and is DENIED.
RHODES further answers from later review and investigation that the man with the crutches was

trying to mark the location of and warn MPD officers to the danger of imminent death to

Roseanne Boyland, Victoria White, and other demonstrators.  The crutches were being held up –

and never touched anyone at least not by any voluntary act – to signal the MPD to stop beating

people and stop throwing people on top of Roseanne Boyland and to call for medical help.  (Note that the Oath Keepers' own medic, a physician, had been detailed to the USCP to assist by Stewart Rhodes.)  Unfortunately, the MPD attacked the man holding up his crutches instead of listening to him.  On information and belief, the woman laying on the floor to the right side of Figure 32 wearing a black shirt or coat is Roseanne Boyland and the people on the floor around her, including someone wrapped in an American flag like a cape, are trying to revive Boyland. Unfortunately, Boyland was murdered by the MPD in the same manner in which George Floyd was murdered by officer Derek Chauvin.  As MPD officers then piled more and more people on top of her.

*Answering Complaint Par. 397)*        RHODES does not have knowledge of these incidents concerning the Proud Boys including Dominic Pezzola. RHODES further answers that he does not know what "participated in" means because he is pretty sure the Plaintiff does not know either or does not want to say.  Recall that those MPD officers are employees of the District of Columbia, such that the Plaintiff could find out.

*Answering Complaint Par. 398)*        DENIED.  Although RHODES was not with these Oath Keepers in this time period, he understands that no one among the Oath Keepers was remotely interested in the Senate's wing of Congress, even knew what or where the Senate's wing is, or went to the Senate chamber.  Kelly Meggs reports that he had heard that a 12 year old girl and/or others had been shot and first aid is one of the core areas in which Oath Keepers are trained.  That rumor, obviously, turned out to be distorted.

*Answering Complaint Par. 399)*        DENIED, starting with the idea that the Oath Keepers were heading to the Senate.

*Answering Complaint Par. 400)*        DENIED.  Law enforcement officers, especially

MPD, crushed demonstrators into the Rotunda and as proven on videos the demonstrators were trying to exit the Capitol building.

*Answering Complaint Par. 401)*        RHODES denies that unidentified John and Jane Doe Defendants have any relevance to this case, because the Plaintiff cannot sue a crowd.  On the other hand, Plaintiff like the DOJ and other conspiracy theorists have persecuted the innocent demonstrators while showing little to no interest in those actually guilty.

*Answering Complaint Par. 402)*        RHODES lacks any knowledge of the allegations concerning the Proud Boys.

*Answering Complaint Par. 403)*        DENIED, largely because the paragraph is so compound and vague that RHODES cannot unpack the allegations to respond to them. Furthermore, as RHODES has already answered the communication systems were jammed.

*Answering Complaint Par. 404)*        DENIED, in that there was no on-going attack, the Signal chat hinted at was with on-lookers by video watching television in their homes scattered around the country and not with any of these Defendants.  To RHODES's knowledge no one ever tried to enter the South side of the Capitol nor pound on its doors.  In the videos cited above, one will note that the South side of the Capitol was the only place where fences remained intact along the Southside of the Capitol.  RHODES further answers that "the doors to the Capitol" meaning the East Rotunda Doors that sit just inside the Columbus Doors opened from the inside. The doors were never breached.  The massive "Columbus Doors" were never closed.

*Answering Complaint Par. 405)*        RHODES has no knowledge of a "Stop the Steal J6" Zello Channel or its contents, except that a copy was distributed to defense counsel and it was discussed in the criminal trial of *United States v. Stewart Rhodes, et al.*  Most notable about this conversation over Zello is the *total lack of crowd noise* in the background, because none of

the participants were in Washington, D.C.  Near the end of the recorded conversation one of the participants says he would like to go to the Capitol [on January 6, 2021] but Washington, D.C. is ***12 hours away from him***.  The "Stop the Steal J6" channel conversation was among people sitting in their homes across the country watching the news on television and making random commentary from what they are seeing on the television.

    ***Answering Complaint Par. 406)***       The paragraph is compound.  RHODES has no knowledge of any such message, because again the massive size of the crowds not only at the Capitol (estimated at 10,000 by USCP) and in the District of Columbia overall (estimated at 500,000 to 1 million) overwhelmed cell phone towers capacity including not only for phone calls but also for data and internet access.  RHODES further answers that if Rhodes were excluding Oath Keepers who were already tasked "with a security detail" then there could not be any conspiracy or plan to attack the Capitol or oppose the Electoral College by force.  All of the Oath Keepers in the city would be needed all together in attacking the Capitol.  Yet Rhodes is cited as saying that *only* those Oath Keepers *not* already tasked with a security detail should come to him. Therefore, security details were more important than whatever Rhodes had in mind.  RHODES has reviewed information long after January 6, 2021.  RHODES responds that the allegation of the communication in the first sentence is obviously in sharp conflict with an earlier alleged communication in which Rhodes called on Oath Keepers to meet him on the South side of the 750 foot long Capitol.  That would put Rhodes in two different locations around 1000 feet apart or more.  Oath Keepers could not have found Rhodes in the Northeast corner if they were looking for him on the South end of the Capitol 1000 feet away among massive crowds.  The second sentence is ADMITTED except that RHODES with Kelly Meggs leading ran into Rhodes in the center area on the East side where they (others not RHODES) exited the East Rotunda

Doors at the top of the East center stairway (once the MPD finally let them escape from the Rotunda and leave).  RHODES further answers that the communication clarifies that "the mission" of the Oath Keepers that day was to do "security detail[s]."  There was no plan to approach or enter the Capitol or get involved in anything concerning the counting by the Vice President in the presence of Congress of Electoral College votes.  RHODES further answers that all of the allegations of the Plaintiff once again confirms that there was no plan, agreement, or conspiracy of the type imagined by the Plaintiff, DoJ, and others.  The allegations of the paragraph clarify that at least eight (8) Oath Keepers were already inside the Capitol building and meet up with Stewart Rhodes after they left the building.  Therefore, Rhodes was not gathering Oath Keepers to enter the building, but to get out of the building.

*Answering Complaint Par. 407)*        RHODES has no knowledge of Vallejo's declarations, but RHODES further answers that Vallejo was in Arlington, Virginia at the time at his hotel.  Therefore, Rhodes would only know what he was watching on the hysterical and alarmist news coverage which was calculated to spread panic and over-reaction (in other words, drive ratings or clicks).  Perhaps that might be why he wanted to launch a drone to get a clear view.  Neither the Plaintiff nor RHODES know what Vallejo might have meant by "We are at war" – whether simply an exclamation of what he was seeing on the television news.  However, watching from the hotel in Virginia, Rhodes also would have known at or about 3:57 PM that Congress had already recessed at 2:13 PM and that a curfew had been declared for the six blocks around the U.S. Capitol to start at 4:00 PM.

*Answering Complaint Par. 408)*        RHODES has no knowledge of James' private communications with Michael Greene, but notes again that the cell phone towers were over-whelmed possibly because of undisclosed mass collections, such that most attempted calls failed

and did not go through and the few phone calls that connected usually did not result in conversations because the crowd noise was too loud for the call to be heard and understood. Therefore, the allegation is improbable.

*Answering Complaint Par. 409)*        DENIED.  However, RHODES refers back to the general answer in that no one individual can know what everyone else in the world was doing when there were an estimated 10,000 people around the U.S. Capitol.  It is possible that somebody was talking about this but RHODES had and has no knowledge of any such thing. RHODES further answers that only Government personnel, U.S. Capitol Police, MPD or Congressional staff could possibly know the location of Members of Congress.  Therefore, only a government agent organizing incitement of demonstrators could be sharing information about the location(s) of Members of Congress at that point in time.  Subsequently, Members of Congress have given interviews and there is some information after the fact, but not on the day.

*Answering Complaint Par. 410)*        The paragraph is compound.  RHODES DENIES the allegations because the Government admits that Caldwell never went inside the U.S. Capitol building, including from analysis of both security camera video recordings and the geolocation cell phone technology. Caldwell was never inside the U.S. Capitol or close to the building.  Why would Caldwell say he was "inside" when undeniably he was not?  Most likely because Caldwell was not referring to himself, but to the crowd of demonstrators as a whole.  RHODES further answers that the opinions or statements of unidentified people is of no relevance nor admissible. Again, the Plaintiff cannot sue a crowd or unnamed people or sue this Defendant for what other people did.  However, RHODES further answers that the alleged replies on Facebook demonstrate that they are from people *who were not in* Washington, D.C.  The replies are allegedly encouraging Caldwell to do things at the Capitol.  Those actually at the Capitol would

not be expressing these thoughts to Caldwell but merely doing it themselves.  RHODES further answers that if the expressions were accurate (not only if they were made but if their substantive content were true) the FBI would have investigated with as much vigor and energy as the FBI is investigating Ray Epps and other suspicious actors and John Does.  None of the Defendants would *know* if "all legislators are down in the Tunnels 3 floors down" unless they were insiders in Congress or law enforcement.  Thus only an undercover FBI or CIA agent could write "all legislators are down in the Tunnels 3 floors down" which none of the Defendants could possibly know.

      *Answering Complaint Par. 411)*    RHODES has no knowledge of the conversation alleged or the substance allegedly conveyed.  But RHODES further answers that he does not know how anyone would know where the Members of Congress were at that time, other than Members of Congress themselves, the USCP or the MPD.  The message – if accurate – would have to come from an undercover government agent who would know where the Members of Congress were.  Since the Oath Keepers did not have any gas – but are accused at most of a can of bear spray which would contain a tiny amount of spray – the alleged conversation makes sense only if an undercover government agent was giving directions to another and send the message to the wrong person.  This would not be the first time this happened, that a Confidential Human Source clicked on the wrong contact on his phone's contact list.   Caldwell never went into the Capitol so Caldwell could not have done anything in the tunnels under the Capitol building.

      *Answering Complaint Par. 412)*    RHODES has no knowledge of the events involving the Proud Boys or the conversation alleged and has no knowledge of any "backup" coming to the Capitol.  RHODES doesn't know – and suspects that the Plaintiff does not know – what

"backup" means.  Is Keith Lee referring to the MPD or the National Guard coming to the aid of

the U.S. Capitol Police?  While the Plaintiff continues the DOJ's practice of ripping phrases out

of context of complete conversations, so far the allegations would suggest that Keith Lee was

passing along news reports that "backup" law enforcement teams from MPD, Virginia,

Maryland, and eventually the National Guard were on their way to the Capitol.

    *Answering Complaint Par. 413)*       DENIED, to begin with because prosecutors do not

"reveal" anything in indictments, which are not proof of anything.  Indictments are accusations,

not evidence or information.  RHODES condemns the vilification of any person simply for

whom they are, here Roger Stone.  RHODES has no knowledge of Rhodes' phone calls and

doubts that under the conditions of overwhelmed phone systems on January 6, 2021, that anyone

could communicate with anyone 19 times.  RHODES further answers from his own first-hand

experience and observation as an eyewitness that it would probably take 19 attempts to make 1

phone call near or around the Capitol on the afternoon of January 6, 2021.

    *Answering Complaint Par. 414)*       RHODES has no knowledge of the events involving

the Proud Boys nor of any Attack(s).

    *Answering Complaint Par. 415)*       RHODES has no knowledge of the events involving

the Proud Boys.

    *Answering Complaint Par. 416)*       The paragraph is compound.  The first sentence is

DENIED.  RHODES further answers that he does not have knowledge of Proud Boys' Matthew

Greene's post. (Presumably the paragraph refers to Matthew Greene instead of Oath Keepers

member Michael Greene.)  RHODES answers the compound allegations of the third sentence

that (a) RHODES did not "instruct" but rather invited Oath Keepers to join with him at an Olive

Garden in or near Vienna, Virginia.  Many Oath Keepers did not do so, either leaving

immediately to return home to their families and jobs or choosing other plans.  (b) The Oath
Keepers did discuss the day's events.  (c) Oath Keepers Michael Greene who had been put in
charge of the Oath Keepers' entire on-site activities in Washington, D.C. on January 4-6, 2021,
as later reported to the FBI in his FBI interview, as shown on two FBI Form 302's, that at the
Olive Garden he learned that some Oath Keepers had gone inside the Capitol.  Greene was
shocked and flabbergasted to hear that, and echoed Rhodes' initial reactions to the Oath Keepers
present that going into the Capitol was a stupid thing to have done.  (d) Most of the conversation
at the Olive Gardens was RHODES and GREENE discussing what the hell were the Oath
Keepers members thinking who had gone into the Capitol.  The conversation was mostly about
confirming that nobody had any previous knowledge nor gave any approval for it.  Again,
RHODES had put MICHAEL GREENE in charge of all on the ground activities in D.C. January
4-6, 2021, and they each discussed with each other that neither had the faintest hint of any of the
Oath Keepers ever contemplating going into the Capitol building, especially when they were
supposed to be providing security to permitted rallies.  (e)No one ever celebrated any "Attack."

*Answering Complaint Par. 417)*      DENIED.  RHODES further answers that not only
had he left the area of the Capitol well prior to 4:00 PM, but that it would be impossible to
prevent President Biden and Vice President Harris from assuming office by preventing the
certification of the electoral votes.  Such a Left-wing conspiracy theory is preposterous.  A new
President and Vice President assume office on January 20, not on January 6.  RHODES further
answers that the allegations are nonsensical, and thus not something he can answer, because if it
were true that the Defendants intended to prevent "certification" (actually counting, not
certifying) the electoral votes, they would already know from the moment they stepped outside
of the Capitol that they had not "succeeded" if that were their goal.  If anyone wanted to do that

106

they would have to stay in the Capitol building to the exclusion of all law enforcement at least through January 20, and probably that would not accomplish the goal either.

*Answering Complaint Par. 418)*     DENIED.

*Answering Complaint Par. 419)*     DENIED.  However, RHODES further answers that the Plaintiff's Complaint is self-contradictory, now admitting that no presidential power is transferred on January 6 but only on January 20.  RHODES further answers that members of the Oath Keepers had carried firearms at state capitols for years prior to 2021 consistent with local laws.  But there is no rational connection between carrying firearms at state capitols and the presidential inauguration on January 20 in Washington, D.C.

*Answering Complaint Par. 420)*     DENIED.  RHODES further answers that because Rhodes had not entered the U.S. Capitol on January 6, 2021, no one believed that the U.S. Government could be so irrational and corrupt as to arrest someone who played no role in the demonstrations at the Capitol, especially after law enforcement did nothing to enforce the law during the civil war on the streets from 2014 through 2020.  RHODES further answers that the Oath Keepers did what they had always planned to do:  After helping out with the rallies, go home.  They had done what they came to do, help with lawful demonstrations, and went home.  Unlike professional Left-wing demonstrators, the Oath Keepers had jobs and families to quickly return to.

*Answering Complaint Par. 421)*     RHODES assumes that James returned to his home in Alabama but does not know what James did with regard to any gear

*Answering Complaint Par. 422)*     RHODES has no knowledge of the events involving the Proud Boys.  RHODES notes that it would be easy to confuse Matthew Greene with Michael Greene of the Oath Keepers.

*Answering Complaint Par. 423)*     RHODES cannot admit nor deny the allegation it is as vague and ambiguous as it could possibly be.  The phrase conspicuously comes from a larger conversation.

*Answering Complaint Par. 424)*     RHODES ADMITS that eventually he saw Vallejo's message but does not understand Vallejo's enthusiasm or plans in that RHODES and other Oath Keepers were already on their way home or preparing to go home, as they always had planned to do.  (For example, there visit was defined by hotel reservations.  The Oath Keepers did not cut their hotel reservations short.)  Therefore, Vallejo obviously wanted to be helpful by seeing what was going on.  But the suggestion that the Oath Keepers would use that information for any activity rather than for curiosity is belied by the fact that the Oath Keepers would be travelling home by the time Vallejo's diligence and attention to detail produced any information.

*Answering Complaint Par. 425)*     RHODES did not notice any such messages from Kelly Meggs.  RHODES does not know what Kelly Meggs meant but he is pretty sure that the Plaintiff doesn't know what Meggs meant.  RHODES denies responding to Kelly Meggs.  But once again the snippets need to be read in the full context of the entire conversations.

*Answering Complaint Par. 426)*     RHODES did not notice any such messages from Ed Vallejo right away, but was traveling and resting.  RHODES further answers that Vallejo's enthusiastic and encouraging comments were meant as *espirit de corps* not as a literal description of any plans.  Again, the Oath Keepers were in various stages of packing up and leaving town to go home to their jobs and families and were not concerned other than for curiosity about "defense lines."

*Answering Complaint Par. 427)*     ADMITTED, in that eventually RHODES saw the text message.

*Answering Complaint Par. 428)*        RHODES is without knowledge of these alleged communications.  RHODES further answers that the allegation once again confirms that the Oath Keepers had no plans or agreement to take any action with regard to Biden assuming the Presidency where the Plaintiff alleges that Vallejo said "I don't know. We've got to figure out what happens on the 20th [Inauguration Day]."   "I don't know" and "We've got to figure out what happens" is incompatible with the existence of any such plan.

*Answering Complaint Par. 429)*        The paragraph is compound.  RHODES ADMITS the allegations of the paragraph except that RHODES never "instructed James to conceal his identity," which in any event makes no sense.  What happened on January 6, 2021, had already occurred, but the time to "conceal his identity" would have been at the events at the Capitol.

*Answering Complaint Par. 430)*        The paragraph is compound.  RHODES DENIES the allegations as being garbled and thus not true.  RHODES further answers – remembering that the FBI confiscated smart phones and computers making it impossible to check many details – that the attorney for the Oath Keepers explained *when* it was okay and when it was *not* okay to delete information. (Recall that smart phones have limited storage space, sometimes make noises every time a message is received, and get cluttered up.  It was the practice of many over 12 years to delete chat groups with all of their messages after an event was finished.) The allegation that she "instructed" Oath Keepers to delete anything is DENIED.  RHODES does not know what James instructed others to do or what he understood.

*Answering Complaint Par. 431)*        The paragraph is compound.  RHODES answers that the scenario depicted is a product of imaginative confusion.  RHODES ADMITS that James and Grods travelled to Texas and stayed with RHODES.  The rest of the paragraph is DENIED.

*Answering Complaint Par. 432)*        The paragraph is compound.  DENIED.

*Answering Complaint Par. 433)*        The paragraph is compound.  RHODES DENIES

the allegations of the paragraph.

*Answering Complaint Par. 434)*        The paragraph is compound.  RHODES is without knowledge of these alleged actions or conversations in which he was not involved.  However, RHODES further answers that the alleged statement by Kelly Meggs "Fl stays home until shots fired!" indicates a focus on defense against unlawful attacks waged against the Oath Keepers, not to initiate any violence.

*Answering Complaint Par. 435)*        ADMITTED, as a rough approximation of the messages since RHODES does not have access to them now.

*Answering Complaint Par. 436)*        ADMITTED, as a rough approximation of the messages since RHODES does not have access to them now, except that RHODES cannot answer with regard to unidentified people.  However, RHODES further answers that the alleged communication if accurate indicates confusion and a lack of any plan as to what the Oath Keepers would be doing after January 6, 2021.

*Answering Complaint Par. 437)*        The paragraph is compound.  ADMITTED, as a rough approximation of the messages since RHODES does not have access to them now

*Answering Complaint Par. 438)*        RHODES has no knowledge of the alleged conversations in which he was not involved.

*Answering Complaint Par. 439)*        DENIED.  RHODES further answers as the founder and leader that the Oath Keepers did not believe that the Oath Keepers is a militia nor that anyone could "organize local militias."  Some of the core things that the Oath Keepers taught from detailed historical research is that all able-bodied (originally men) constitute the latent or potential militia, but when called up (like a posse under a Sheriff's authority as very familiar from movies) by a proper government official some or a subset of the potential militia could be

organized to assist lawful government authority.  Furthermore, the Oath Keepers always taught that the function of a militia was to keep the peace, restore order, and/or uphold the law.  For example, when left-wing cities allowed tens of thousands of rioters, arsonists, street thugs, and criminal engage in open (actually declared) civil war from 2012 (really back to 1999 with the Battle in Seattle) through 2020, the inability or unwillingness of corrupt big-city mayors or soft-on-crime Governors would be addressed with the help of militias.  However, militias do not exist on their own initiative or for their own desires.  Therefore, a militia could not be organized within their historical and legal foundations to "oppose President Biden's administration" unless in self-defense if Biden's Administration waged an illegal civil war against the American people, which in fact the Biden Administration is doing.  The Oath Keepers was founded among other purposes to teach and remind military members that they take an oath to the U.S. Constitution not to an individual politician and that the military teaches its members not to obey unlawful orders.  One of the motivations was events that occurred in the Iraqi war and the need to teach and remind military that unlawful orders must be subject to an established hierarchy of questions and challenges.  For those who neglect to study American law or history, an overly-simplified image from Western movies might risk trivializing the topic but be easy to grasp.  In some such old movies the Sheriff as the primary authority in a city, county, or region is shown angrily chastising a group for threatening to become a "lynch mob" (acting on their own authority) in contrast to other occasions when a "posse" is officially called up and sworn in to assist the Sheriff lawfully in the conduct of his official duties.  Those advocating for militia and those reacting with alarmist conspiracy theories about militias fail to grasp that a militia multiplies the reach of proper governmental authority; a militia does not change the law or act outside of the law.  A militia must serve the law, not serve itself.

*Answering Complaint Par. 440)*      DENIED.

*Answering Complaint Par. 441)*      The paragraph is compound.  All of its allegations are emphatically DENIED, as with also the U.S. Capitol Police as well.  Both the U.S. Capitol Police and the MPD were dramatically under-staffed (compared with normal days) on January 6, 2021, and many USCP officers were directed to stay home despite being paid for the day.

*Answering Complaint Par. 442)*      DENIED, unless by "supporting these efforts" it is intending to refer to undercover government agents inciting the crowds to violence.

*Answering Complaint Par. 443)*      DENIED unless the abdication of the District's responsibilities is what is being referenced as "unprecedented."  RHODES further answers that the U.S. Capitol Police did not even close the 10 ton, 17 foot high, solid bronze Columbus Doors on the East central entrance.  While that is the USCP's fault in the first instance, when the MPD arrived they also did not close or ask for the closing of the main doors to block entrance to the Capitol.  If law enforcement had wanted the demonstrators to enter the Capitol it is hard to think of what more could have been done in that regard.  RHODES further answers that the District of Columbia clearly had issued a permit for a march from the Ellipse area of the Washington Mall to the Capitol, which apparently the MPD has never disclosed.  Yet there was no MPD presence at the endpoint of the march, leaving only 5 USCP officers and some bike racks to guard the pedestrian entrance to the Capitol Grounds near the Peace Monument (fountain).

*Answering Complaint Par. 444)*      DENIED.  RHODES further answers that the District of Columbia's resources were entirely sufficient to manage everything alleged in the conspiracy theories of the Plaintiff, the DoJ, and others, had those resources actually been deployed, including after police excessive use of force agitated and provoked a defensive and angry response.  The District of Columbia made an intentional and deliberate decision to under-

prepare, but instead to inflame and escalate crowd reactions, including failing to request 10,000 to 20,000 National Guard troops that Mayor Muriel Bowser, as the functional equivalent of Governor, was invited to request, being told that the request would be approved.

*Answering Complaint Par. 445)*       The paragraph is compound.  The allegations of the first sentence are DENIED.  RHODES further answers that the leaders of the U.S. Congress, the Sergeants at Arms, and the USCP leadership deployed USCP forces at only about 20% of normal staffing despite USCP having approved permit applications for the U.S. Capitol Grounds for January 6, 2021, back in December 2020.  Thus, the USCP had actual knowledge that a huge demonstration would be occurring yet knowingly chose to under-staff the sworn officers reporting for that day – always an important day every 4 years.  Worse, there seems to have been an effort within USCP to suppress intelligence reports as well as a USCP system for retaliation against anyone not complying with the official false narrative.  As to the second sentence, RHODES accepts the allegations as true although not personally present when these things happened, except that RHODES is unsure of the exact timing of when the U.S. Capitol Police called upon the District of Columbia's MPD for assistance.  RHODES further answers that governments do not do things this way without some kind of memorandum of understanding and demands full proof of the agreement with the District and USCP and the official request.

*Answering Complaint Par. 446)*       RHODES has no direct knowledge of these allegations and demands proof thereof, in that he does not know when the MPD started to respond compared to when they arrived at the Capitol, whereupon the MPD made things worse by their excessive use of force.  (There is some expert analysis that one person in particular through alarmist, vague, and misleading panicked messages on police radio channels deceived USCP and MPD officers into reacting like the sky was falling.)

*Answering Complaint Par. 447)*     DENIED.  RHODES further answers that the record makes abundantly clear that the MPD created much of the chaos, as is captured on hundreds of video recordings.

*Answering Complaint Par. 448)*     The paragraph is compound.  RHODES ADMITS the allegations of the first sentence.  RHODES DENIES the allegations of the second sentence primarily because MPD and USCP attacked the otherwise peaceful crowds, including attacking individuals trying to de-escalate the situation and to call in emergency medical assistance for demonstrators whom the MPD injured and in two cases killed or contributed to their deaths.

*Answering Complaint Par. 449)*     DENIED in that the MPD was not overwhelmed but was the fuel driving the problem.  RHODES has no knowledge of whom the MPD contacted or what they did.  However, RHODES further answers that it is exceedingly improbable that neighboring Virginia – the 12th largest State in the Union -- could not spare many times whatever resources could possibly be required and under no circumstances would MPD acting rationally, if not "designed to fail," contact police officers at least 6 hours away.  Fairfax County, Virginia – a short distance away -- would be larger in population than 8 of the States if it were a State.  Military bases in Northern Virginia Ft. Belvoir, Fort Myer, Quantico Marine base, the famed FBI Hostage Rescue Team at Quantico are all within a relatively short distance of Washington, D.C.  Therefore, RHODES further answers that the Plaintiff like nearly everyone in the political class and news media is obviously embellishing and exaggerating.  If the MPD were contacting New Jersey instead of FBI Hostage Rescue in nearby Quantico, Virginia, then there is something seriously wrong with the MPD's management of its involvement.

*Answering Complaint Par. 450)*     RHODES has no knowledge of the details of how many officers were injured on January 6, 2021, how seriously, how, or why.  Any at all is too

many, and many of the Oath Keepers' members are current or former police officers.  But to

provide an answer to the Complaint, RHODES lacks the knowledge to do so.  RHODES does

further answer that twice that number were seriously injured in the ANTIFA and Left-wing riot

and attack on the White House in May to June 2020.  RHODES is unaware of a January 6th

Attack.  Given that it is the core of the Plaintiff's lawsuit in reality, RHODES is confident that

the Plaintiff should be able to provide details of any and all injuries "as a direct result of" some

attack, which injuries RHODES would be unable to know.  However RHODES does know from

reviewing video recordings that Ray Epps helped a group throw a giant sign of approximately 10

feet by 16 feet at police officers and other demonstrators, yet Ray Epps has not been charged.

None of the Oath Keepers harmed anyone.

  *Answering Complaint Par. 451)*    The paragraph is compound.  RHODES has no

knowledge of the allegations of the first and second sentences.  The allegations of the third

paragraph are DENIED, including because the Plaintiff, the DoJ, and the political class have no

knowledge why this unnamed officer committed suicide.  The Plaintiff, DoJ, and political class

merely assume that an officer being celebrated nationwide by the top officials and leaders in the

entire country and hailed as a hero would of course commit suicide.  The allegation of the third

sentence does not pass the plausibility standard.

  *Answering Complaint Par. 452)*    DENIED.  RHODES further answers that video

recordings show that it was demonstrators who screamed for help such as Roseanne Boyland

who was crushed to death as MPD officers piled more and more bodies on top of Boyland.

People around the entrance to the arched tunnel screamed for MPD officers to stop and that

Boyland was being crushed to death.  RHODES further answers that no one was electrocuted

during any events on January 6, 2021, nor did any instrumentality for electrocuting anyone exist

anywhere on Capitol Hill (other than properly insulated and protected electric grids for the building inaccessible to anyone).

**Answering Complaint Par. 453)**        RHODES has no knowledge of the allegations of the Paragraph but because injuries to MPD officers is the core of the Plaintiff's lawsuit assumes and insists that the Plaintiff will document all injuries that it is seeing reimbursement for.

**Answering Complaint Par. 454)**        RHODES has no knowledge of the allegations of the Paragraph but because injuries to MPD officers is the core of the Plaintiff's lawsuit assumes and insists that the Plaintiff will document all.

**Answering Complaint Par. 455)**        DENIED, in that RHODES is not aware of any of the 39 Defendants named in this Amended Complaint causing any harm or trauma to anyone. Other people did, out of 10,000 total demonstrators. But RHODES has no knowledge of any of these 39 Defendants doing so. RHODES is aware of the MPD and USPC blowing a hole in the side of one demonstrator's face (Joshua Black) and is aware that the blood spilled on the marble of the U.S. Capitol was the blood of peaceful protestors like Joshua Black, none of it from police officers.

**Answering Complaint Par. 456)**        DENIED.  RHODES further answers that the Defendants did not engage in any "calculated, pre-planned, and coordinated actions."  RHODES further answers that he does not know of any attack.  RHODES further answers that the District of Columbia suffered no fiscal costs from January 6th from demonstrations occurring on Federal land managed by the U.S. Park Police and the U.S. Capitol Police.  Injuries to MPD police officers of course in the cold, hard, impersonal math of money have been or will be fully compensated by the Federal Government and/or insurance.

**Answering Complaint Par. 457)**        The paragraph is compound.  The allegations of the

first sentence are DENIED.  RHODES further answers that only about 20% of sworn officers of

the U.S. Capitol Police was told to report to work on January 6, 2021, and so there was no

necessity of any MPD officers to be deployed.  Leaders of Congress and the USCP intentionally

chose to under-staff the ceremonial gathering of January 6, 2021.  Furthermore, Deputy Chief

Pittman either ordered or was misunderstood as ordering a lockdown not merely of the U.S.

Capitol building but all subsidiary buildings like the six office buildings.  As a result USCP

officers were trapped in various buildings and could not be redeployed where needed.  Therefore,

deployment from MPD was admirable and to be commended, but not actually necessary if

Congressional leaders had fulfilled their duties.  Mayor Muriel Bowser as the functional

equivalent of a Governor could have requested and received as many as 20,000 National Guard

troops but didn't want to.  As to the second sentence, RHODES does not know how many MPD

officers were deployed to the Capitol.  As to the third sentence, first part and second part,

RHODES accepts without knowledge the allegations.  As to the third sentence, third part,

RHODES DENIES that the deployment of MPD officers on January 6, 2021, was not

comparable to far-larger mass demonstrations periodically held in Washington, D.C., including

the insurrectionist riots following the inauguration of Donald Trump on January 20, 2017, and

the violent street war attack on the White House in May to September 2020.  As to the fourth

sentence, RHODES DENIES that the Plaintiff had any costs because no such government to

government response could have occurred without a memorandum of understanding making the

Federal government responsible for the full costs to the District.

    ***Answering Complaint Par. 458)***       The allegation is compound. As to the first

sentence, RHODES DENIES the allegations of the first sentence because they are the same costs

alleged in paragraph 457 not "also" additional costs.  The allegations of the second sentence are

DENIED for the same reasons and because none of the 39 named Defendants in this case engaged in any attack or harmed any MPD officers in any way.  The allegations of the third sentence are DENIED as merely being the same costs already alleged in paragraph 457 although perhaps in greater detail.  The allegations of the fourth sentence are DENIED for the same reason that the Federal Government is responsible to pay for these costs under its expected formal agreement with the District of Columbia.  RHODES hopes that those law enforcement officers who were injured by others are made whole financially and healed in every way that requires more than just money to restore them to full health and happiness.

*Answering Complaint Par. 459)*        RHODES refers to his answers to paragraphs 456 to 458.

## Count I

*Answering Complaint Par. 460)*        The allegations of paragraphs 460 to 468 are DENIED but are also really legal conclusions of Count I, which was dismissed.

## Count II

*Answering Complaint Par. 461)*        The allegations of paragraphs 469 to 475 are DENIED but are also really legal conclusions of Count II, which was dismissed

## Count III

*Answering Complaint Par. 476)*        The paragraph is not a factual allegation.

*Answering Complaint Par. 477)*        The paragraph is not a factual allegation.

*Answering Complaint Par. 478)*        DENIED.

*Answering Complaint Par. 479)*        DENIED.  RHODES further answers that he does not know everything that happened among roughly 10,000 people along a 750 foot long building, RHODES DENIES that any of the named Defendants did what is alleged.

*Answering Complaint Par. 480)*     DENIED.

**Count IV**

*Answering Complaint Par. 481)*     The paragraph is not a factual allegation.

*Answering Complaint Par. 482)*     The paragraph is not a factual allegation.

*Answering Complaint Par. 483)*     DENIED.

*Answering Complaint Par. 484)*     DENIED.  RHODES further answers that he does

not know everything that happened among roughly 10,000 people along a 750 foot long building,

RHODES DENIES that any of the named Defendants did what is alleged.

*Answering Complaint Par. 485)*     DENIED.

**Count V**

*Answering Complaint Par. 486)*     The paragraph is not a factual allegation.

*Answering Complaint Par. 487)*     The paragraph is not a factual allegation.

*Answering Complaint Par. 488)*     DENIED

*Answering Complaint Par. 489)*     DENIED

*Answering Complaint Par. 490)*     DENIED

May 8, 2023                              RESPECTFULLY SUBMITTED,


*/s/ John M. Pierce*

John M. Pierce
**JOHN PIERCE LAW, P.C.**
21550 Oxnard Street,
3rd Floor, PMB 172
Woodland Hills, CA 91367
(213) 279-7846
jpierce@Johnpiercelaw.com
*Civil Attorney for Elmer Stewart Rhodes*

# AFFIRMATIVE DEFENSES[6]

Plaintiff's claims in the Amended Complaint should be dismissed in Defendants' favor based upon the following affirmative defenses.  The Defendant specifically alleges as true each and every factual circumstance and element of each Affirmative Defense.

A) Contributory Negligence:  Plaintiff, the District of Columbia, is significantly responsible for the damages alleged in the Complaint.  This is not meant to shift the blame as a moral matter or to under-appreciate the law enforcement officers who are similar to many of the Oath Keepers' membership, but under the law may affect the quantum of damages or even liability if the jury finds under the District's recently amended law that the District was more than 50% responsible.  Again, the Defendant assumes that the Federal Government is responsible for indemnifying any law enforcement officers who were injured.  For example, District of Columbia Mayor Muriel Bowser refused to call in up to 10,000 to 20,000 National Guard troops, pre-authorized by then Commander-in-Chief President Donald Trump, to protect the U.S. Capitol building and other areas of the District, despite being advised by federal law enforcement and security officials to take this action.  The District did request about 153 National Guardsmen for traffic control only, and these were granted several days before January 6, 2021, and were in fact on duty and deployed on July 5-6, 2021.  Therefore, the Plaintiff was fully aware that it could have requested additional National Guardsmen for other needs beyond just traffic duty, because it actually

---

[6] Credit due to Thomas Caldwell's attorney David Fischer from whose Answer Harrelson incorporates his Affirmative Defenses.

did request approximately 153 National Guardsmen for traffic duty and received

approval for them.  The Plaintiff knows the process.

B)   Furthermore, Mayor Bowser officials not only allowed Antifa, so-called (mis-

named) Black Lives Matter, anarchist, and other Leftist protestors to riot, run

amok, batter Washington, D.C.'s Metro Police Department officers, commit

arson, burn police cars, throw bricks and frozen water bottles, and destroy public

property from 2017 through 2020.  Then-President Donald Trump should have

ignored the bad advice of tradition-bound and fearful advisers and invoked the

[ANTI] Insurrection Act whose purpose is to restore order in such circumstances.

But then the District of Columbia and its officials celebrated and rewarded the

rioters such as by renaming a street as Black Lives Matter Plaza, thereby

capitulating to the violent riots. This encouraged and incited further violent street

riots.  The District and its officials effectively endorsed and encouraged left-wing

and anarchist rioters to burn churches, burn businesses, burn cars, and burn

buildings; to topple historical statues; fomented a violent attack upon the White

House as the nation's world-wide headquarters of its military and foreign policy

and crisis management and which resulted in law enforcement officers being

assaulted and injured and causing the U.S. Secret Service to evacuate President

Trump from the Oval Office; failing to provide security for Republican U.S.

Senators such as Rand Paul (R-KY), who was assaulted, battered, and threatened

by a mob of BLM and Antifa protestors; and otherwise encouraging and tacitly

approving of unruly and violent behavior.  Mayor Bowser and District officials

also figuratively "handcuffed" D.C. Metro Police and other law enforcement

agencies in enforcing the law by threatening legal action against police for taking aggressive actions to quell left-wing violence in the District. Mayor Bowser's refusal to oppose violent rioting along with the District's officials doing likewise clearly contributed to the damages and injuries that Plaintiff alleges in the Amended Complaint. Accordingly, Plaintiff is barred from recovery based upon its contributory negligence.

C)   As a result, the Defendants came prepared to defend themselves against lawless rioters whom the Plaintiff celebrated and coddled for years and were then falsely blamed for being ready to defend themselves and others where the District of Columbia failed to maintain order and safety. The Defendants' preparation to meet such Left-wing violence was a necessity in light of these street wars.

D)   Proximate Causation and/or Mitigating Damages: Similarly, and for the same reasons just stated, the District of Columbia is the cause of many of its own costs. The District of Columbia – after having many decades of experience with mass demonstrations converging on the Nation's Capitol – ignored warnings and failed to prepare to keep order. On information and belief, planners of peaceful demonstrations and a "March to the Capitol" applied for and received RHODES understands that it would not be a convincing defense to say "I'm not at fault because you left the jewelry store door open." But RHODES did not commit any violence nor any property destruction. The Plaintiff is suing RHODES for what other people did, mostly people who are unidentified and whom RHODES has never met or known. Thus, it is valid in defense to say that the District of Columbia is trying to sue RHODES for actions by other people, when the

District actually caused much of the damages it seeks recovery for.  The correct analogy is that the jewelry store left the door open, but doesn't know who robbed it, so they are accusing random, innocent people who did not do it who just happen to be walking nearby.  Most of the clashes between demonstrators and police began when the District of Columbia's MPD arrived and took a very different approach than most of the U.S. Capitol Police.  On one body-cam video, USCP officers are seen and heard confronting MPD officers asking "*What* are you doing???"  as MPD officers fought with demonstrators.  MPD officers, like USCP officers, did not follow their training or instructions concerning the use of force and especially use of non-lethal force.  Clashes with USCP and MPD officers and demonstrators were inflamed when police unlawfully (contrary to rules and instructions) fired rubber bullets and other munitions at the heads of demonstrators from above and blew out part of the face of demonstrator Joshua Black.  **"The Blood on the Marble"** was from Joshua Black and other pro-Trump demonstrators, not from the police.  Many police have mentioned in public or testified in Congress about slipping on blood.  But it was the blood of Trump supporters they were slipping on – as proven by video recordings collected and produced by the U.S. Department of Justice.   And the District of Columbia's MPD and the USCP sparked off the clashes of which it now complains.  Furthermore, the MPD knew that there was a planned "March to the Capitol" on the streets of Washington, D.C., and accommodated the march with deployment of police blocking side streets while allowing the march along Pennsylvania Avenue, N.W.  Thus the MPD knew that there was a march and

likely issued a permit for it.  Yet the MPD deployed exactly zero (0) MPD officers at the terminus of the "March to the Capitol" leaving only 5 USCP officers standing behind some portable bike racks near the fountain now known as the "Peace Monument."  MPD knew weeks before January 6, 2021, that a march would end at the edge of the City's streets where Pennsylvania Avenue, N.W. intersections Second Street, N.W. at the fountain.  Furthermore, MPD officers were asked to allow certain self-appointed leaders of the crowd (including Alex Jones at one point) to address the crowd and try to calm them down and de-escalate the situation.  MPD officers told them that officers were seeking permission to let them up on the steps to address the crowd.  An answer never came.  But this confused the crowd into thinking it would be okay to go up on the stairs as the yelling back and forth suggested.  They gave the crowd an alternative understanding and explanation for what they were seeing. Furthermore, had the MPD cooperated with those self-appointed leaders the crowd would likely have been at least partly de-escalated.  Finally, the USCP (and even the MPD) had the ability to use the building's massive public address system to warn the crowds to disperse.  But they did not.  And the MPD could have used portable megaphones to warn the police to disperse.  But they did not. These actions would have mitigated the damages claimed.

E)  Intervening superseding cause.  The District's handling of the situation was an intervening superseding cause of any damages that the District claims.  In part this means that there was a cause of some, many, or all of the damages over which the Defendant had no control. It means in part that the proximate causation

chain was interrupted by the District's own actions.  The District knew fully well that a massive demonstration was occurring on January 6, 2021.  Mayor Muriel Bowser warned business owners and offices in the building to stay closed and stay home out of the District because of the massive size of the expected demonstration – all throughout the City, not just at the Capitol.  On information and belief, the MPD issued a permit for a march along Pennsylvania Avenue, because there was massive publicity of a march.  The MPD blocked off side streets to accommodate the march down Pennsylvania Avenue without traffic entering from the side.  The U.S. Park Police issued a permit for the demonstration at the Ellipse which included the condition that it did not authorize a march.  The six demonstration permits issued by the U.S. Capitol Police for the Capitol Grounds also did not authorize a march.  Yet the main events was called a march and there was massive news coverage of the march to be held on January 6, 2021.  Therefore, it appears that the MPD issues a permit for a march that it is not telling us about.  In any event, the District knew very well since December 19, 2020, at least that there would be a massive demonstration.  A few days before the demonstration, it is now proven by documents beyond all doubt despite controversy, then President Donald Trump asked the District of Columbia if they were requesting 10,000 to 20,000 National Guard troops because if Mayor Bowser asked the request would be eagerly granted.  Yet in the face of such full awareness, the District of Columbia was woefully unprepared for the demonstration, even though mass demonstrations are fairly common in Washington, D.C.  Many analysts believe they know why and it has nothing to

do with any of the theories publicly suggested.  But we must remember that Nancy Pelosi told the Chairman of the Joint Chiefs of Staff to disobey any military orders from the President and Commander in Chief.  In any event, the District's and the U.S. Capitol Police's mis-steps were a superseding cause of the harm that they now complain about.

F)  Mistaken Identity:  While in general plaintiffs may often have to start with a lawsuit to find out who was actually to blame for injuries, clearly that was not RHODES nor any of the Defendants sued here.  Out of around 500,000 to 1 million demonstrators in the District of Columbia on January 5-6, 2021, with about 10,000 demonstrators at and around the U.S. Capitol and Capitol Grounds, and about 1000 charged mostly for misdemeanor trespassing, the District of Columbia has picked out 39 Defendants to be sued here.  But these Defendants are not the people responsible for what the Plaintiff complains about.

G)  Lack of Damages – "Other":  The Plaintiff primarily alleges injury to MPD officers, which is clear enough to examine.  Again, Defendant believes that every officer suffering any injuries should receive support and expenses for every type of injury.  But the lawsuit also broadly alleges damages to the District of Columbia (not to the Federal Government) of other, unspecified, vaguely hinted at damages.  Since the events at issue (those that are not normal Free Speech demonstrations) happened on Federal Government property, especially, it appears that there are really no damages other than injuries to MPD officers.  Photographs complaining of "damage" to the Capitol Hill area show only debris (trash) – not damage.  Defendant objects to the inclusion of routine clean-up of

trash from a mass-demonstration (although typical of leftist demonstrations and not normal for conservative demonstrations) as "damage" to anything in the District of Columbia or at or around the Capitol. As a routine matter, the Federal Government should always compensate the District, in Defendant's opinion, for demonstrations held in the District aimed at the Federal Government or its policies. But it would be wrong to describe routine – even if extensive – trash pick-up as "damage."

H) Lack of Damages – Injuries to MPD Officers: While injuries to anyone, especially police officers, are a very serious matter, nevertheless for the purposes of a legal process to assign responsibility, the Plaintiff's Complaint provides very little detail about who was injured, how, how much, and any indications as to how (context). Naturally Defendant is not suggesting public disclosure of names or personally identifying information or HIPPA-protected medical information. But at some point in some way the details of injuries claimed with regard to a large number of officers must be alleged or disclosed. Perhaps this will be addressed by a motion for a bill of particulars / more definite statement which would facilitate confidentiality of police officer and medical information. Furthermore, presumably the MPD responding at a 12:58 PM request from the U.S. Capitol Police for assistance means that (1) the District of Columbia had some kind of pre-existing memorandum of understanding to spell out the details of when the MPD assists USCP or perhaps the reverse. (2) The Federal Government has as of January 6, 2021, already agreed to reimburse and indemnify the District of Columbia for any costs incurred including for any

injuries to MPD or any other District of Columbia officials.  While of course

money alone cannot fully remedy physical injuries or related effects, the

Amended Complaint has not identified how much of the costs (to the extent that

a monetary remedy can be effective) have already been paid by the Federal

Government.

May 8, 2023                                RESPECTFULLY SUBMITTED,


                                           */s/ John M. Pierce*

                                           John M. Pierce
                                           **JOHN PIERCE LAW, P.C.**
                                           21550 Oxnard Street,
                                           3rd Floor, PMB 172
                                           Woodland Hills, CA 91367
                                           (213) 279-7846
                                           jpierce@Johnpiercelaw.com
                                           *Civil Attorney for Elmer Stewart Rhodes*


### CERTIFICATE OF SERVICE

I hereby certify that, on May 8, 2023, this motion was filed via the Court's
electronic filing system, which constitutes service upon all counsel of
record.   To the extent that some Defendants are not represented by counsel, the
firm will serve them by mail, postage prepaid.

                                           */s/ John M. Pierce*
                                           John M. Pierce